1  Robert D. Atkins (State Bar No. 015375)
   PATENT LAW GROUP: Atkins and Associates, P.C.
2  55 North Arizona Place, Suite 104
   Chandler, Arizona 85225
3  Telephone: 480.499.9400
   main@plgaz.com
4
   (Additional Counsel Identified On Signature Page)
5  Attorneys for Plaintiff IceMOS Technology Corporation

6
                **IN THE UNITED STATES DISTRICT COURT**
7                  **FOR THE DISTRICT OF ARIZONA**

8  | IceMOS Technology Corporation, | CASE NO. _____ |
   |---|---|
   | *Plaintiff,* | |
9  | | PLAINTIFF'S ORIGINAL |
   | Omron Corporation, | COMPLAINT |
10 | *Defendant.* | |
   | | DEMAND FOR JURY TRIAL |

1. Plaintiff IceMOS Technology Corporation ("Plaintiff" or "IceMOS"), by and through its undersigned counsel, files this Original Complaint against Defendant Omron Corporation, as follows:

## I.   PARTIES

2. IceMOS is a Delaware corporation with its principal place of business at 7855 South River Parkway, #122, Tempe, Arizona 85284.

3. Defendant Omron Corporation ("Omron") is a corporation formed under the laws of Japan with its principal place of business at Shiokoji Horikawa, Shimogyo-ku, Kyoto 600-8530 Japan.

## II.   JURISDICTION & VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) in that this action is between a United States entity and a foreign entity and the matter in controversy exceeds $75,000.00.

5. This Court has personal jurisdiction over Omron in that Omron has purposefully directed activities and transactions towards Arizona and has availed itself of the privilege of conducting business in Arizona; IceMOS's claims arise out of and relate to Omron's activities in Arizona; and exercising specific jurisdiction over Omron is reasonable.

6. "A defendant has purposely availed himself of the benefits of a forum if he has deliberately engaged in significant activities within a State ***or has created continuing obligations between himself and residents of the forum***." *Gray & Co. v.*

*Firstenberg Mach. Co.*, 913 F.2d 758, 760 (9th Cir. 1990) (emphasis added) (internal quotes omitted). Omron has created continuing obligation between itself and IceMOS, a resident of this forum, by voluntarily entering into a Supply Agreement. All items manufactured by Omron under the Supply Agreement were deliverable to IceMOS in Arizona. Further, Omron has traveled to Arizona to meet with IceMOS and has made fraudulent representations and anticipatorily breached its obligations to IceMOS during such meetings.

7. IceMOS claims arise out of and relate to Omron's contacts with and extra-contractual behavior directed to Arizona. The Ninth Circuit applies a "but for" test for determining whether a plaintiff's cause of action arise out of the defendant's forum-related activities. *Id.* at 761. As in *Gray & Co.*, if Omron had not contracted with IceMOS to manufacture and deliver products to Arizona, IceMOS would not have been injured by Omron's breach of contract. *See id.* Likewise, had Omron not traveled to Arizona and made false representations to IceMOS, IceMOS would not have been injured by Omron's fraud.

8. Exercise of jurisdiction over Omron is reasonable in that Omron has purposefully interjected itself into Arizona by its voluntary dealings with IceMOS. Because Omron is a foreign corporation, the burden of litigating in this forum would not be substantially greater than in any other U.S. forum, nor is there a conflict between this forum's sovereignty and the sovereignty of another U.S. forum. Arizona has an interest in seeing that its residents are not misled by fraud or harmed by

breaches of contract, and Arizona is an efficient forum for the litigation of this suit in that many of the U.S. witnesses are located in Arizona. *See id.* (listing factors for reasonableness of personal jurisdiction).

9. Venue is proper as to Omron under 28 U.S.C. § 1391(c)(3) in that Omron is not a resident of the United States and may, therefore, be sued in any judicial district.

### III.   FACTUAL BACKGROUND

10. Founded in 2004, IceMOS offers and provides high quality super junction metal oxide semiconductor field-effect transistors ("Super Junction MOSFETs"), microelectromechanical systems ("MEMS") solutions, and advanced engineering substrates.

11. From 2008 through 2011, IceMOS and Omron had a customer-supplier relationship. During this time, IceMOS began designing and developing its Super Junction MOSFETs, for which Omron manufactured wafers at its wafer fabrication facility in Japan.

12. On February 28, 2011, IceMOS entered into a Supply Agreement with Omron for Omron to fabricate and supply semiconductor wafers for IceMOS's Super Junction MOSFETs. A true and correct copy of said Supply Agreement is attached hereto as "Exhibit 1" and is incorporated by reference as if fully set forth herein.

13. The intent of the Supply Agreement was to provide IceMOS with a reliable and consistent supply of wafers for its Super Junction MOSFETs to allow IceMOS to meet growing demand and timely deliver products to its customers.

14. To that end, in the Supply Agreement, Omron agreed to (1) "perform the fabrication requested by IceMOS;" (2) "share equally in the production mask costs (initial sets) applicable to the products listed in Exhibit A and future products;" and (3) "fully resource the development of all generations of Super Junction MOSFETs" through the duration of the Supply Agreement. Supply Agreement, §§ 2.0, 4.0, & 4.2.1.

15. Despite its covenant to fully resource the development of IceMOS' Super Junction MOSFETs, beginning at least as early as 2014, Omron began to withdraw support for IceMOS by substantially reducing engineering lots and redirecting engineering resources from IceMOS' development activities to Omron's internal business activities.

16. Omron's reduction of support for IceMOS has been ongoing and increased from 2015 to 2016, causing disruption and delays in the development and manufacture of IceMOS's Super Junction MOSFETs and its ability to meet customer demands. Such disruption and delays have detrimentally impacted IceMOS's existing and prospective business relationships by preventing IceMOS from swiftly developing its products, selling those products into the market, and timely delivering products to existing customers.

17. On March 6, 2015, Omron met with IceMOS in Phoenix, Arizona and orally indicated its intention to terminate the Supply Agreement in March 2017.

18. The term of the Supply Agreement is ten (10) years. However, the Supply Agreement can be terminated early by either party by providing "*written notice* at least three (3) years, including a one (1) year period of transfer to other wafer fabrication facilities, prior to the early termination." Supply Agreement, § 6.2 (emphasis added).

19. The Supply Agreement requires that all notices under the agreement "be in writing and delivered personally or via facsimile or via registered or certified mail" to the party's address listed in the agreement. Supply Agreement, § 9.4.

20. Omron did not deliver any written notice to IceMOS during the March 6, 2015 meeting. Further, Omron's employee, Yoshitake Ito, recognized that the discussed potential termination date did not comply with the three-year notice requirement in the Supply Agreement.

21. The March 6, 2015 meeting discussions of a potential termination did not constitute proper notice of early termination in that the intended termination date was March 6, 2017, less than three (3) years from the date of the meeting.

22. The March 6, 2015 meeting further did not constitute proper notice of early termination in that the notice of termination was not in writing and delivered personally or via facsimile or via registered or certified mail.

23. Omron's failure to comply with the notice requirements for early termination was further recognized and confirmed during a meeting between Omron and IceMOS on December 9, 2015. The meeting minutes state:

> IcMOS [sic] will request Omron to change payment terms

for the inventory build because Omron terminate [sic] one year advanced, Omron officially informed IceMOS of the termination in Mar. 2015. Though supply agreement shows at least three years required prior to termaination [sic], Omron stated to terminate on Mar. 31, 2017. It's not three years but two years.

24. A true and correct copy of said meeting minutes is attached hereto as "<u>Exhibit 2</u>" and is incorporated by reference as if fully set forth herein. As such, Omron has previously acknowledged that its intended termination is in breach of the Supply Agreement.

25. At both the March 6, 2015 meeting and the December 9, 2015 meeting, Omron represented its intent to fully support IceMOS's Super Junction MOSFETs throughout the proposed, but never noticed, termination period.

26. As of the date of this Complaint, Omron has not provided proper written notice to IceMOS sufficient to trigger the early termination provision of the Supply Agreement. IceMOS has never accepted the oral termination as proper.

27. Since meeting with Omron and learning of Omron's intent to terminate the Supply Agreement, IceMOS has maintained that Omron is not permitted to terminate the Supply Agreement and must continue to support the design, development, and manufacture of IceMOS's Super Junction MOSFETs for at least three (3) years after proper termination notice.

28. Nonetheless, in good faith to minimize/mitigate any potential damages and in reliance upon Omron's representations regarding ongoing support during the

termination period, IceMOS has negotiated with Omron to resolve the termination issue and has attempted to find alternative facilities to meet its manufacturing demands.

29. Given the term of the Supply Agreement, the manufacturing processes for IceMOS's Super Junction MOSFETs were developed specifically for Omron's wafer manufacturing facility and equipment.

30. Thus, despite its best efforts, IceMOS has been unable to identify a comparable manufacturing facility that will not cause substantial delay, costs, and further loss to IceMOS.

31. Additionally, IceMOS has learned that the deep reactive ion etching ("DRIE") etcher that it purchased at Omron's insistence and consigned to Omron's facility cannot be transferred and supported outside of Japan, severely limiting IceMOS's options for alternative manufacturers without the substantial loss of the millions of dollars invested in the purchase of the DRIE etcher.

32. Recognizing its failure to comply with the three-year notice period or its obligations to continue to fully support IceMOS during a transition, Omron has since shifted its intended termination date to March 6, 2018.

33. Such shift is still in violation of the Supply Agreement in that the March 6, 2018 date is less than three (3) years from the time Omron indicated its intent to terminate on that date.

34. The March 6, 2018 date for termination is in further violation of the Supply Agreement in that Omron has not provided IceMOS with notice in writing and delivered personally or via facsimile or via certified or registered mail.

35. Nonetheless, Omron maintains an intent to terminate the Supply Agreement as of March 6, 2018.

36. Additionally, Omron has taken the position that the Supply Agreement does not require it to fully support IceMOS's Super Junction MOSFETs for three (3) years, including one (1) year of transfer support, but rather requires only two (2) years of support and one (1) year of transfer support.

37. This position is in direct contradiction of Omron's prior representations that it would fully support IceMOS's Super Junction MOSFETs throughout the termination period.

38. On or about May 9, 2017, Omron sent a letter to IceMOS indicating that it intends to cease all manufacture of IceMOS's Super Junction MOSFETs by July 2017. A true and correct copy of said letter is attached hereto as "<u>Exhibit 3</u>" and is incorporated by reference as if fully set forth herein.

39. Since entering into the Supply Agreement, IceMOS has fully performed under the contract, including investing substantial sums in the purchase of the DRIE etcher that Omron insisted upon for the manufacturing of IceMOS's Super Junction MOSFETs.

40. IceMOS has advised Omron of the detrimental impact of its efforts to improperly and prematurely terminate the Supply Agreement. Omron's continued efforts and plans to terminate the Supply Agreement have rendered IceMOS's supply chain uncertain and have inhibited IceMOS's ability to effectively and productively conduct its business. No customers will buy IceMOS's products without a qualified manufacturer identified and approved.

41. Additionally, IceMOS intends to make an initial public offering ("IPO") in 2018 with an expected valuation in excess of $100,000,000.00, of which Omron is aware. Early termination of the Supply Agreement without proper notice will seriously and detrimentally affect IceMOS's ability to make its intended IPO in 2018 and/or negatively impact the valuation thereof.

42. Omron's past failures to satisfy its obligations under the Supply Agreement, its failure to provide proper notice of its intent to terminate the Supply Agreement, and its ongoing efforts to terminate the Supply Agreement early and without proper support for IceMOS's products have caused, and will continue to cause, ongoing harm to IceMOS, including but not limited to, lost business opportunities, lost business reputation, and lost business valuation, for which IceMOS seeks redress, as follows:

## IV. CAUSES OF ACTION

43. Based on the above facts, IceMOS brings this suit for the following causes of action: (i) breach of contract; (ii) promissory estoppel, in the alternative; and (iii) fraud.

### A. COUNT I: BREACH OF CONTRACT

44. The Supply Agreement is a valid and enforceable contract for breach of which IceMOS is a proper party to sue.

45. At all relevant times, IceMOS fully performed, tendered performance of, and/or was excused from performing its contractual obligations under the Supply Agreement.

46. IceMOS has invested millions of dollars in the performance of its contractual obligations under the Supply Agreement, including but not limited to, purchasing the DRIE etcher, purchasing numerous mask sets and silicon wafers for development and production, and hiring a dedicated team of Japanese engineers to work with Omron to facilitate the development and manufacturing of IceMOS's Super Junction MOSFETs.

47. Omron has engaged in multiple breaches of the Supply Agreement, including but not limited to, failing and/or refusing to "fully resource the development of all generations of Super Junction MOSFETs;" failing and/or refusing to "share equally in the production mask costs (initial sets) applicable to the products;" attempting to improperly terminate the Supply Agreement without proper notice; and

repudiating its obligations to support IceMOS's Super Junction MOSFETs throughout the three-year termination period.

48.   Omron's breaches of the Supply Agreement have caused, and will continue to cause, ongoing harm to IceMOS, including but not limited to, actual damages in the form of increased costs, loss of business due to delay in reaching the market, harm to IceMOS's business reputation due to inability to timely meet customer demands, loss of business opportunities due to uncertainty of supply, and impairment of IceMOS's valuation in advance of its planned IPO.

49.   The harm to IceMOS's business reputation, the impairment of its valuation, and the loss of business opportunities—in particular, the harms that have arisen and will arise from Omron's improper termination and repudiation of its obligation to support IceMOS throughout the termination period—are not adequately recompensable by monetary damages. IceMOS does not have an adequate remedy at law to compensate it for such immeasurable harms.

50.   The manufacturing processes for IceMOS's Super Junction MOSFETs are unique and were developed specifically for Omron's wafer fabrication facility.

51.   Additionally, IceMOS purchased specialized manufacturing equipment at Omron's insistence and consigned such equipment to Omron's wafer fabrication facility. Such equipment was specifically configured for Omron's facility and cannot be serviced outside of Japan.

52. Because of the unique manufacturing processes and specialized equipment, IceMOS cannot avoid the harm to is business reputation and loss of business by transferring manufacturing to another facility.

53. IceMOS has attempted in good faith to avoid and mitigate such harm and has been unable to locate a comparable facility and qualify it for customers within the time Omron has demanded. IceMOS has stood, and continues to stand, ready, willing, and able to perform its obligations under the Supply Agreement.

54. Because of the immeasurable nature of the harm to IceMOS and the unique nature of the supply services under the Supply Agreement, IceMOS seeks specific performance of the Supply Agreement. Specifically, IceMOS seeks to have Omron continue manufacturing and supporting IceMOS's Super Junction MOSFETs until the earlier of either February 28, 2021 or three (3) years after the day proper written notice of termination is delivered in accordance with the Supply Agreement.

55. In the alternative, to the extent that the court finds that the harm to IceMOS's business reputation and valuation and the loss of business opportunities are recompensable by monetary damages, IceMOS seeks recovery of all actual damages suffered by it due to Omron's multiple breaches of the Supply Agreement in an amount to be proven at trial, which amount IceMOS believes exceeds $25,000,000.00.

**B.   COUNT II: PROMISSORY ESTOPPEL, IN THE ALTERNATIVE**

56. Alternative to the foregoing cause of action for breach of contract, to the extent the Court finds that the Supply Agreement is unenforceable or that IceMOS is

1  otherwise unable to recover thereunder, IceMOS brings this claim for promissory estoppel, seeking enforcement of Omron's promises.

57. Omron made a promise to IceMOS. Specifically, Omron promised to manufacture and support IceMOS's Super Junction MOSFETs for a period of ten (10) years unless earlier terminated upon three (3) years' proper notice and support.

58. IceMOS reasonably and substantially relied on this promise to its detriment by specifically tailoring its manufacturing processes to Omron's facility and investing substantial sums to facilitate development and manufacturing of its Super Junction MOSFETs at Omron's facility.

59. IceMOS's reliance was reasonably foreseeable to Omron. Omron made the promise as an inducement for IceMOS to make use of Omron's manufacturing services.

60. Injustice can only be avoided by enforcing Omron's promise to manufacture and support IceMOS's Super Junction MOSFETs for the promised term.

61. Accordingly, IceMOS seeks to enforce Omron's promise by recovery of the damages suffered by IceMOS in reliance on Omron's promise, including but not limited to, the depreciated value of the DRIE etcher and other equipment specifically purchased and consigned to Omron's wafer manufacture facility in reliance on Omron's promise.

## C.     COUNT III: FRAUD

62.    At the March 6, 2015 meeting in Arizona, and again at the December 9, 2015 meeting in Japan, Omron's employee, Yoshitake Ito, represented to IceMOS that Omron intended to fully support IceMOS's Super Junction MOSFETs. *See, e.g.,* Exhibit 2 (including provisions for inventory build through March 2017 and representation that Omron will "do [its] best to support transfer activities and inventory build for Super Junction").

63.    This representation was material to the negotiations over Omron's attempts to improperly terminate the Supply Agreement.

64.    This representation was false in that Omron has indicated it will not fully support IceMOS's Super Junction MOSFETs through the termination period but will provide only transfer support for one (1) year of the termination period.

65.    When Omron made the representation, it either knew that it had no intent to fully support IceMOS's Super Junction MOSFETs throughout the termination period or made the representation, as a positive assertion, with reckless disregard to its truth or falsity.

66.    Omron made its representation as part of the negotiations over its admittedly improper termination efforts with the intent that IceMOS rely on the representation.

67. IceMOS did, in fact, rely on the representation in its decision to attempt to mitigate damages by looking for an alternative manufacturing facility and to work in good faith with Omron despite Omron's improper termination efforts.

68. Omron's fraudulent misrepresentation has caused, and continues to cause, harm to IceMOS by rendering its supply chain uncertain and impairing IceMOS's ability to effectively and profitably conduct business, for which IceMOS seeks to recover actual damages in an amount to be proven at trial.

## V. REQUEST FOR PRELIMINARY INJUNCTION

69. IceMOS requests that the Court enter a preliminary injunction against Omron enjoining Omron from ceasing to manufacture IceMOS's Super Junction MOSFETs or providing IceMOS less support than Omron provides for its own manufacturing during the pendency of this suit. Good cause exists for such relief in that there is a substantial likelihood that IceMOS will succeed on its claim for breach of contract and will suffer irreparable harm in the absence of an injunction.

70. There is a substantial likelihood that IceMOS will succeed on its claim for breach of contract in that Omron has admitted and acknowledged that it did not comply with the three-year notice period. During the December 9, 2015, Omron acknowledged that its attempted notice on March 6, 2015 was less than three (3) years prior to the termination date. Exhibit 2, p. 1.

71. Further, Omron has never provided IceMOS with written notice of early termination that conforms to the notice requirements set forth in the Supply Agreement.

72. In the absence of an injunction, IceMOS is substantially likely to suffer irreparable harm. The loss of its manufacturer would prevent IceMOS from satisfying its commercial obligations, causing IceMOS to lose customers and suffer damage to its business reputation.

73. Such harm to its business would not be recompensable by an award of monetary damages.

74. Further, such harm outweighs any potential injury to Omron from being enjoined. Requiring Omron to continue manufacturing IceMOS's Super Junction MOSFETs in accordance with the Supply Agreement that Omron voluntarily entered into will not cause Omron irreparable harm comparable to the loss of business reputation, business opportunities, and business valuation faced by IceMOS in the absence of such injunction.

75. Finally, the public interest would not be disserved by enjoining Omron as the public has an interest in contracts being enforced and in parties satisfying their contractual obligations. Enjoining Omron to comply with the obligations it voluntarily agreed to serves this interest and does not run counter to any other public interest.

76. For these reasons, IceMOS requests that the Court enjoin Omron from ceasing to manufacture IceMOS's Super Junction MOSFETs or providing less support

to IceMOS than Omron provides for its own manufacturing during the pendency of this suit.

## VI.   PRAYER

**WHEREFORE, PREMISES CONSIDERED,** IceMOS prays that the Court enter judgment against Omron for breach of contract and fraud, awarding IceMOS its actual damages arising from Omron's fraudulent misrepresentation and enjoining Omron from ceasing to manufacture IceMOS's Super Junction MOSFETs and from providing less support for IceMOS's Super Junction MOSFETS than Omron provides for its own products until the earlier of either February 28, 2021 or three (3) years after the day proper notice of termination is delivered in accordance with the Supply Agreement. In the alternative, to the extent that the Court finds that the harm arising from Omron's breach of contract are recompensable by monetary damages, IceMOS prays that the Court award actual damages for its breach of contract claim. In the alternative, to the extent that the Court finds the Supply Agreement is unenforceable or that IceMOS is otherwise unable to recover thereunder, IceMOS prays that the Court enter judgment against Omron for promissory estoppel and award IceMOS its actual damages arising from its reliance on Omron's promise. IceMOS prays for such further relief, at law or in equity, to which it may show itself to be entitled.

## VII.   DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), IceMOS hereby demands a trial by jury on all issues triable to a jury.

| | | |
|---|---|---|
| 1 | Dated: August 2, 2017 | Respectfully submitted, |
| 2 | | /Robert D. Atkins/ |
| | | Robert D. Atkins (State Bar No. 015375) |
| 3 | | PATENT LAW GROUP: Atkins and Associates, P.C. |
| 4 | | 55 North Arizona Place, Suite 104 |
| | | Chandler, Arizona 85225 |
| 5 | | Telephone: 480.499.9400 |
| | | main@plgaz.com |
| 6 | | |
| 7 | | Michael W. Shore (*pro hac vice* to be filed) |
| | | mshore@shorechan.com |
| | | Alfonso G. Chan (*pro hac vice* to be filed) |
| 8 | | achan@shorechan.com |
| | | Paul T. Beeler (*pro hac vice* to be filed) |
| 9 | | pbeeler@shorechan.com |
| | | SHORE CHAN DEPUMPO LLP |
| 10 | | 901 Main Street, Suite 3300 |
| | | Dallas, Texas 75202 |
| 11 | | Telephone: (214) 593-9110 |
| | | Facsimile: (214) 593-9111 |
| 12 | | |
| 13 | | **COUNSEL FOR PLAINTIFF ICEMOS TECHNOLOGY CORPORATION** |