Robert D. Atkins (State Bar No. 015375)
PATENT LAW GROUP: Atkins and Associates, P.C.
55 North Arizona Place, Suite 104
Chandler, Arizona 85225
Telephone: 480.499.9400
main@plgaz.com

(Additional Counsel Identified On Signature Page)
Attorneys for Plaintiff IceMOS Technology Corporation

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IceMOS Technology Corporation, | CASE NO. 2:17-cv-02575-JAT |
| *Plaintiff,* | |
| *v.* | FIRST AMENDED COMPLAINT |
| Omron Corporation, | |
| *Defendant.* | DEMAND FOR JURY TRIAL |

1.      Plaintiff IceMOS Technology Corporation ("Plaintiff" or "IceMOS"), by and through its undersigned counsel, files this First Amended Complaint against Defendant Omron Corporation, as follows:

## I.      PARTIES

2.      IceMOS is a Delaware corporation with its principal place of business at 7855 South River Parkway, #122, Tempe, Arizona 85284.

3.      Defendant Omron Corporation ("Omron") is a corporation formed under the laws of Japan with its principal place of business at Shiokoji Horikawa, Shimogyo-ku, Kyoto 600-8530 Japan.

## II.      JURISDICTION & VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because this action is between a United States entity and a foreign entity and the matter in controversy exceeds $75,000.00.

5.      Arizona's long-arm statute allows courts in this State to exercise jurisdiction over nonresident defendants to the extent allowed by the Constitution.

6.      This Court has personal jurisdiction over Omron because Omron has purposefully directed activities and transactions towards Arizona and has availed itself of the privilege of conducting business in Arizona; IceMOS's claims arise out of and relate to Omron's activities in Arizona; and exercising specific jurisdiction over Omron is reasonable.

7.      Specifically, Omron has engaged in a multi-year contractual relationship with IceMOS. IceMOS is an Arizona citizen that Omron has deliberately engaged in contractual activities with.

8.      IceMOS has had its principal place of business in Tempe, Arizona since 2004, which predates the parties' contacts by three years.

9.      In 2007, Omron approached IceMOS *in Arizona* to present Omron's foundry business to IceMOS. On numerous occasions, Omron personnel have visited IceMOS's headquarters in Tempe in furtherance of either obtaining IceMOS's business, or (after the

parties entered their contract discussed below) to meet regarding their contractual relations. Such meetings occurred in at least 2007, 2011, 2012, 2013, and 2015. The March 2015 meeting at which Omron purported to verbally give notice of termination of the IceMOS-Omron Supply Agreement dated February 28, 2011 ("Supply Agreement") occurred at IceMOS headquarters in Tempe.

10.     Omron has further directed the following actions toward Arizona—all of which involve the business relationship upon which this lawsuit is based: (1) during the course of Omron's relationship with IceMOS, Omron has shipped all production and engineering lots it manufactured for IceMOS to IceMOS's Arizona headquarters; (2) sent all planning requests to IceMOS's Arizona headquarters; (3) negotiated the Supply Agreement identified below with IceMOS's business representatives based in Arizona; (4) requested payment from IceMOS's Arizona headquarters and received payments from IceMOS's Bank of America Arizona account; (5) directed numerous emails and other correspondence to IceMOS in Arizona relating to the products that are the subject of the Supply Agreement at issue; (6) sent invoices and payment plans to IceMOS in Arizona; (7) called IceMOS president Sam Anderson in Arizona on many occasions to discuss the business relationship at issue.

11.     Omron has created continuing obligation between itself and IceMOS, a resident of this forum, by voluntarily entering into the Supply Agreement. All items manufactured by Omron under the Supply Agreement were deliverable to IceMOS in Arizona. Further, Omron has traveled to Arizona to meet with IceMOS and has made fraudulent representations and anticipatorily breached its obligations to IceMOS during such meetings.

12.     IceMOS's claims arise out of and relate to Omron's contacts with, and extra-contractual behavior directed to, Arizona. "A defendant has purposely availed himself of the benefits of a forum if he has deliberately engaged in significant activities within a State *or has created continuing obligations between himself and residents of the forum*." *Gray &*

*Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 (9th Cir. 1990) (emphasis added) (internal quotes omitted).

13.      The Ninth Circuit applies a "but for" test for determining whether a plaintiff's cause of action arise out of the defendant's forum-related activities. *Id.* at 761. If Omron had not contracted with IceMOS to manufacture and deliver products to Arizona, IceMOS would not have been injured by Omron's breach of contract. *See id.* Likewise, if Omron had not traveled to Arizona and made false representations to IceMOS, IceMOS would not have been injured by Omron's fraud.

14.      Exercise of jurisdiction over Omron is reasonable because Omron has purposefully availed itself of a contractual relationship with an Arizona citizen by its voluntary dealings with IceMOS. Because Omron is a foreign corporation, the burden of litigating in this forum would not be substantially greater than in any other U.S. forum, nor is there a conflict between this forum's sovereignty and the sovereignty of another U.S. forum. Arizona has an interest in seeing that its residents are not misled by fraud or harmed by breaches of contract, and Arizona is an efficient forum for litigating this suit because many of the U.S. witnesses are in Arizona. *See id.* (listing factors for reasonableness of personal jurisdiction).

15.      Venue in this District is proper as to Omron under 28 U.S.C. § 1391(c)(3) because Omron is not a resident of the United States and may, therefore, be sued in any judicial district.

### III.      FACTUAL BACKGROUND

#### A.      IceMOS and Omron.

16.      Founded in 2004, IceMOS offers and provides high quality super junction metal oxide semiconductor field-effect transistors ("Super Junction MOSFETs"), microelectromechanical systems ("MEMS") solutions, and advanced engineering substrates. It is a small privately held company with its headquarters in Tempe, Arizona and operations in Belfast, Northern Ireland and Japan.

17.     Omron is an 86-year old Japanese company founded by Kasuma Tateisi. Omron claims its corporate culture can be summarized by Tateisi's favorite phrase, "Don't just say 'I can't.' Try and find a way to do it." As detailed below, Omron did not apply that spirit to its relationship with IceMOS.

18.     In 2007, Omron purchased a wafer fabrication facility in Yasu, Japan (the "Yasu Fab") that fabricated 200mm complementary metal-oxide semiconductor (CMOS) wafers with a 50,000 wafer/month capacity. Omron offered contract manufacturing services to utilize extra capacity above what it needed for internal customers and its external expansion. Omron's general manager Yoshio Sekiguchi approached IceMOS and Great Wall Semiconductor (GWS) to be customers of the Yasu Fab. Both IceMOS and GWS ultimately entered supply agreements with Omron.

19.     When it solicited IceMOS's business, Omron knew IceMOS was a small company with no meaningful ability to shift production facilities from the Yasu Fab and no ability to qualify a second source of production for wafer fabrication simultaneously with designing, engineering, and producing products at Omron's Yasu Fab. Simply stated, Omron knew that it would be IceMOS's sole supplier of wafer fabrication services.

20.     From 2008 through 2011, IceMOS and Omron had a customer-supplier relationship. During this time, IceMOS began designing and developing its Super Junction MOSFETs for manufacture at the Yasu Fab.

21.     The sales cycle for microelectronic components like Super Junction MOSFETs is long and complex. IceMOS Super Junction MOSFETs are "designed into" customers' end products (*e.g.* power supplies and light ballasts). The process includes the customer providing functional specifications, size or package requirements and interoperability conditions.

22.     Because of the detailed selling process, marketing Super Junction MOSFETs requires extensive work with customers. This work is done by sales/application engineers who work closely with the fabrication facility's engineers. The work needed just to start

1  products into production—design work, application compatibility, fine-tuning with the
2  fabrication facility and customer, creating and adjusting mask sets, producing and qualifying
3  samples, process engineering—takes up to *three years*. IceMOS performs this work for
4  customer devices that have multi-year life cycles. Once IceMOS wins a design battle to have
5  its products included in a device, it must commit to the customer that it can continuously
6  supply the devices for the expected life of the products in which they are used.

7       23.    The foundry where semiconductors are manufactured is critical for a
8  semiconductor company like IceMOS. IceMOS's customers will only approve and purchase
9  products produced at fabrication facilities that the customers have qualified for making
10 products for the customers' finished devices. Once a semiconductor company's foundry has
11 been approved by customers, the semiconductor company needs the foundry to continue
12 manufacturing products. This is why, even if the semiconductor company and foundry
13 manifest an intent to cease mutual operations, the semiconductor company needs the foundry
14 to continue supplying products until a new foundry has been located, manufacturing
15 processes transferred, the new foundry proves it can make products with sufficient yields,
16 ***and*** the customers qualify the new foundry under their own policies and procedures. Thus,
17 withdrawal from a foundry agreement requires the foundry and semiconductor company to
18 work together to ensure the semiconductor's customers obtain the products they need.

19      24.    When customers choose IceMOS, they contract for an uninterrupted supply of
20 IceMOS Super Junction MOSFETs for a period that extends continuously into the future for
21 the life of the customer's device. Failure to meet customer demand means that if IceMOS is
22 the first source for the customer's needs, it will be replaced by a second source until it could
23 meet production needs (and if the customer would accept IceMOS products after a supply
24 gap). If IceMOS is the second source of the customer's requirements because it is filling in
25 another supplier's inability to fulfill the customer's orders, and IceMOS has a supply gap, it
26 will simply be replaced by the customer and not used again.

27

28

25.     Supply chain problems are anathema to IceMOS, which serves the power management industry. IceMOS must work with its customers to design and qualify IceMOS products for use in customer systems. One missed shipment or delivery problem can undo thousands of man-hours worth of work to obtain a design win.

26.     The cycle time for running a production lot of MOSFET wafers exceeds 7 months. To order and receive raw materials takes three months, Omron's processing of the raw materials takes another three months, and then IceMOS and Omron need 4-6 weeks to test and assemble the products for the customers. For an engineering lot (which is used for testing and design-in work and creating samples for marketing to customers), the process requires an additional four weeks.

27.     What IceMOS describes above is the basic nature of how the microelectronics industry works. Omron had actual knowledge of IceMOS's product cycles from design to production when Omron solicited IceMOS in 2007 and when it entered the Supply Agreement. Omron has had extensive consultation and interaction with IceMOS's engineers and principles throughout the decade-long course of the parties' dealings. And Omron has been in the electronics business for nearly a century, therefore it has full knowledge of the nature of IceMOS's products and the Yasu Fab's critical importance to IceMOS's ability to meet its own customer obligations.

**B.     The Supply Agreement.**

28.     On February 28, 2011, IceMOS and Omron entered into the Supply Agreement for Omron to fabricate and supply semiconductor wafers for IceMOS's Super Junction MOSFETs. A true and correct copy of said Supply Agreement is attached hereto as "Exhibit 1" and is incorporated by reference as if fully set forth herein.

29.     The intent of the Supply Agreement was to provide IceMOS with a reliable and consistent supply of wafers for its Super Junction MOSFETs to allow IceMOS to develop super junction platforms and meet growing demand by timely delivering products from those platforms to its customers.

30.     To that end, in the Supply Agreement, Omron agreed to (1) "perform the fabrication requested by IceMOS"; (2) "share equally in the production mask costs (initial sets) applicable to the products listed in Exhibit A and future products"; and (3) "fully resource the development of all generations of Super Junction MOSFETs" through the duration of the Supply Agreement. Supply Agreement, §§ 2.0, 4.0, & 4.2.1.

31.     From their negotiations of the Supply Agreement, Omron knew that IceMOS depended upon Omron to support IceMOS's business due to the global dearth of fabrication facilities that could support IceMOS's manufacturing requirements. IceMOS has developed two generations of Super Junction MOSFETs at the Yasu Fab. While developing these products, IceMOS has created substantial intellectual property, including approximately 50 patents.

32.     IceMOS dedicated a team of Japanese engineers to work with Omron to develop the high voltage Super Junction MOSFET technology, and improve yields in processing—the cost to IceMOS of this engineering capacity was $600,000 per year. IceMOS further invested in the Omron relationship by purchasing silicon wafers for development and production, and by purchasing mask sets from Omron.

33.     Because the global availability of fabrication facilities like Omron's Yasu Fab is so low, and the design-to-production time for IceMOS's products is long, the Supply Agreement term is 10 years and early termination could only be effectuated upon three years' *written* notice, including one year of support to transfer production to another wafer fabrication facility before termination. The transition year is not separate from the three-year period where production and product development and support continue until termination. The transition work must continue in parallel while Omron continues to fulfill its obligations to make products and support research and development. Supply Agreement §§ 6.0, 6.2.

34.     To enable Omron to support IceMOS's contracted-for 3500 wafer/month capacity, IceMOS agreed to purchase a deep reactive ion etcher (DRIE) necessary for Super Junction MOSFET manufacturing, which cost IceMOS $1,235,666 to purchase and

$112,000 for installation. IceMOS agreed to pay the expenses necessary to install the DRIE in the Yasu Fab. Supply Agreement § 4.14. The DRIE was configured for use in Japan and IceMOS cannot use it at any facility outside Japan until it is substantially modified. Omron has refused to purchase the DRIE and has refused to help IceMOS to ship it outside Japan.

35.    Omron further agreed to take all preventive measures necessary to provide continuous supply to IceMOS. Supply Agreement § 4.15, Ex. H.

36.    It took four years of the 10-year Supply Agreement's term, and tremendous efforts by IceMOS in design, development and engineering, for Omron to finally obtain a 75% wafer yield on IceMOS's first generation (GEN1) Super Junction MOSFET products. Even the best manufacturing Omron could achieve resulted in Super Junction MOSFET wafers with 25% of the die on them useless.

37.    Upon information and belief, in 2015 Omron's new president determined that acquiring the Yasu Fab was a mistake. Despite its long-term contracts with GWS and IceMOS, Omron now wanted to exit the contract manufacturing business and redirect the engineers and capacity to Omron's internal customers.

38.    The Supply Agreement requires that all notices under the agreement "be in writing and delivered personally or via facsimile or via registered or certified mail" to the party's address listed in the agreement. Supply Agreement, § 9.4. Omron never provided IceMOS with notice of its intent to terminate the Supply Agreement that meets the § 9.4 requirements.

**C.    Omron's Breaches of its Covenant of Good Faith and Fair Dealing.**

39.    The design-in process for IceMOS's Super Junction MOSFETs is complex. IceMOS products need to be designed to meet the needs of customers. The process requires designing prototypes, testing samples, ensuring applications work with the MOSFETs, fine tuning the process with the fabrication facility and customer and repeating as necessary to create the final production design. This is a normal process for microelectronic component suppliers and their fabrication facilities.

40.     IceMOS moved its fabrication work to Omron because of the support Omron initially offered and later promised, which included engineering services and the availability of engineering lots in numbers sufficient to support the research and development of multiple generations of Super Junction MOSFET products. IceMOS would use engineering lots (12 wafers) to work on product designs. The Supply Agreement did not place limits on engineering lots that IceMOS could use to design and test its products. Instead, Omron had to supply all engineering lots necessary to create the Super Junction MOSFETs IceMOS was developing.

41.     In late 2012, after IceMOS had consigned the DRIE etcher to Omron and had commenced work on its GEN1 products, Omron severely limited IceMOS's use of engineering lots to just 3 lots per month. This constituted a 90% reduction in the amount IceMOS needed to prepare its products and forced IceMOS to purchase production lots for use as engineering lots and send specific instructions to Omron for each lot's processing to obtain the testing and product review Omron had previously indicated would cost IceMOS nothing. Despite Omron's decision, which thwarted the purpose of the Supply Agreement, IceMOS had to remain with Omron because there were no alternative fabrication facilities in Japan and IceMOS had committed all available capital resources to fulfilling its obligations under the Supply Agreement.

42.     Omron thwarted the intent of the parties by reducing its engineering budget to just 10% of its original commitment to IceMOS after IceMOS purchased the DRIE and started Super Junction MOSFET development into the Yasu fabrication facility. This support reduction caused Omron's ongoing inability to obtain adequate yields. It also contributed to numerous process and manufacturing problems that resulted in low-quality products from Omron. Only in 2015 did Omron's production on IceMOS's first generation products (GEN1) reach the minimally acceptable 75% yield threshold to commence high-volume production, which was at least two years *later* than what would have occurred if Omron had

not curtailed its engineering budget and instead had fulfilled its obligations as originally promised.

43. These delays caused by Omron's actions that denied IceMOS the fruits of the Supply Agreement cost IceMOS millions of dollars in development time, destroyed or prevented relationships with customers who should have had qualified products years earlier, and severely devalued IceMOS's contemplated IPO because the Super Junction MOSFET sales have been stalled and impeded. Ultimately, Omron severely constrained IceMOS's ability to develop its Super Junction MOSFET business, which cost IceMOS years of product sales prior to Omron's breach and into the future.

44. IceMOS has started bringing up its second generation of Super Junction MOSFETs (GEN2) at contract manufacturer Phenitec Semiconductor Corporation (Phenitec). Omron has removed substantially all resources from supporting IceMOS and its GEN2 products, which impairs IceMOS's ability to supply customers while IceMOS transfers its GEN2 production from Omron to Phenitec.

45. Omron's failure to support IceMOS's customers and concurrently fulfill its obligations to transfer IceMOS product fabrication to other wafer facilities has caused additional damages. Such failures include Omron's refusal to purchase for itself or assist IceMOS in transferring IceMOS's DRIE etcher, Omron's removal of resources to support IceMOS in transferring its GEN1 production to a new fabricator, Omron's denying IceMOS the ability to continue design-in work for GEN1 customers during the transition of fabrication services from Omron to a new wafer fabrication, Omron's denying IceMOS the ability to complete GEN2 product development during the Supply Agreement term, Omron's refusal to ensure continued supply of fabrication services during IceMOS's transition to a subsequent facility by failing to maintain adequate end-of-life inventory of IceMOS Super Junction MOSFETs, and Omron's failure to assist IceMOS in obtaining alternative fabrication arrangements.

**D.     Omron's Breaches of the Supply Agreement.**

46.     On March 6, 2015, Omron met with IceMOS in Phoenix, Arizona and through a non-officer employee *orally* indicated that Omron intended to close its Yasu Fab at the end of March 2017, and therefore that Omron would not accept any new orders from IceMOS after December 31, 2016. Omron made no unequivocal statement that it would not honor the Supply Agreement in some way, only that the Yasu Fab was closing and no orders would be accepted that could not be completed by the end of March.

47.     IceMOS did not accept the statement from Omron's employee or acknowledge in any way that the Supply Agreement had been or could be terminated without following the Supply Agreement's express terms. IceMOS never accepted any oral termination and never acknowledged that the Supply Agreement was no longer in full force and effect.

48.     The Supply Agreement's requires a termination notice in written form providing three years notice and full compliance right up to the end date. The Supply Agreement additionally requires that during the last year – while Omron continues to meet its manufacturing, engineering and other support obligations – it *also* must cooperate and support transition to another wafer fabrication facility. Supply Agreement, § 6.2.

49.     Omron did not deliver written notice to IceMOS during the March 6, 2015 meeting. Further, Omron's employee, Yoshitake Ito, recognized that the discussed factory shutdown date did not comply with the three-year notice requirement in the Supply Agreement, even if Omron had provided notice in compliance with the Supply Agreement.

50.     The March 6, 2015 meeting discussions of a potential Yasu Fab shutdown did not constitute proper notice of early termination because the intended shut down date was March 6, 2017, less than three years from the date of the meeting.

51.     The March 6, 2015 meeting further did not constitute proper notice of early termination because the notice of termination was not in writing and delivered personally or via facsimile or via registered or certified mail.

52.     The March 6, 2015 meeting further did not constitute proper notice of early termination because the notice of termination was not communicated by an officer, director or other person with any authority to terminate the Supply Agreement.

53.     Omron confirmed its own failure to comply with the notice requirements for early termination during a meeting between Omron and IceMOS on December 9, 2015. Omron's meeting minutes, which Mr. Ito sent by email to IceMOS president Sam Anderson, stated:

> IcMOS [sic] will request Omron to change payment terms for the inventory build because Omron terminate [sic] one year advanced, Omron officially informed IceMOS of the termination in Mar. 2015. Though supply agreement shows at least three years required prior to termaination [sic], Omron stated to terminate on Mar. 31, 2017. It's not three years but two years.

54.     A true and correct copy of said meeting minutes is attached hereto as "Exhibit 2" and is incorporated by reference as if fully set forth herein. Thus, Omron has acknowledged that its faulty effort at termination is, even if accepted as a termination, in breach of the Supply Agreement. The meeting minutes also do not constitute proper notice of termination because Omron did not furnish them as required by the terms of the Supply Agreement.

55.     At both the March 6, 2015 meeting and the December 9, 2015 meeting, Omron falsely represented its intent to fully support IceMOS's Super Junction MOSFETs throughout the "termination period" that Omron had proposed but for which it had not issued written notice. Such support has not occurred. The promises of uninterrupted service and support until March 2017 were made to induce IceMOS to accept an early termination based upon assurances the transition would be handled in a way that would prevent any additional harm to IceMOS. Omron knew IceMOS had no other viable options.

56.     As of the date of the Original Complaint in this matter, Omron had not provided proper written notice to IceMOS sufficient to trigger the early termination provision

of the Supply Agreement. IceMOS has never accepted the oral termination as proper. This is a material breach of the Supply Agreement.

57.     Omron has further breached the Supply Agreement by actions and inaction other than its breach of the early termination provision.

58.     First, Omron has failed to ship one or more IceMOS orders. The Supply Agreement requires lead time of no more than 10 weeks for products with fewer than 15 photo layers. Supply Agreement § 4.11. A shipment scheduled to ship on August 5, 2016, which had a lead time of 10 weeks, did not ship until October 14, 2016. The delay occurred because Omron failed to exercise proper process control and had to replace a failed process run. IceMOS lost the customer due to Omron's fabrication failure and sought to return the late product because the customer had switched to an IceMOS competitor. Omron did not credit IceMOS for the failed process run and instead claimed an outstanding invoice for the rejected product.

59.     Second, Omron failed to ensure continuous uninterrupted supply despite § 4.15 of the Supply Agreement and its Exhibit H.

60.     Third, Omron has rejected the return of unusable wafers rejected by IceMOS.

61.     Fourth, Omron has refused to accept new purchase orders from IceMOS, in violation of, *inter alia*, §§ 2.0, 4.15 and 6.2 of the Supply Agreement.

62.     Fifth, Omron has refused to effectuate a sufficient inventory build to service IceMOS during the transition of fabrication services from Omron's Yasu Fab to a subsequent fabrication facility in violation of § 6.2 of the Supply Agreement.

63.     Since meeting with Omron and learning of Omron's intent to terminate the Supply Agreement, IceMOS has maintained that Omron is not permitted to terminate the Supply Agreement and must continue to support the design, development, and manufacture of IceMOS's Super Junction MOSFETs for at least three years after proper termination notice.

64.     Nonetheless, in a good faith endeavor to minimize/mitigate any potential damages, and in reliance upon Omron's representations regarding ongoing support during the termination period, IceMOS has negotiated with Omron to resolve the termination issue and has attempted to find alternative facilities to meet its manufacturing demands.

65.     Given the term of the Supply Agreement and the nature of semiconductor fabrication, IceMOS developed the manufacturing processes for its Super Junction MOSFETs specifically for Omron's wafer manufacturing facility and equipment.

66.     Despite its best efforts, IceMOS has been unable to identify a comparable manufacturing facility with adequate supply capability or capacity that will not cause substantial delay, costs, and further loss to IceMOS.

67.     Additionally, IceMOS has learned that the DRIE etcher that it purchased at Omron's insistence and consigned to Omron's facility cannot be transferred and supported outside of Japan, severely limiting IceMOS's options for alternative manufacturers without the substantial loss of the millions of dollars invested in the purchase and installation of the DRIE etcher.

68.     Recognizing its failure to comply with the three-year notice period or its obligations to continue to fully support IceMOS during a transition, Omron has since shifted its intended termination date to March 6, 2018, which is still fewer than three years from the first possible written notice date.

69.     Such shift also violates the Supply Agreement because the March 6, 2018 date Omron decided upon is less than three years from the time Omron indicated its intent to terminate on that date.

70.     The March 6, 2018 date for termination is in further violation of the Supply Agreement because Omron has not provided IceMOS with notice in writing and delivered personally or via facsimile or via certified or registered mail.

71.     Nonetheless, Omron now maintains an intent to terminate the Supply Agreement as of March 6, 2018. But Omron has provided no assurances to IceMOS that it

1  will fully support new product development with engineering lots or provide the necessary

2  level of engineering support.

3       72.     Despite its covenant to fully resource the development of IceMOS's Super

4  Junction MOSFETs, no later than early 2014, Omron began to redirect engineering resources

5  from IceMOS's development activities to Omron's internal business activities. In so doing,

6  Omron failed to ensure that it could continue to supply 3500 wafers/month as required by

7  the Supply Agreement.

8       73.     Omron's reduction of support for IceMOS has been ongoing and has worsened

9  from 2015 to 2016, causing disruption and delays in the development and manufacture of

10  IceMOS's Super Junction MOSFETs and its ability to meet customer demands. Such

11  disruption and delays have detrimentally impacted IceMOS's existing and prospective

12  business relationships by preventing IceMOS from developing its products, selling those

13  products into the market, and timely delivering products to existing customers.

14       74.     Additionally, Omron has recently taken the position that the Supply

15  Agreement does not require it to fully support IceMOS's Super Junction MOSFETs for three

16  years, including one year of concurrent transfer support, but rather requires only two years

17  of product support and one year of transfer support, which conflicts with Omron's duty to

18  ensure uninterrupted supply in § 4.15 of the Supply Agreement.

19       75.     Omron's position has no merit. Under Omron's interpretation, IceMOS would

20  have agreed to a termination that would leave IceMOS with no ability to service its customers

21  for a full year. IceMOS made no such agreement because that would kill the company.

22  Because IceMOS Super Junction MOSFETs must be "designed in" to customer products,

23  which products have a multi-year life cycle, a customer decision to include IceMOS Super

24  Junction MOSFETs in its products in a device means IceMOS must commit to the customer

25  that it can continuously supply the devices for the expected life of the products in which they

26  are used. This is the nature of the microelectronics industry, and Omron had full knowledge

27  of the life cycle and design-in processes when it courted IceMOS in 2007 and 2008, and

when it entered the Supply Agreement in 2011. Omron's claim that the Supply Agreement can be interpreted in that manner demonstrates its bad faith and malicious intent.

76.     Omron previously represented, in the December 9, 2015 meeting minutes, that it would fully support IceMOS's Super Junction MOSFETs throughout the termination period. That representation was false.

77.     On or about May 9, 2017, Omron sent a letter to IceMOS indicating that it intends to cease all manufacture of IceMOS's Super Junction MOSFETs by July 2017. A true and correct copy of said letter is attached hereto as "Exhibit 3" and is incorporated by reference as if fully set forth herein.

78.     IceMOS has advised Omron of the detrimental impact of its efforts to improperly and prematurely terminate the Supply Agreement. Omron's continued efforts and plans to terminate the Supply Agreement have rendered IceMOS's supply chain uncertain and have inhibited IceMOS's ability to effectively and productively conduct its business. No customers will buy IceMOS's products without a qualified manufacturer identified, approved, and committed to manufacturing IceMOS's orders.

79.     Additionally, IceMOS intends to make an initial public offering ("IPO") in 2018 with an expected valuation exceeding $100,000,000.00, of which Omron is aware. Early termination of the Supply Agreement without proper notice has seriously and detrimentally affected IceMOS's ability to make its intended IPO in 2018 and/or will negatively impact the valuation thereof.

80.     Omron's past failures to satisfy its obligations under the Supply Agreement, its failure to provide proper notice of its intent to terminate the Supply Agreement, and its ongoing efforts to terminate the Supply Agreement early and without proper support for IceMOS's products have caused, and will continue to cause, ongoing harm to IceMOS, including but not limited to, lost business opportunities, lost business reputation, and lost business valuation, for which IceMOS seeks redress, as follows:

## IV.     CAUSES OF ACTION

81.     Based on the above facts, IceMOS brings this suit for the following causes of action: (i) breach of contract; (ii) breach of the implied duty of good faith and fair dealing; (iii) promissory estoppel, in the alternative; and (iv) fraud.

**A.     COUNT I: BREACH OF CONTRACT**

82.     IceMOS adopts and incorporates by reference all preceding paragraphs as if fully set forth herein.

83.     The Supply Agreement is a valid and enforceable contract for breach of which IceMOS is a proper party to sue.

84.     At all relevant times, IceMOS fully performed, tendered performance of, and/or was excused from performing its contractual obligations under the Supply Agreement.

85.     IceMOS has invested millions of dollars in the performance of its contractual obligations under the Supply Agreement, including but not limited to, purchasing the DRIE etcher, purchasing numerous mask sets and silicon wafers for development and production, and hiring a dedicated team of Japanese engineers to work with Omron to facilitate the development and manufacturing of IceMOS's Super Junction MOSFETs.

86.     Omron has engaged in multiple breaches of the Supply Agreement, including but not limited to, failing and/or refusing to "fully resource the development of all generations of Super Junction MOSFETs;" failing and/or refusing to "share equally in the production mask costs (initial sets) applicable to the products;" attempting to improperly terminate the Supply Agreement without proper notice; and repudiating its obligations to support development and manufacture IceMOS's Super Junction MOSFETs throughout the three-year termination period.

87.     Omron's breaches of the Supply Agreement have caused, and will continue to cause, ongoing harm to IceMOS, including but not limited to, actual damages in the form of increased costs, loss of business due to delay in reaching the market, harm to IceMOS's business reputation due to inability to timely meet customer demands, loss of business

1   opportunities due to uncertainty of supply, and impairment of IceMOS's valuation in
2   advance of its planned IPO.

3   88.    The harm to IceMOS's business reputation, the impairment of its valuation,
4   and the loss of business opportunities—in particular, the harms that have arisen and will arise
5   from Omron's improper termination and repudiation of its obligation to support IceMOS
6   throughout the termination period—are not adequately recompensable by monetary
7   damages. IceMOS does not have an adequate remedy at law to compensate it for such harms.

8   89.    The manufacturing processes for IceMOS's Super Junction MOSFETs are
9   unique and were developed specifically for the Yasu Fab.

10  90.    Additionally, IceMOS purchased specialized manufacturing equipment at
11  Omron's insistence and consigned such equipment to the Yasu Fab. Such equipment was
12  specifically configured for Omron's facility and cannot be serviced outside of Japan.

13  91.    Because of the unique manufacturing processes and specialized equipment,
14  IceMOS cannot avoid the harm to its business reputation and loss of business by transferring
15  manufacturing to another facility in time to avoid the harm.

16  92.    IceMOS has attempted in good faith to avoid and mitigate such harm and has
17  been unable to locate a comparable facility with sufficient capacity and qualify it for
18  customers within the time Omron has demanded. IceMOS has stood, and continues to stand,
19  ready, willing, and able to perform its obligations under the Supply Agreement.

20  93.    Because of the immeasurable nature of the harm to IceMOS and the unique
21  nature of the supply services under the Supply Agreement, IceMOS seeks specific
22  performance of the Supply Agreement. Specifically, IceMOS seeks to have Omron continue
23  manufacturing and supporting IceMOS's Super Junction MOSFETs until the earlier of either
24  February 28, 2021 or three years after the day proper written notice of termination is
25  delivered in accordance with the Supply Agreement.

26  94.    In the alternative, to the extent that the court finds that the harm to IceMOS's
27  business reputation and valuation and the loss of business opportunities are recompensable
28

1  by monetary damages, IceMOS seeks recovery of all actual damages suffered by it due to

2  Omron's multiple breaches of the Supply Agreement in an amount to be proven at trial,

3  which amount IceMOS believes exceeds $25,000,000.00.

4  **B.    COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR**

5  **DEALING**

6  95.    IceMOS adopts and incorporates by reference all preceding paragraphs as if

7  fully set forth herein.

8  96.    In addition to the breaches of contract stated above, Omron has breached its

9  implied duty of good faith and fair dealing.

10  97.    The parties agreed that the Supply Agreement "shall be governed by and

11  construed in all respects under the laws of New York, without regard to rules concerning

12  conflicts of laws." Supply Agreement, § 9.2.

13  98.    New York law holds that "in every contract there is an implied covenant that

14  neither party shall do anything which will have the effect of destroying or injuring the right

15  of the other party to receive the fruits of the contract, which means that in every contract

16  there exists an implied covenant of good faith and fair dealing."

17  99.    The New York covenant of good faith and fair dealing implies in the Supply

18  Agreement all promises that a reasonable person in the promisee's position would justifiably

19  understand were included to ensure the promisee's expectations are not destroyed by the

20  promisor's actions even if such actions are not specifically prohibited by the contract.

21  100.    As described in Paragraphs 35-41 above, Omron has taken actions that have

22  prevented IceMOS from receiving the "fruits of the contract." Such actions are separate and

23  distinct from Omron's various breaches of the Supply Agreement.

24  101.    Because of the unique manufacturing processes and specialized equipment,

25  IceMOS cannot avoid the harm to is business reputation and loss of business by transferring

26  manufacturing to another facility.

27

28

102.   IceMOS has attempted in good faith to avoid and mitigate such harm and has been unable to locate a comparable facility with sufficient capacity and qualify it for customers within the time Omron has demanded.

103.   Omron's breaches of its covenant of good faith and fair dealing have damaged IceMOS by raising IceMOS's costs to comply with the Supply Agreement.

104.   Omron's breaches of its covenant of good faith and fair dealing have damaged IceMOS by harming its customer relations and damaging its goodwill.

C.   COUNT III: PROMISSORY ESTOPPEL, IN THE ALTERNATIVE

105.   IceMOS adopts and incorporates by reference all preceding paragraphs as if fully set forth herein.

106.   Alternative to the foregoing cause of action for breach of contract, to the extent the Court finds that the Supply Agreement is unenforceable or that IceMOS is otherwise unable to recover thereunder, IceMOS brings this claim for promissory estoppel, seeking enforcement of Omron's promises.

107.   Omron made a promise to IceMOS. Specifically, Omron promised to manufacture and support IceMOS's Super Junction MOSFETs for a period of ten years unless earlier terminated upon three years' proper notice and support.

108.   IceMOS reasonably and substantially relied on this promise to its detriment by specifically tailoring its manufacturing processes to Omron's facility and investing substantial sums to facilitate development and manufacturing of its Super Junction MOSFETs at Omron's facility.

109.   IceMOS's reliance was reasonably foreseeable to Omron. Omron made the promise as an inducement for IceMOS to make use of Omron's manufacturing services.

110.   Injustice can only be avoided by enforcing Omron's promise to manufacture and support IceMOS's Super Junction MOSFETs for the promised term.

111.   Accordingly, IceMOS seeks to enforce Omron's promise by recovery of the damages suffered by IceMOS in reliance on Omron's promise, including but not limited to,

1  the depreciated value of the DRIE etcher and other equipment specifically purchased and

2  consigned to Omron's wafer manufacture facility in reliance on Omron's promise.

3  **D.**  **COUNT IV: FRAUD**

4       112.  IceMOS adopts and incorporates by reference all preceding paragraphs as if

5  fully set forth herein.

6       113.  At the March 6, 2015 meeting in Arizona, and again at the December 9, 2015

7  meeting in Japan, Omron's employee, Yoshitake Ito, represented to IceMOS's Sam

8  Anderson that Omron intended to fully support IceMOS's Super Junction MOSFETs. *See,*

9  *e.g.,* Exhibit 2 (including provisions for inventory build through March 2017 and

10  representation that Omron will "do [its] best to support transfer activities and inventory build

11  for Super Junction").

12       114.  This representation was material to the negotiations over Omron's attempts to

13  improperly terminate the Supply Agreement.

14       115.  This representation was false because Omron has indicated it will not fully

15  support IceMOS's Super Junction MOSFETs through the termination period but will provide

16  only transfer support for one year of the termination period.

17       116.  When Omron made the representation, it either knew that it had no intent to

18  fully support IceMOS's Super Junction MOSFETs throughout the termination period or

19  made the representation as a positive assertion with reckless disregard to its truth or falsity.

20       117.  Omron made its representation as part of the negotiations over its admittedly

21  improper termination efforts with the intent that IceMOS rely on the representation as the

22  parties sought a business solution to their impasse.

23       118.  IceMOS did, in fact, rely on the representation in its decision to attempt to

24  mitigate damages by looking for an alternative manufacturing facility and to work in good

25  faith with Omron despite Omron's improper termination efforts.

26       119.  IceMOS did not know, nor did it have reason to know, that Omron's

27  representation was false.

28

120. Omron's fraudulent misrepresentation has caused, and continues to cause, harm to IceMOS by rendering its supply chain uncertain and impairing IceMOS's ability to effectively and profitably conduct business, develop products, qualify production for customers, and service customers, for which IceMOS seeks to recover actual damages in an amount to be proven at trial.

## V. REQUEST FOR PRELIMINARY INJUNCTION

121. IceMOS requests that the Court enter a preliminary injunction against Omron enjoining Omron from ceasing to manufacture IceMOS's Super Junction MOSFETs or providing IceMOS less support than Omron provides for its own manufacturing during the pendency of this suit. Good cause exists for such relief in that there is a substantial likelihood that IceMOS will succeed on its claim for breach of contract and will suffer irreparable harm in the absence of an injunction.

122. There is a substantial likelihood that IceMOS will succeed on its claim for breach of contract in that Omron has admitted and acknowledged that it did not comply with the three-year notice period. During the December 9, 2015 meeting Omron acknowledged that its attempted notice on March 6, 2015 was less than three years prior to the termination date. Exhibit 2, p. 1.

123. Further, Omron has never provided IceMOS with written notice of early termination that conforms to the notice requirements set forth in the Supply Agreement.

124. In the absence of an injunction, IceMOS is substantially likely to suffer irreparable harm. The loss of its manufacturer would prevent IceMOS from satisfying its commercial obligations, causing IceMOS to lose customers and suffer damage to its business reputation.

125. Such harm to its business would not be recompensable by an award of monetary damages.

126. Further, such harm outweighs any potential injury to Omron from being enjoined. Requiring Omron to continue manufacturing IceMOS's Super Junction MOSFETs

1    in accordance with the Supply Agreement that Omron voluntarily entered will not cause

2    Omron irreparable harm comparable to the loss of business reputation, business

3    opportunities, and business valuation faced by IceMOS in the absence of such injunction.

4         127.   Finally, the public interest would not be disserved by enjoining Omron as the

5    public has an interest in contracts being enforced and in parties satisfying their contractual

6    obligations. Enjoining Omron to comply with the obligations it voluntarily accepted serves

7    this interest and does not run counter to any other public interest.

8         128.   For these reasons, IceMOS requests that the Court enjoin Omron from ceasing

9    to manufacture IceMOS's Super Junction MOSFETs or providing less support to IceMOS

10   than Omron contracted to provide during the pendency of this suit.

11                               **VI.    PRAYER**

12        **WHEREFORE, PREMISES CONSIDERED,** IceMOS prays that the Court enter

13   judgment against Omron for breach of contract, breach of the implied covenant of good faith

14   and fair dealing, and fraud, awarding IceMOS its actual damages arising from Omron's

15   fraudulent misrepresentation, punitive damages for Omron's intentional fraud, and enjoining

16   Omron from ceasing to manufacture IceMOS's Super Junction MOSFETs and from

17   providing less support for IceMOS's Super Junction MOSFETS than Omron provides for its

18   own products until the earlier of either February 28, 2021 or three years after the day proper

19   notice of termination is delivered in accordance with the Supply Agreement. To the extent

20   that the Court finds that the harms arising from Omron's breach of contract and breach of

21   implied covenant are recompensable by monetary damages, IceMOS prays that the Court

22   award actual damages for its breach of contract claim and for its breach of implied covenant

23   claim. In the alternative, to the extent that the Court finds the Supply Agreement is

24   unenforceable or that IceMOS is otherwise unable to recover thereunder, IceMOS prays that

25   the Court enter judgment against Omron for promissory estoppel and award IceMOS its

26   actual damages arising from its reliance on Omron's promises. IceMOS prays for such

27   further relief, at law or in equity, to which it may show itself to be entitled.

28

## VII.   DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), IceMOS hereby demands a trial by jury on all issues triable to a jury.

Dated: August 28, 2017                    Respectfully submitted,

*/s/ Robert D. Atkins/*
Robert D. Atkins (State Bar No. 015375)
PATENT LAW GROUP: Atkins and Associates, P.C.
55 North Arizona Place, Suite 104
Chandler, Arizona 85225
Telephone: 480.499.9400
main@plgaz.com

Michael W. Shore (admitted *pro hac vice*)
mshore@shorechan.com
Alfonso G. Chan (admitted *pro hac vice*)
achan@shorechan.com
Russell J. DePalma (admitted *pro hac vice*)
rdepalma@shorechan.com
Paul T. Beeler (*pro hac vice* to be filed)
pbeeler@shorechan.com
SHORE CHAN DEPUMPO LLP
901 Main Street, Suite 3300
Dallas, Texas 75202
Telephone: (214) 593-9110
Facsimile: (214) 593-9111

**COUNSEL    FOR    PLAINTIFF    ICEMOS TECHNOLOGY CORPORATION**

**CERTIFICATE OF SERVICE**

☒ I hereby certify that on August 28, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/EFC registrants:

**Brian Jay Schulman**
Greenberg Traurig LLP
2375 E Camelback Rd., Ste 700
Phoenix, AZ 85016
602-445-8000
Fax: 602-445-8100
Email: schulmanb@gtlaw.com

**Kevin M Lewis**
Greenberg Traurig LLP - Chicago, IL
77 W Wacker Dr., Ste. 2400
Chicago, IL 60601
312-456-8400
Fax: 312-456-8435
Email: lewiskev@gtlaw.com

*/s/ Maritza O'Neill/*
Maritza O'Neill