**EXHIBIT 1**

# SUPPLY AGREEMENT

This Supply Agreement ("AGREEMENT") is entered into on this 28th day of Feb, 2011, by and among

OMRON Corporation (hereinafter "OMRON" or "OMRON YASU")
Micro Devices Division,
Micro Devices HQ
686-1, Ichimiyake, Yasu,
SHIGA, 520-2362 JAPAN

and

IceMOS Technology (hereinafter "IceMOS")
7855 South River Parkway
Tempe,
Az85284,
USA.


Background: The purpose of this AGREEMENT is to set forth terms under which OMRON is to provide Foundry Services to IceMOS.

(1) IceMOS and OMRON have been engaged in a customer supplier relationship since year 2008. During this period IceMOS has designed and developed Super Junction MOSFETs which have been manufactured by OMRON YASU semiconductor wafer fabrication facility.

(2) Demand for IceMOS Super Junction MOSFETs is estimated to reach a volume of up to three thousand and five hundred (3500) wafers per month by year 2014. This projected volume now brings increased visibility to IceMOS and OMRON with respect to purchase of certain manufacturing equipment necessary to enable a high volume production. It is important to IceMOS that supply agreements are in place that allow IceMOS to provide to IceMOS customers products with high quality and reliability standards, competitive pricing and cost down programs, uninterrupted supply programs, on time delivery, failure analysis, technology roadmaps, and capacity ahead of demand.

(3) To enable the capacity ahead of demand IceMOS has agreed to purchase equipment that is critical to Super Junction MOSFET manufacturing. Such equipment is DRIE etchers. In return for the purchase and consignment of DRIE ethers Omron agrees to take this investment into consideration with respect to the volume – price learning curve for Super Junction products.

## RECITALS

**WHEREAS,** IceMOS desires to establish a FOUNDRY source of supply of fabricated and unprobed wafers using the Super Junction MOSFET processes and product line currently manufactured in OMRON YASU factory for supply to IceMOS top tier customers.

**WHEREAS,** IceMOS has created certain process flows, design parameters and specifications for its Super Junction MOSFET that uniquely make these devices leadership MOSFETs suitable for high frequency operations, or as safety devices and has qualified these processes, designs and products in the OMRON YASU factory.

**WHEREAS,** OMRON has the semiconductor wafer fabrication business and manufacturing capabilities at its' YASU facility and does desire to expand its' customer base by entering into this AGREEMENT with OMRON.

## ARTICLE 1
## DEFINITIONS

SECTION 1.0  Where set forth in this AGREEMENT, the following terms shall have the meanings as defined in this Section:

"Design Specifications" shall mean the specifications, test vectors, GDSII databases and other design and process flows provided by IceMOS to OMRON for use in the fabrication of IceMOS Super Junction MOSFETs specifically to enable OMRON to supply production volumes to IceMOS. These Design Specifications and projected demand for each specification are listed in Exhibit A
Additional products will be added to Exhibit A as business opportunities develop.

"Effective Date" shall mean the effective date if this AGREEMENT which shall be the date first above written.

"Exhibit" or "Exhibits" shall mean any and all exhibits to this AGREEMENT, which by this reference are incorporated into and made a part hereof.

"Foundry" shall mean, unless otherwise mutually agreed to in writing by parties, OMRON YASU wafer fabrication facility.

"Foundry Services" shall mean that OMRON fabricate to certain "Design Specifications" Listed in Exhibit A for IceMOS's Super Junction MOSFETs in volume production at terms agreed in Exhibit B, C and D.

"Intellectual Property (IP)" shall mean, custom design and process blocks developed by IceMOS and provided to OMRON for the propagation of Super Junction MOSFETs specifically to enable IceMOS to supply to IceMOS customers.

"Intellectual Property (IP)" shall mean, custom device structures or designs and custom process blocks, including GDSII databases and Mask Sets and other design parameters and modified process flows that are involved in meeting the "Design Specifications" including the "Design Specifications". All "Intellectual Property (IP)" described in this paragraph for the volume production of Super Junction MOSFETs specifically to enable OMRON to supply production volumes to IceMOS is the property of IceMOS.

"Licensed Products" shall mean the semiconductor wafers fabricated to IceMOS Super Junction MOSFETs "Design Specifications as listed in Exhibit A".

"Production" shall mean the fabrication of Super Junction MOSFETs specifically by OMRON YASU facility to be supplied in volume to IceMOS.

"Production Lot" shall mean a total of twenty-five (25),  eight (8) inch wafers, processed together at the OMRON YASU facility.

"Engineering Lot" shall mean a total of twelve (12) wafers or less processed with special engineering instructions provided by IceMOS to OMRON.

"Proprietary Information" shall mean any all designs, design specifications, scientific, marketing, or business information or data, engineering know-how, trade secrets, drawings, artwork, documentation, circuitry, processes, illustrations, mask work, and any other information, whether or not copyrightable, or patentable, of any party to this AGREEMENT which is deemed by such party to be confidential or proprietary.

"Risk Production" shall mean the fabrication of Products, prior to formal acceptance of the production units.

"Target Yield" shall mean an average number of good Products resulting from production wafers which shall be agreed between IceMOS and OMRON.

"Wafer Acceptance Test" shall mean a wafer level test that will be performed by OMRON on a PCM structure using a representative sample size to be agreed upon between OMRON and IceMOS as defined in Exhibit C and D.

## ARTICLE II
## DESCRIPTION OF WORK

SECTION 2.0  Agreement to Perform Fabrication Services. OMRON hereby agrees to perform the fabrication requested by IceMOS in accordance with the Design Specifications set forth in Exhibit C at the terms previously agreed upon in Exhibit B.

SECTION2.1  Support. IceMOS will in a timely manner provide specifications, and engineering support as may be reasonably necessary to OMRON in preparation for

volume production, through risk production until OMRON has accepted each product as qualified for volume production.

SECTION 2.2  Changes. OMRON shall notify IceMOS of any desired changes to the process flow or product design in writing and obtain approval from IceMOS before implementation of any changes. Exhibit F describes OMRON Process Change Notification Procedure.

# ARTICLE III
# PROTOTYPE UNITS

SECTION 3.0  First Iterations. IceMOS shall supply the database to OMRON for the fabrication of each first article PROTOTYPES design of the products listed in Exhibit A.

SECTION 3.1  Masks. OMRON may subcontract mask making to its own subcontract photomask making. In any case, the responsibility of and for the masks is that of OMRON. IceMOS shall be responsible for the mask costs applicable to process development and/or PROTOTYPES. If the reason of the mask build is caused by OMRON, OMRON shall be responsible for the mask costs applicable to process development and/or PROTOTYPES.

SECTION 3.2  First PROTOYYPES. IceMOS shall have ninety (90) days to inspect prototypes of products listed in Exhibit A fabricated by OMRON. Within such ninety (90) day period, IceMOS shall provide a written notice of its acceptance or rejection of the PROTOTYPES.

SECTION 3.3  Products and Process. OMRON shall process, at OMRON's expense, silicon for each product meeting the "Design Specifications" in Exhibit A.

# ARTICLE IV
# VOLUME PRODUCTION

SECTION 4.0  Mask Sets. IceMOS and OMRON will share equally in the production mask costs (initial sets) applicable to the products listed in Exhibit A and future products. IceMOS shall be responsible for the additional mask set costs applicable to product redesign caused by IceMOS for any reason. If the reason of the mask build for product redesign is caused by OMRON, OMRON shall be responsible for the mask set costs.

SECTION 4.1  Purchase Orders. Volume Production Purchase Orders will be issued directly by IceMOS to OMRON. OMRON shall accept or reject Purchase Orders and shipment instructions and confirm all shipment schedules within five (5) business days following its receipt of orders or instructions.

SECTION 4.2  Pricing.
4.2.1          The wafer prices including in this AGREEMENT are outlined in Exhibit
B. OMRON agrees to fully resource the development of all generations of Super Junction
MOSFETs as indicated in Exhibit B2, through the duration of this AGREEMENT.
IceMOS and OMRON shall in good faith discuss on the wafer pricing and may apply
new wafer prices for future technology if there is a big difference in load of wafer process
or material from the existing design and process of Design Specification indicated in
Exhibit A.

4.2.2          IceMOS will consider any section on the Currency Fluctuation Risk Share
Model that OMRON proposes but is under no obligation to accept such proposal.

SECTION 4.3  Forecasts.
4.3.1          In order to permit OMRON to plan for the manufacture of wafers
reasonably in line with the estimated demands of IceMOS. IceMOS shall provide
OMRON a monthly rolling forecast of its estimated demand for wafers over the next
twelve (12) months.

4.3.2          IceMOS shall provide OMRON with its updated forecasts no later than
fourteen (14) days before the end of each calendar month. If IceMOS fails to submit an
updated forecast, the previous forecast shall be deemed reissued as the updated forecast,
provided that one additional month shall be added with forecast requirements equal to
those specified for the last month of the reissued forecast.

SECTION 4.4  Payment Terms. Payment will be made by IceMOS to OMRON at net
sixty (60) days EOM. All prices and payments will be in US Dollars.

SECTION 4.5  Line Audits. Upon the written request of IceMOS, OMRON agrees to
hold a line audit where IceMOS can invite IceMOS customers to participate in Line
Audits.

SECTION 4.6  Lot Identification. All production lots shipped will be scribed with the
correct Lot identification number as provided by IceMOS or OMRON. All data from
these lots will be held and traceable for an agreed period of time.

SECTION 4.7  Visual Inspection. OMRON shall perform visual inspection based upon
the Outgoing Visual Inspection Criteria shown in Exhibit D.

SECTION 4.8  Test. Parametric testing will be performed by IceMOS with data feedback
to OMRON for correlation to OMRON PCM Wafer Acceptance Test as defined in
Exhibit C.

SECTION 4.9  Return of Product. All lots delivered by OMRON will be subject to
incoming inspection and testing on a monitoring basis by IceMOS. In the event any lot is
found to fail the "Design Specification" per Exhibit A for a given device title then
IceMOS will have the right to reject the Lot and return to OMRON.

SECTION 4.10  Reliability and QA. Reliability and QA data, which is sufficient to demonstrate normal life and environmental test performance of Products shall be submitted by IceMOS to OMRON upon request. Wafer level reliability and QA data, which is monitored using OMORN standard product structure shall be submitted by OMRON to IceMOS upon request.

SECTION 4.11  Delivery and Lead time. OMRON shall ship fabricated wafer lots in accordance with IceMOS Packing Criteria. Production lead time will not exceed ten (10) weeks for the products which have less than fifteen (15) photo layers.

SECTION 4.12  Title and Risk of Loss. Title and Risk of loss and damage to wafers purchased by IceMOS are placed in accordance with shipment terms. Shipment Terms shall be EXW YASU (pursuant to Incoterms 2000).

 SECTION 4.13  Taxes and Duties. All taxes and/or duties of any kind that are payable in connection with the performance of this AGREEMENT imposed by the authorities of Japan or its political subdivisions shall be borne by OMRON.

SECTION 4.14  Capacity. OMRON agrees to support IceMOS up to a minimum capacity of three thousand and five hundred (3500) wafers per month during the term of this AGREEMENT. To enable such a capacity, IceMOS has agreed to purchase equipment of DRIE etcher that is critical to Super Junction MOSFET manufacturing, for one (1) etcher at every one thousand (1000) wafers per month ramping up. IceMOS has also agreed to pay the fitting up cost necessary to install the DRIE in OMRON YASU facility. If OMRON has a difficulty to support up to three thousand and five hundred (3500) wafers per month due to the unexpected process variation introduced by new technology by IceMOS in the future, IceMOS and OMRON shall agree to seek for the solution by good faith discussion and mutual agreement.

SECTION 4.15  Uninterrupted Supply. OMRON agrees to take all preventive measures listed in Exhibit H necessary to provide continuous supply to IceMOS during the term of this AGREEMENT.

## ARTTICLE V
## PROPRIETARY INFORMATION

SECTION 5.0  Proprietary Information. All custom design and process blocks developed by IceMOS and provided to OMRON for the propagation of IceMOS Super Junction MOSFETs specifically to enable OMRON to supply production volumes to IceMOS, shall be proprietary information. Title to this proprietary information shall at all times be and remain the property of IceMOS.

SECTION 5.1  All custom device structures or designs and custom process blocks, including GDSII databases and Mask Sets and other design parameters and modified

process flows that are involved in meeting the "Design Specifications" including the "Design Specifications" shall at all times be and remain the property of IceMOS.

## ARTICLE VI
## TERM AND TERMINATION

SECTION 6.0 Term. The term of this AGREEMENT shall be for a period of ten (10) years from the above effective date.

SECTION 6.1 Termination. For cause upon a ninety (90) day written notice of a material breach of this AGREEMENT by either Party, or for a voluntary petition in bankruptcy by either Party, or by mutual consent of all Parties.

SECTION 6.2 Early Termination. Notwithstanding anything contained in this AGREEMENT, either Party can terminate this Agreement without any cause and liability by giving a written notice to the other Party at least three (3) years, which include one (1) year period of transfer to other wafer fabrication facilities, prior to termination.

SECTION 6.3 Survival. All provisions of Article V, Article VII and Article VIII shall survive after the expiration of this AGREEMENT.

## ARTICLE VII
## LIMITED WARRANTY

SECTION 7.0 Limited Warranty. OMRON warrants that the production products, when delivered hereunder to IceMOS pursuant to this AGREEMENT, shall be free from defects in material and workmanship, and shall conform in all respects to the IceMOS's Specifications, which were accepted hereunder as the basis for the fabrication of wafers. For a period of twelve (12) months following shipment of the Production Products, OMRON will replace, free of charge, all Production Products determined to be defective in manufacture, provided, however, that IceMOS promptly notifies OMRON of such defect in writing and obtains Return Material Authorization number (RMA) from OMRON.

## ARTICLE VIII
## IP WARRANTIES

SECTION 8.0 Warranty by IceMOS. IceMOS hereby warrants that the Design Specifications and its transfer thereof to OMRON, including, but not limited to, GDSII FILES and MASK SETS, do not infringe any trade secrets, copyrights, patents, mask work rights, or any other proprietary rights of any third party.

## ARTICLES IX
## MISCELLANEOUS

SECTION 9.0  Assignment. No party may assign this AGREEMENT nor delegate its duties hereunder.

SECTION 9.1  Waiver. No term or condition of this AGREEMENT shall be deemed waived unless such a waiver is in a writing executed by the Party against whom the waiver is sought to be enforced.

SECTION 9.2  Law to Govern, Jurisdiction. This AGREEMENT shall be governed by and construed in all respects under the laws of New York, without regard to rules concerning conflicts of law.

SECTION 9.3  Severability. If any of the provisions of this AGREEMENT in any way violate or contravene any laws applicable to this AGREEMENT, such provision shall be deemed not to be part of this AGREEMENT and the remainder of this AGREEMENT shall remain in full force and effect.

SECTION 9.4  Notice. All notices required pursuant to this AGREEMENT shall be in writing and delivered personally or via  facsimile or via registered or certified mail, to the address of the Parties first above appearing, which may be changed by written notice of the same to the other Party.

To: Samuel Anderson
IceMOS Technology
7855 South River Parkway
Tempe,
Az85284

To:  Yoshio Sekiguchi
OMRON Corporation
Micro Devices Division,
Micro Devices HQ
686-1, Ichimiyake, Yasu,
SHIGA, 520-2362, JAPAN

SECTION 9.5  Attorney Fees. No Attorney's  Fees will be paid by the other Party in the event of a dispute.

SECTION 9.6  Force Majeure. Neither Party shall be liable for any loss, damage, delay or failure of performance resulting directly or indirectly  from any cause beyond reasonable control, including, but not limited to, acts of God, extraordinary traffic conditions, riots, civil disturbances, wars, states of belligerence or acts of the public enemy, strikes, labor disputes, work stoppages, or the laws, regulations, acts of failure to

act of any government authority, provided that neither of the Parties shall be excused for failure or delay in making payments of money due and payable hereunder.

SECTION 9.7 <u>Authority</u>. Each person signing this AGREEMENT on behalf of a Party represents and warrants that he or she has the actual authority to bind the Party on behalf of whom the person is signing this AGREEMENT.

SECTION 9.8 <u>Exhibits</u>. The following Exhibits are attached hereto and made part hereof:

> EXHIBIT A:  Design Specifications and Forecast.
> EXHIBIT B:  Prices.
> EXHIBIT C:  PCM Specifications and Wafer Acceptance Criteria.
> EXHIBIT D:  Visual Inspection Criteria.
> EXHIBIT E:  IceMOS Reliability Testing.
> EXHIBIT F:  OMRON Process Change Notification Procedure.
> EXHIBIT G:  Shipping Specifications.
> EXHIBIT H:  OMRON Preventive Measure of Uninterrupted Supply

SECTION 10 CONFIDENTIALITY

10.1         The Parties acknowledge that confidential proprietary information may be disclosed by IceMOS ("Discloser") to OMRON ("Recipient") and/or disclosed by OMRON ("Discloser") to IceMOS ("Recipient") as the case may be. Under no circumstances can any of the terms of this AGREEMENT be disclosed to any third party including, without the written permission of IceMOS. Confidential Information which is disclosed verbally may be identified by Discloser to Recipient as confidential at time of disclosure and may be confirmed in writing by the Discloser within thirty (30) days after such disclosure by submitting a letter containing substantially similar information or a summary of the Confidential Information disclosed to Recipient.

10.2         The Parties hereby agree that Recipient shall (i) not disclose, publish, distribute, transfer, loan, provide, or otherwise make available the Confidential Information to any third party without written consent of Discloser, (ii) restrict dissemination of Confidential Information to only those directors, officers, employees, representatives, advisors, contractors, consultants, or agents who must be directly involved with Confidential Information and who are bound by a duty of confidentiality applicable to the Confidential Information, (iii) use the same degree of care as for its own information of like importance, but at least use reasonable care, in safeguarding against disclosure of Confidential Information of the other Party, and (iv) use the Confidential Information solely for exercising its rights or performing its obligations under this AGREEMENT.

10.3         Recipient's obligations regarding Confidential Information received under this AGREEMENT shall survive the termination of this AGREEMENT.

10.4         This AGREEMENT imposes no obligation upon Recipient with respect to Confidential Information disclosed under this AGREEMENT which (i) is now available

or becomes generally available to the public without breach of this AGREEMENT, (ii) is explicitly approved for release by written authorization of Discloser, (iii) is lawfully obtained from a third party not having a duty of confidentiality with regard to such Confidential Information, (iv) is disclosed to a third party by Discloser without imposing a duty of confidentiality on such third party regarding such Confidential Information, or (vi) is proven to have been developed by Recipient independently, and wholly without the benefit of such Confidential Information.

10.5    Disclosure of Confidential Information shall not be precluded if such disclosure is (i) in response to a valid order of a court of competent jurisdiction, (ii) required by SEC disclosure rules, or (ii) otherwise required by law through no act of the Recipient, provided, however where disclosure is requested or required by law through judicial or administrative process, papers or court order, the Recipient shall notify the Discloser in a timely manner to allow the Discloser to seek to obtain a protective order preventing disclosure or otherwise requiring that the confidentiality of the information and/or documents for which disclosure is sought be protected and that the Confidential Information be used only for the limited purpose for which it was sought.

10.6    Recipient agrees that all Confidential Information received is and shall remain the property of Discloser and that such shall not be copied or reproduced without the express permission of the Discloser, except for such copies as may be absolutely necessary in order to perform tasks for the benefit of the Discloser. Upon written request, Recipient shall return all the Confidential Information to Discloser along with all copies and/or derivatives made, including that on computer databases and copies of portions of the Confidential Information, except that Recipient may retain in a restricted access area archival copies of the Confidential Information, to be used only in case of a dispute concerning this AGREEMENT.

**IN WITNESS  WHEREOF,** the parties hereto have caused this AGREEMENT  to be executed by its duly authorized representatives effective as of the date first above appearing.

**IceMOS Technology**

By: _Samuel Anderson_

Name: _SAMUEL ANDERSON_

Title: _PRESIDENT_

Date: _Mar 09 2011_


**Omron Corporation**

By: _Yoshio Sekiguchi_

Name: _YOSHIO SEKIGUCHI_

Title: _SENIOR GENERA MANAGER_

Date: _Mar. 09. 2011_

# Exhibit A

## Design Specifications and Volume Forecast

A) Design Specifications

 ICEMOS TECHNOLOGY LTD

*Preliminary Data Sheet*
**ICE20N65**

## ICE20N65  N-Channel Enhancement Mode MOSFET

| | Product Summary | | |
|---|---|---|---|
| $I_D$ | $T_C = 25°C$ | 20A | Max |
| $V_{(BR)DSS}$ | $I_D = 250\mu A$ | 650V | Max |
| $R_{DS(on)}$ | $V_{GS} = 10V$ | 0.19 Ω | Typ |

### Features
* Low $R_{DS(on)}$
* Ultra Low Gate Charge
* High dV/dt capability
* High Unclamped Inductive Switching (UIS) capability
* High peak current capability
* Increased transconductance performance
* Optimized design for high performance power systems





TO220
Full-PAK

Isolated
(TO-220)

**Maximum Ratings and Thermal Characteristics** [b] ($T_C = 25°C$ unless otherwise noted)

| Parameter | | Symbol | Limit | Unit |
|---|---|---|---|---|
| Drain-Source Voltage | | $V_{DS}$ | 650 | V |
| Gate-Source Voltage | | $V_{GS}$ | ±30 | |
| Drain Current | – Continuous (Tc = 25°C) | $I_C$ | 20 | A |
| | – Pulsed (limited by Tjmax) | $I_{DM}$ | 62 | |
| Repetitive Avalanche Current (limited by Tjmax) | | $I_{AR}$ | 7 | A |
| Energy in Avalanche (single pulse, D = 3.5A) | | $E_{AS}$ | 690 | mJ |
| Maximum Power Dissipation (Tc = 25°C) | | $P_D$ | 35 | W |
| Operating Junction and Storage Temperature Range | | $T_J, T_{stg}$ | -55 to 150 | °C |
| dV/dt voltage slope (Vds=490V, D=20A TJ = 125°C) | | dV/dt | 50.0 | V/ns |
| Thermal Resistance[a] | – Junction-to-Ambient | $R_{thJA}$ | 62 | °C/W |
| | – Junction-to-Case | $R_{thJC}$ | 3.50 | |

a Where mounted on 1 inch square footage as per data sheet Ref.
b Preliminary Data Sheet – Specifications subject to change

B) Volume Forecast

| Product Commercial | Part # Device Entry | 1Q011 wafers/mo | 2Q011 wafers/mo | 3Q011 wafers/mo | 4Q011 wafers/mo | 1Q12 wafers/mo | 2Q12 wafers/mo | 3Q12 wafers/mo | 4Q12 wafers/mo |
|---|---|---|---|---|---|---|---|---|---|
| **Super Junction** | | | | | | | | | |
| 650v | Ice20N60 | | 100 | 300 | 500 | 1000 | 1200 | 1500 | 2000 |
| 700V | Ice20N70 | | | 100 | 300 | 500 | 1000 | 1200 | 1500 |
| **700V** | Ice2N70 | | | **25** | **50** | 100 | 150 | 150 | 150 |
| 500V | Ice5N50 | | | | **25** | **50** | **100** | **150** | **200** |
| | **Superjunction Total** | **0** | **100** | **425** | **875** | **1650** | **2450** | **3000** | **3850** |

# Exhibit B

## Pricing and Terms for Commerical Superjunction

| Wafers Volume | Total Wafer Price including 15 Layers + EPI Starting material |
|---|---|
| 01 to 100 | $500 |
| 101 to 250 | $480 |
| 251 to 500 | $460 |
| 501 to 1000 | $440 |
| 1001 to 3500 | $400 |
| Wafers Volume | Total Wafer Price including 13 Layers + EPI Starting material |
| 01 to 100 | $470 |
| 101 to 250 | $450 |
| 251 to 500 | $430 |
| 501 to 1000 | $410 |
| 1001 to 3500 | $370 |
| Wafers Volume | Total Wafer Price including 13 Layers + DWB Starting material |
| 01 to 100 | $400 |
| 101 to 250 | $380 |
| 251 to 500 | $360 |
| 501 to 1000 | $340 |
| 1001 to 3500 | $300 |

# EXHIBIT B2



Note : All cell design assumes 3um trench width.

ICEMOS Technology CONFIDENTIAL

# EXHIBIT C

## OMRON SPECIFICATIONS, PARAMETRIC WAFER ACCEPTANCE CRITERIA AND TECHNICAL INFORMATION

*The below chart and criterias are derived from the "Preliminary" Specification for ICE20N65, just for example to indicate OMRON's standard criteria.

### PCM Specification (Preliminary)

To be finalized

### Sampling and Criteria

The sampling ratio/criteria are as follows
Sampling ratio: 5 sites / wafer, 25 wafers / lot
Shipping criteria: 4 of 5 sites must pass on each wafer
when not 80% spec in, engineering decision

# EXHIBIT D

## VISUAL INSPECTION CRITERIA

**1.1. Inspection classification**
   **1.1.1 Macro Inspection**
     Front and back side wafer surface inspection
     At 1X magnification (naked eye).
   **1.1.2 Microscope Inspection**
    Die/chip base inspection
     At minimum 50X
     Defect verification, up to 500X

**1.2. Sampling Plan**
   Macro inspection : All wafers
   Microscope inspection : AOQL 1% (die/chip count)

**1.3. Acceptance Criteria**
   Macro inspection : No defect, by wafer
   Microscope inspection : AOQL 1%, by lot

**1.4. Disposition**
   Macro inspection : Go/No go, by wafer
   Microscope inspection : If rejected, lot hold and engineering decision

**1.5. Defect Definition**
**1.5.1 Macro Inspection**

| Inspection item | Reject Criteria |
|---|---|
| Edge chipping | > 1mm, if chipping penetrates to backside<br>> 2mm, if not penetrate |
| Crack | Any cracking |
| Scratch | > 100mm |
| Contamination | > 3 mm, on backside |
| Defocus/Comet | > 10mm significant uneven color or discoloration |
| Wafer ID | Missing, incorrect or illegible |
| Roughness | Significant backside surface roughness |

**1.5.2 Microscope Inspection**

| Metal Defects | Reject Criteria |
|---|---|
| Damaged metal line , metal void | Metal void of > 50% line width |
| Scratched/missing bond pad metal | Metal void of > 20% bond pad area |
| Metal short | < 50% of line spacing |
| Overlay alignment | > 50% of via alignment off set or < 50% line spacing caused by off set via |
| Blistering/Lifting/Peeling | Any blistering, lifting or peeling |
| Discoloration | Any metal corrosion or discoloration |

| Passivation Defects | Reject Criteria |
|---|---|
| Passivation on bondpad/edge seal | Residue > 10% of bondpad Any residue on edge seal |
| Missing passivation /polyimide | Any passivation missing on metal line |
| Overetched Bond Pad Passivation | Any passivation missing on bond pad edge |
| Passivation crack | Any passivation cracking. |
| Peeling/delaminated of passivation/ polyimide | Any peeling or delamination |

| Other Defects | Reject Criteria |
|---|---|
| Pad contamination | Foreign material or contamination on >10% bondpad area |
| Contamination | Foreign material or contamination which is grater than bondpad size on the wafer surface |
| Probe damage | Probe mark or scratch on the active area |

# EXHIBIT E

## RELIABILITY TESTING

Available from IceMOS upon Request.

# EXHIBIT F

## OMRON PROCESS CHANGE NOTIFICATION PROCEDURE

Procedure

This is to describe a rule about the process change requested by OMRON.

1. OMRON shall request approval from IceMOS before implementing any of the changes defined in Appendix A
2. The request to IceMOS for change approval shall be in writing, using OC-PCN-02 form indicated in Appendix B. Omron shall send request IceMOS simultaneously.
3. Approval of changes by IceMOS will be in writing, using OC-PCN-02 form with CC to another approver.
4. OMRON must notify IceMOS of the change minimum 60 days before the implementation.
5. IceMOS must respond to the request within 30 days, with either approval, disapproval, or identification of what additional work is required. If IceMOS do not respond within 30 days, then the change request is considered to be approved.

Appendix A

　　1） Mask changes or redesign.
　　2） Changes in doping species, dose(excluding adjustment within spec.), process technique, or energy.
　　3） Changes in junction depth, oxide, or film thickness greater than +/-10%, of qualified value.
　　4） Changes of passivation (ILD) or glassivation material, thickness, (+/-10% of qualified value), or deposition technique.
　　5） Changes that affect metallization width, thickness, material, number of layers, deposition techniques, grain structure.
　　6） Changes in WAT structures, specification.
　　7） Changes of photolithography equipment type.
　　8） Changes of equipment type for oxidation, etching, or deposition of any layer.

Appendix B: PCN Format provided by OMRON to IceMOS

| TO | | PROCESS CHANGE NOTICE | | PCN No | |
|---|---|---|---|---|---|
| FROM | OMRON | | | | |
| Title | | | | ( ) Permanent | |
| | | | | ( ) Temporary | |

| Parts Number | | | Department | | |
|---|---|---|---|---|---|
| Process | | | Date of Issue | | |

| Reason of Change |
|---|
| |

| Change From | Change To |
|---|---|
| | |

| Evaluation Items and their Results |
|---|
| |

| Application | ( ) Date | |
|---|---|---|
| | ( ) Lot | |
| | ( ) Other | |

| Signature | | | | |
|---|---|---|---|---|
| Issue (OMRON) | | | Receive ( ) | |
| Engineering | | | Approval | |
| Quality | | | | |
| | | | | |
| | | | | |
| | | | | |

Form. OC-PCN-02

# EXHIBIT G

## SHIPPING SPECIFICATIONS

**1.1. Inner Packing**

1.1.1   Wafer Container : Use a Shin-etsu-MW200N wafer case.



1.1.2 The direction of a wafer : Wafer Pattern field is Handle Side.
Wafer Notch direction is facing down.



1.1.3.  Desiccant (Silica gel PP 5g)
One bag is put on the upper surface of a container.

1.1.4  Polyethylene bag
        A polyethylene bag is used and single packing of the container is carried out.
        The seal of the mouth of a polyethylene bag is carried out.



## 1.2. Shipment Label

OMRON Corporation

| Customer P/N | GWS18N05D |
|---|---|
| OMRON P/N | 2STMFGWS18N05D |
| Lot Number | BDH01001S1 |
| Wafer Quantity | 25 |
| Chip Quantity | 67100 |
| Date Code | 12/04/2008 |

Made in Japan

## 1.3. Delivery of Shipment Lot
1.3.1  Directions of a shipment lot
        Production control directs a shipment lot in an inspection operating group after
        checking progress of the lot to ship based on a shipment plan.

## 1.4. Outer Packing
1.4.1  Packing Material
        Use corrugated paper, shock absorbing material, and a top-and-bottom board.
        In case you ship with one wafer container, use the spacer for 1BOX.



1.4.2  Tape
    Three places of a carton box are fixed with a gummed tape.

1.4.3  PP Band
    They are after fixation, and length/width with a gummed tape.
    It binds with every two each and fixes by the stopper.



## 1.5. Size and weight of carton box

Size         : 698 mm x 378 mm x 360 mm
Gross Weight : 8.2 Kg  (50 wafers)

# Exhibit H

## OMRON Preventive Measure of Uninterrupted Supply

1.      Scope

This document describes about Omron's disaster recovery plan (preventive measure) to minimize impact of natural and/or man-made disasters.

2.      Natural Disaster

  2.1  Earthquake
  - Set seismic instrument for emergency gas and chemical supply shut down.
  - Bolt floor gratings each other.
  - Bolt down process equipments to the floor.
  2.2  Thunder (Power Flicker, Power Failure)
  - Introduce thunder storm warning system and stop floor operation if there is a chance of power flicker and/or power failure.
  - Set UPS for some key equipments.
  - Introduce emergency power generation system for some key facilities.

3.      Fire

  - Organize internal fire brigade and having regular fire drill.
  - Place sprinkler and $CO_2$/ chemical fire extinguishers.

4.      Manufacturing Know-how and IT system

  4.1   Process document and Recipe
  - Soft copy of process documents are daily back-upped
  - The latest revision of manufacturing recipe (control data for process tool) is back-upped to removable media.
  4.2   MES (Manufacturing Execution System)
  - MES is running with back-up server (automatic real-time data replication but manual system switch in the case of system failure).
  - Weekly data back-up to removable tape.

5.      Equipments and Facilities / Supplier

  - Maintenance contact list of process equipments and facilities is available.
  - Supplier (wafer, gas, chemical, sub-material) contact list is available.