**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IceMOS Technology Corporation, | No. CV-17-02575-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| Omron Corporation, | |
| Defendant. | |

Pending before the Court is Defendant Omron Corporation's ("Defendant") Motion to Dismiss (Doc. 20) pursuant to Federal Rules of Civil Procedure ("Rules") 12(b)(2) and 12(b)(6). The Court now rules on the motion.

## I.     BACKGROUND

On September 11, 2017, Plaintiff filed the pending Motion to Dismiss (Doc. 20). Defendant filed a Response (Doc. 21) on October 11, 2017. Plaintiff then filed a Reply (Doc. 22) on October 26, 2017. The operative Complaint (Doc. 14) in this case asserts the following causes of action discussed herein: (i) breach of contract; (ii) breach of the implied duty of good faith and fair dealing; (iii) promissory estoppel, in the alternative; and (iv) fraud. (Doc. 14 at 18-23).

### A.     Facts

The following facts are either undisputed or recounted in the light most favorable to the non-moving party. S*ee Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). Plaintiff IceMOS Technology Corporation ("Plaintiff") is a

Delaware corporation with its principal place of business in Tempe, Arizona, and operations in Northern Ireland and Japan. (Doc. 14 at 4). Plaintiff provides super junction metal oxide semiconductor field-effect transistors ("MOSFETs"), microelectromechanical systems solutions, and advanced engineering substrates to third-parties. (*Id*.). Defendant is a Japanese company that is publicly traded on the Tokyo Stock Exchange and affiliated with a global network of companies with subsidiaries located in the United States. (Doc. 21 at 12). In 2007, Defendant purchased a wafer fabrication facility in Yasu, Japan (the "Yasu Fab") that fabricated complementary metal-oxide semiconductor wafers. (Doc. 14 at 5). Plaintiff requires wafer fabrication services to produce its products. (*Id*.).

Around the time of its purchase of the Yasu Fab, Defendant approached Plaintiff's consultant in Japan and suggested that Plaintiff and Defendant enter into a business relationship. (Doc. 21 at 4). From 2008 through 2011, Plaintiff and Defendant negotiated an agreement ("Supply Agreement") for the Yasu Fab to serve as Plaintiff's fabrication facility. (Doc. 14 at 5). These negotiations yielded two non-disclosure agreements and ultimately led to Plaintiff and Defendant entering into the Supply Agreement on February 28, 2011. (*See* Doc. 14 at 7; Doc. 21 at 4).

In the Supply Agreement, Defendant agreed to perform the fabrications requested by Plaintiff, share equally in production mask costs (initial sets), and fully resource the development of all generations of MOSFETs for the duration of the Supply Agreement. (*Id.* at 8). The Supply Agreement term was for ten years and early termination could only be effectuated upon three years' written notice, including a "one (1) year period of transfer to other wafer fabrication facilities, prior to termination." (Doc. 14-1 at 8).[1] In an effort to ensure Defendant could meet Plaintiff's production demands, Plaintiff paid for

---

[1] The full early termination provision, without any alterations for grammatical considerations, is as follows: "Early Termination. Notwithstanding anything contained in this AGREEMENT, either Party can terminate this Agreement without any cause and liability by giving a written notice to the other Party at least three (3) years, which include one (1) year period of transfer to other wafer fabrication facilities, prior to termination." (Doc. 14-1 at 8).

the purchase and installation of a deep reactive ion etcher ("DRIE") necessary for MOSFET manufacturing in the Yasu Fab. (Doc. 14 at 8-9). During the period of performance of the Supply Agreement, Defendant traveled to Arizona at least five times, sent invoices to Plaintiff in Arizona, wrote and called Plaintiff in Arizona, shipped samples to Arizona, and shipped products to Taiwan for additional manufacturing so that the completed products could ultimately be shipped to Arizona. (Doc. 21 at 6).

At a meeting on March 6, 2015, at Plaintiff's headquarters in Arizona, Defendant orally notified Plaintiff that Defendant intended to terminate the Supply Agreement and close the Yasu Fab at the end of March, 2017. (Doc. 14 at 12).[2] Plaintiff alleges that, at this March 6, 2015 meeting, and again at a December 9, 2015 meeting in Japan, Defendant represented its intent to fully support Plaintiff's MOSFETs throughout the termination period proposed by Defendant. (*Id.* at 13). On or about May 9, 2017, Defendant notified Plaintiff by letter that Defendant intended to cease all manufacturing of Plaintiff's MOSFETs by July of 2017. (*Id.* at 17). This cessation date was set to occur prior to the completion of the three year termination period. (*Id.* at 25).

During the course of the Supply Agreement's term, Plaintiff claims that Defendant, among other allegations, refused to fully resource the development of all generations of MOSFETs, failed to share equally in the production mask costs (initial sets), attempted to improperly terminate the Supply Agreement, and repudiated its obligations to support development and manufacturing of Plaintiff's MOSFETs through the termination period. (*Id.* at 18). Plaintiff also alleges that Defendant's March 6, 2015 and December 9, 2015 representations—in which Defendant represented its intent to fully support Plaintiff's MOSFETs throughout the proposed termination period—were false. (*Id.* at 22). Plaintiff goes on to allege that when Defendant made these representations, it either knew that they were false or made the representations as positive assertions "with

---

[2] Defendant since shifted its intended termination date to March 6, 2018. (Doc. 14 at 15). Based on the date of the pending motion and subsequent filings, the Court cannot ascertain whether termination did in fact occur on March 6, 2018, as intended, but that information is not material to the Court's analysis herein. (*See* Doc. 21; Doc. 22).

reckless disregard to [their] truth or falsity." (*Id.*).

## II.    MOTION TO DISMISS

Defendant filed the pending Motion to Dismiss pursuant to Rules 12(b)(2), lack of personal jurisdiction, and 12(b)(6), failure to state a claim upon which relief can be granted. The Court will address the parties' jurisdictional arguments first.

### A.    Personal Jurisdiction

Generally, federal courts have personal jurisdiction over non-resident defendants in a foreign country to the extent allowed by the state in which the courts sit. Fed. R. Civ. P. 4(f), (k); *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014). Arizona law provides for personal jurisdiction to the extent allowed by the Constitution of the United States. *See* Ariz. R. Civ. P. 4.2. The Due Process Clause of the Fourteenth Amendment limits a state's power to grant personal jurisdiction over a defendant to a tribunal. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011).

Due process requires that a defendant "have certain minimum contacts with . . . [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). This minimum contacts framework gives rise to two forms of personal jurisdiction: general jurisdiction and specific jurisdiction. *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cty.*, 137 S. Ct. 1773, 1779-80 (2017). Under general jurisdiction, a court can hear any claim against a defendant who can be "fairly regarded as at home" in the state. *Goodyear*, 564 U.S. at 919. Under specific jurisdiction, a court can hear claims related to a defendant's voluntary, in-state activities. *Bristol-Myers Squibb*, 137 S. Ct. at 1780.

Where a defendant moves to dismiss a case for lack of personal jurisdiction, the plaintiff bears the burden to establish personal jurisdiction. *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1108 (9th Cir. 2002). Where a court resolves the issue of personal jurisdiction solely by reference to the parties' moving papers and filed documents, the plaintiff satisfies this burden by making "only a prima facie showing of jurisdictional

facts to withstand the motion to dismiss." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006) (citation omitted). In such a case, uncontroverted statements in the plaintiff's complaint are taken as true, and conflicts between facts contained in affidavits are resolved in the plaintiff's favor. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

### 1. General Jurisdiction

Generally, an individual is at home where domiciled, while a corporation is at home either where it is incorporated or where it has its principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). Plaintiff alleges no facts establishing that Defendant is either incorporated or has its principal place of business in Arizona, so this Court cannot exercise general jurisdiction over Defendant.

### 2. Specific Jurisdiction

The specific jurisdiction inquiry "focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Walden*, 134 S. Ct. 1121 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). This analysis is concerned with the defendant's contact—rather than a third party's—with the forum state itself, rather than with a person who resides there. *Id.* at 1122. Therefore, a defendant's mere contact with a plaintiff, without more, is insufficient to support specific jurisdiction. *Id.* at 1223. In the Ninth Circuit, minimum contacts sufficient to justify specific jurisdiction exist where: "(1) the defendant has performed some act or consummated some transaction within the forum or otherwise purposefully availed himself of the privileges of conducting activities in the forum, (2) the claim arises out of or results from defendant's forum-related activities, and (3) the exercise of jurisdiction is reasonable." *Pebble Beach*, 453 F.3d at 1155 (quoting *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000)). The plaintiff has the burden of establishing the first two factors. *Schwarzenegger*, 374 F.3d at 802. If the plaintiff makes that showing, the burden then shifts to the defendant to "'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462,

476-78 (1985)). In performing a personal jurisdiction analysis, a court looks to purposeful availment where the cause of action lies in contract and to purposeful direction where the cause of action lies in tort. *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069 (9th Cir. 2017).

### a. Purposeful Availment and Purposeful Direction

Under the first prong of the Ninth Circuit test, a defendant must avail itself of, or direct its activities toward, the forum state. *Schwarzenegger*, 374 F.3d at 802. Because Plaintiff asserts both contract and tort claims, both the purposeful availment and purposeful direction tests apply. *Picot v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015).

### i. Purposeful Availment

The purposeful availment test, which applies to Plaintiff's contract claims, is met if "the defendant has taken deliberate action within the forum state or if [the defendant] has created continuing obligations to forum residents." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995) (citing *Hirsch v. Blue Cross, Blue Shield of Kansas City*, 800 F.2d 1474, 1478 (9th Cir. 1986)). However, "a contract alone does not automatically establish minimum contacts in the plaintiff's home forum." *Boschetto v. Hansing*, 539 F.3d 1011, 1017 (9th Cir. 2008). "Rather, there must be 'actions by the defendant *himself* that create a 'substantial connection' with the forum state.'" *Picot*, 780 F.3d at 1212 (quoting *Burger King*, 471 U.S. at 475) (emphasis in original). These actions must be more than "random, fortuitous, or attenuated," and must include "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* (internal quotation marks and citations omitted).

Plaintiff alleges that Defendant took deliberate action within Arizona by seeking out and maintaining a contractual relationship with Plaintiff in Arizona. (Doc. 14 at 2-3). Defendant attempts to discount these deliberate actions by arguing that Defendant's actions in Arizona constituted "pre-contractual" activities and that the actual negotiations for the Supply Agreement took place outside of Arizona via writing, phone calls, and visits to Japan. (Doc. 20 at 4-5 (citing *Galesburg 67, LLC v. Nw. Television, Inc.*, No. EP-

13-CV-384-PRM, 2014 WL 10121177, at *4 (W.D. Tex. Aug. 27, 2014); *McDowell v. Paykel*, No. CV-06-2679-PHX-FJM, 2007 WL 1412465, at *3 (D. Ariz. May 11, 2007))). Yet, in *Burger King*, the Supreme Court recognized that prior negotiations are considered in a jurisdictional analysis because a contract is "ordinarily but an intermediate step serving to tie up prior business negotiations." 471 U.S. at 479. Additionally, the Supreme Court noted the "inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id.* at 476. Following *Burger King*'s logic here, the "pre-contractual" activities pointed to by Defendant are the prior business negotiations that the Supply Agreement sought to tie up, and the mere fact that all of these negotiations did not occur in Arizona cannot preclude a finding of purposeful availment.

Plaintiff further argues that Defendant created continuing obligations to Plaintiff in Arizona through the Supply Agreement. (Doc. 14 at 2). Defendant argues that the mere existence of the Supply Agreement is insufficient to support personal jurisdiction in the Plaintiff's home forum. (Doc. 20 at 4 (citing *Picot*, 780 F.3d at 1212)). Here, however, Plaintiff does not argue that the Supply Agreement stands on its own. (Doc. 14 at 3). Plaintiff alleges that, in addition to entering into the Supply Agreement, Defendant sought out business with Plaintiff in Arizona, mailed invoices and samples to Plaintiff in Arizona, and was aware that its product was intended to be delivered to Plaintiff in Arizona. (*Id.*). *Compare Picot*, 780 F.3d at 1213 (holding a contract alone could not support purposeful availment when the defendant never traveled to the forum during negotiations, the contract did not envision product being sent to the forum, and there were only two fortuitous visits by defendant to the forum), *with Ballard*, 65 F.3d at 1498 (foreign bank was found to have purposefully availed itself of the benefits of conducting business in the forum because it sought out business with forum residents, mailed account statements to forum customers, and was aware that it was servicing forum residents); s*ee also Haisten v. Grass Valley Med. Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1395 (9th

Cir. 1986) (holding that forum had specific jurisdiction over a foreign company with no physical contacts with forum because it sought out and intentionally conducted business with forum residents). Through the deliberate acts of seeking out and cultivating business with Plaintiff in Arizona, and creating continuing obligations to Plaintiff in Arizona through the Supply Agreement, Defendant purposefully availed itself of the benefits of conducting business in Arizona.

### ii.    Purposeful Direction

The purposeful direction, or effects, test, which applies to Plaintiff's fraud claim, requires that a defendant: "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Axiom Foods*, 874 F.3d at 1069 (citation omitted).

Plaintiff sufficiently satisfies the first factor by alleging that Defendant intentionally made fraudulent representations to Plaintiff that Defendant intended to "fully support" Plaintiff's MOSFETs when Defendant either knew it had no intent to do so or it made the representation as a positive assertion with reckless disregard to its truth or falsity. (Doc. 14 at 22).

Plaintiff also satisfies the second factor by alleging that the fraud was expressly aimed at the forum state because Defendant's representative traveled to Arizona to commit the initial act of fraud against an Arizona corporation. (*Id*.). Regarding this second factor, the Supreme Court instructs a court to consider "whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 134 S. Ct. at 1125. Here, the fact that Defendant allegedly committed the initial act of fraud in Arizona connects Defendant to Arizona in a meaningful way. Defendant argues that a single act, the March 6, 2015 meeting in which the alleged fraud was perpetrated, is insufficient to create a substantial connection with Arizona. (Doc. 20 at 8 (citing *Picot*, 780 F.3d at 1213)). Yet, "[s]o long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction." *Burger King*, 471 U.S. at 475 n.18 (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). By alleging that both the commission and

the consequences of the fraud occurred in Arizona, Plaintiff satisfactorily carries its burden of showing that Arizona is "the focal point both of the story and of the harm suffered." *Walden*, 134 S. Ct. at 1123 (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)).

Plaintiff satisfies the third factor by contending that Defendant's fraud caused harm that Defendant knew was likely to be suffered by Plaintiff in Arizona. (Doc. 14 at 22-23). This factor is satisfied if the Defendant's actions had "foreseeable effects" in the forum state. *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1131 (9th Cir. 2010) *abrogated on other grounds by Axiom Foods*, 874 F.3d at 1069. In this case, it was foreseeable that Plaintiff would be harmed by Defendant's alleged fraud, and that the harm caused by Defendant's alleged fraud would be suffered by Plaintiff, an Arizona-based corporation, in Arizona. (Doc. 14 at 22-23).

Whether examining Plaintiff's contract or tort claims, Defendant has both availed itself of and directed its activities toward Arizona. Thus, both the purposeful availment and purposeful direction tests are satisfied.

###### b.       Arises out of Defendant's Forum-Related Activities

Under the second prong of the Ninth Circuit test, the claims must arise out of or result from a defendant's forum-related activities. *Picot*, 780 F.3d at 1211. The Ninth Circuit applies a "but for" test when examining this second prong. *Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 761 (9th Cir. 1990).

Plaintiff first argues that, but for Defendant's contractual activities in Arizona, Plaintiff would not have been injured by Defendant's alleged breach of contract. (Doc. 14 at 4). Defendant contends that the but for test is not satisfied for Plaintiff's contract claim because Plaintiff's alleged breach of contract harms would be the same regardless of where the contract was made or carried out. (Doc. 20 at 8-9 (citing *Supplier's City SA de CV v. EFTEC N. Am., LLC*, No. CV-06-2503-PHX-PGR, 2007 WL 1655989, at *4 (D. Ariz. June 7, 2007) (finding that the but for test was not satisfied therein because the forum in which the plaintiff brought suit was not home to either party, nor did the parties'

contract implicate the forum in any way, and the state in which the defendant was headquartered provided the most appropriate forum)). Here, however, but for Defendant's efforts to contract with an Arizona-based company, Plaintiff's injuries would not have arisen. *See Ballard*, 65 F.3d at 1500 (holding that the but for test was satisfied because the plaintiff's claims would not have arisen but for the foreign bank's contacts with the plaintiff's forum). Thus, the contract claims arise out of or result from Defendant's forum-related activities.

Plaintiff next argues that, but for Defendant traveling to Arizona to make fraudulent statements at the March 6, 2015 meeting, Plaintiff would not have been injured by Defendant's alleged fraud. (Doc. 14 at 4). Defendant disagrees, asserting that, because the alleged fraud took place both in Arizona and Japan, the tort claim could have still arisen without the alleged fraud in Arizona. (Doc. 20 at 9). However, the Ninth Circuit has held that this second prong is satisfied if the tort simply injures a party in the forum state. *See Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998) (holding that a tort claim arose from forum related activities simply because it "had the effect of injuring [the plaintiff] in the forum"). Here, the alleged fraud caused injury to Plaintiff in Arizona, so the tort claim arises out of or results from Defendant's forum related activities.

### c.    Jurisdiction is Reasonable

Under the third prong of the Ninth Circuit test, the exercise of jurisdiction must be reasonable. *Picot*, 780 F.3d at 1211. Courts presume that an otherwise valid exercise of specific jurisdiction is reasonable, and the burden of proving jurisdiction is unreasonable is on the defendant. *Ballard*, 65 F.3d at 1500. Defendant has a heavy burden and must "present a compelling case" that the exercise of jurisdiction would be unreasonable. *Burger King*, 471 U.S. at 477. The considerations in determining reasonableness are:

> (1) the extent of the defendant's purposeful injection into the forum; (2) the defendant's burdens from litigating in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's

interest in convenient and effective relief; and (7) the existence of an alternative forum. All seven factors must be weighed. None is dispositive.

*Ziegler v. Indian River Cty.*, 64 F.3d 470 at 475 (9th Cir. 1995) (citing *Terracom v. Valley Nat. Bank*, 49 F.3d 555, 561 (9th Cir. 1995)).

Regarding the first consideration, Defendant entered into multiple agreements with an Arizona corporation dating back to 2007, including the Supply Agreement. (Doc. 21 at 4). Defendant traveled to Arizona on at least five occasions, solicited business from an Arizona corporation, and sent samples and invoices to an Arizona corporation. (Doc. 20 at 6). Based on the above facts, the Court finds that Defendant's purposeful injection into the forum is significant. *Compare* (Doc. 21 at 5-6 (stating that Defendant made at least five intentional trips to Plaintiff's facilities in Arizona)), *with Picot*, 780 F.3d at 1213-14 (finding a mere two "fortuitous" trips to a forum state provided insufficient grounds on which the Court may exercise specific jurisdiction without a more intentional connection to the forum). This first consideration weighs strongly in favor of a finding of reasonableness. *See also supra* Part II.A.2.a (the Court's purposeful availment and purposeful direction analysis herein further demonstrates that Defendant's purposeful injection into the forum was significant).

Regarding the second consideration, Defendant argues that they would face significant burdens by litigating in Arizona. (Doc. 20 at 10). Defendant is a Japanese corporation and contends that most of the documents and witnesses relevant to Plaintiff's claims are located in Japan. (*Id.*). Additionally, many of the documents involved would need to be translated from Japanese to English for an American court proceeding. (*Id.*). While true, Defendant is part of a global, publicly traded corporation with affiliates in the United States. (Doc. 21 at 11); *see Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1199 (9th Cir. 1988) (holding that a foreign company with affiliates in the United States bears less of a burden litigating in the United States than if the company maintained no physical presence or agent within the United States). Though most of Defendant's documents and witnesses relevant to Plaintiff's claims may be located in Japan,

Defendant sent documents and employees to Arizona on multiple occasions to establish and maintain the Supply Agreement. (Doc. 14 at 2-3). Finally, the language barrier for Defendant is not determinative as Defendant entered into multiple English-language agreements with Plaintiff without seeking translations. (Doc. 21 at 3-4). Thus, this second consideration weighs only slightly against a finding of reasonableness.

Regarding the third consideration, exercising jurisdiction over a Japanese corporation necessarily implicates Japan's sovereignty interest. *See Ballard*, 65 F.3d at 1501. Therefore, this third consideration weighs against a finding of reasonableness.

Regarding the fourth consideration, Arizona has an interest in protecting its citizens from the wrongful acts of nonresident defendants. *See Ziegler*, 64 F.3d at 475 (citing *Terracom*, 49 F.3d at 561; *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1489 (9th Cir. 1993)). Accordingly, this fourth consideration weighs in favor of a finding of reasonableness.

Regarding the fifth consideration, in evaluating the efficiency of a forum, the Ninth Circuit looks to where the witnesses and evidence are likely to be located. *Core-Vent*, 11 F.3d at 1489. Defendant's witnesses and evidence will primarily be located in Japan. However, the documentary evidence can easily be sent electronically, and Plaintiff asserts that "few witnesses are expected to testify." (Doc. 21 at 11). Alternatively, Plaintiff's witnesses are likely to reside in Arizona, and any evidence or related documentation housed with Plaintiff is similarly located in Arizona. Thus, this fifth consideration weighs only slightly against a finding of reasonableness.

Regarding the sixth consideration, Arizona is the forum that can best offer convenient and effective relief to Plaintiff as Arizona is already familiar with the facts and procedural history of the litigation. Additionally, Plaintiff's counsel could not represent Plaintiff in Japan because their counsel does not have a Japanese office and Japan does not offer *pro hac vice* admission. (Doc. 21 at 12). Plaintiff would certainly face inconvenience if required to hire new counsel in Japan, familiarize its new counsel with the facts of the case, and begin legal proceedings anew. Alternatively, Defendant is

currently represented by capable counsel in the Arizona. As a result, this sixth consideration weighs in favor of a finding of reasonableness.

Finally, regarding the seventh consideration, "[t]he plaintiff bears the burden of proving the unavailability of an alternative forum." *Core-Vent*, 11 F.3d at 1490. Here, Plaintiff contends that Japan is not an available alternative forum because the Supply Agreement is governed by New York law, Japan is a civil code legal system, and Plaintiff's counsel would not be able to represent it in Japan. (Doc. 21 at 12). While these facts do present difficulties for Plaintiff, they do not show that Japan is unavailable as an alternative forum. Thus, this seventh consideration weighs against a finding of reasonableness.

In examining all of the considerations together, Defendant has failed to meet its heavy burden of presenting "a compelling case" that the exercise of jurisdiction would be unreasonable. *Burger King*, 471 U.S. at 477. *See Roth v. Garcia Marquez*, 942 F.2d 617, 625 (9th Cir. 1991) (holding that defendant failed to meet its heavy burden of presenting a compelling case against reasonableness, even when only two considerations weighed in favor of a finding of reasonableness). Consequently, this Court concludes that the exercise of personal jurisdiction over Defendant would be reasonable.

Plaintiff has made a "prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Pebble Beach*, 453 F.3d at 1154 (citation omitted). Accordingly, Plaintiff has met their burden of establishing personal jurisdiction.[3]

## B. Failure to State a Claim upon Which Relief Can Be Granted

In moving to dismiss the Complaint for failure to state a claim upon which relief can be granted, Defendant argues that: (1) Plaintiff failed to allege a valid breach of contract claim; (2) Plaintiff's claim for breach of the implied covenant of good faith and

---

[3] The Court need not address whether Mr. Sekiguchi's Declaration (Doc. 20-1) should be stricken from the record in favor of Mr. Anderson's Declaration at this time, as Plaintiff requests. (Doc. 21 at 2). Where a court resolves the issue of personal jurisdiction solely by reference to the parties' moving papers and filed documents, conflicts between facts contained in affidavits are resolved in the plaintiff's favor. *Schwarzenegger*, 374 F.3d at 800. Here, any conflicts between the Declarations are resolved in Plaintiff's favor; thus, Plaintiff's request is moot.

fair dealing is redundant; (3) Plaintiff's promissory estoppel claim is duplicative of Plaintiff's contract claim; (4) Plaintiff fails to allege the required components of an independent fraud claim; and (5) Plaintiff fails to allege the necessary mental state to obtain punitive damages. (Doc. 20 at 11-17).

Rule 8 requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To meet this standard, and to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To have facial plausibility, a complaint must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This analysis is "context-specific" and is driven by "judicial experience and common sense." *Id.* at 679.

A court must "accept as true all allegations contained in a complaint." *Id.* at 678. This same presumption, however, is not extended to legal conclusions: "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A federal court is bound by the holdings of the state's highest court on the interpretation of state law. *See State Farm Mut. Auto. Ins. Co. v. Davis*, 937 F.2d 1415, 1418 (9th Cir. 1991). Where there is no state high court ruling, a federal court must look to other sources, including state intermediate appellate court decisions, to decide how the state's highest court would rule on the issue. *Id.*

### 1. Breach of Contract

Plaintiff's first claim is for breach of contract. (Doc. 14 at 18-20). Per Article IX of the Supply Agreement, the Supply Agreement is governed by New York Law. (Doc. 14-1 at 9). "To state a claim for breach of contract under New York law, a complaint need only allege: (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages."

*Designers N. Carpet, Inc. v. Mohawk Indus., Inc.*, 153 F. Supp. 2d 193, 197 (E.D.N.Y. 2001) (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).

Plaintiff asserts in the Complaint that the Supply Agreement exists as a valid and enforceable agreement, and that Plaintiff either performed or was excused from performance under the Supply Agreement. (Doc. 14 at 18). Defendant neither argues that Plaintiff failed to perform adequately nor that the Supply Agreement is unenforceable. (Doc. 22 at 10). Therefore, the first two requirements for Plaintiff's breach of contract claim are satisfied.

Regarding the third requirement, Plaintiff alleges several theories of breach perpetrated by Defendant. (Doc. 14 at 18-20). Defendant contends that Plaintiff's breach of contract claims "suffer from fatal pleading defects." (Doc. 20 at 11).[4] Defendant specifically points to defects in Plaintiff's theories of breach concerning: (1) Defendant's sharing of Mask Costs, (2) the amount of support Defendant is required to provide in the three-year termination period, and (3) Defendant's resourcing of the development of all generations of MOSFETs. (*Id.* at 11-13).

### a.     Mask Costs

Defendant first argues that the Complaint contains only conclusory allegations that Defendant failed to share mask costs. (*Id.*). The Complaint mentions "masks" only five times. (*See* Doc. 14 ¶¶ 22, 30, 32, 85-86). While a number of these paragraphs contain conclusory statements that Defendant failed to share equally in the mask costs, these paragraphs do not contain factual statements to support the contention that Defendant failed to share equally in mask costs. (*See id.*).

Additionally, in its Response (Doc. 21), Plaintiff merely points to a thirty-five

---

[4] Plaintiff alleges several theories of breach to which Defendant fails to respond. These theories of breach include claims that Defendant attempted to improperly terminate the Supply Agreement, failed to ship certain orders to Plaintiff, failed to ensure continuous uninterrupted supply, rejected the return of unusable products, refused to accept new purchase orders from Plaintiff, and refused to effectuate a sufficient inventory build to service Plaintiff during the transition period. (Doc. 14 at 14). As Defendant chose not to challenge these theories of breach, the Court will not dismiss these theories at this stage.

paragraph section of the Complaint and asserts that these paragraphs contain "specific breaches" to support their claim. (Doc. 21 at 14). However, Plaintiff does not state what the specific breaches regarding mask costs are, or how the thirty-five paragraphs in the Complaint support its claim regarding mask costs. (*Id.*); *see generally United States v. Wigdore*, No. CV 06-3033-PHX-ECV, 2009 WL 10674016, at *3 (D. Ariz. Jan. 14, 2009). Consequently, Plaintiff failed to plead facts supporting the third requirement of its breach of contract claim regarding mask costs. Accordingly, Plaintiff fails to state a claim for breach of contract specifically regarding the mask costs.

### b.      Support in the Termination Period

Defendant next contends that the Complaint incorrectly asserts that Defendant is required to provide full contractual support during the three-year termination period. (Doc. 20 at 11-12). Defendant bolsters this contention by arguing that Plaintiff's interpretation of the Early Termination Clause of the Supply Agreement contained in the Complaint is "not reasonable." (Doc. 22 at 6); *see supra* note 1. Plaintiff responds that Defendant's interpretation is "absurd," and Plaintiff's interpretation is reasonable under the plain meaning of the contract terms. (Doc. 21 at 14).

This Court need not determine which interpretation is correct at this stage. It is clear that Plaintiff's Complaint regarding the termination period is based on factual content that allows the Court to draw a reasonable inference that Defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. If, as Plaintiff alleges, the phrase "include[s] [a] one (1) year period of transfer to other wafer fabrication facilities, prior to termination," means one year of transfer in addition to three years of full support, then Defendant would breach by only offering two years of full support and one year of transfer. (Doc. 14-1 at 8). Plaintiff also alleges damages that flow directly from this theory of breach. (Doc. 14 at 18-19). Therefore, the Court the finds that the Complaint satisfies all four requirements for a breach of contract claim under New York law regarding the support Defendant is required to provide in the three-year termination period.

### c.    Fully Resource Development of MOSFETs

Defendant next asserts that Plaintiff's claim that Defendant did not fully resource the development of all generations of MOSFETs was not adequately pleaded because Plaintiff neglected to cite to Exhibit B2 in its claim. (Doc. 20 at 13). It is true that the Supply Agreement calls for "fully resourcing the development of all generations of MOSFETs as indicated in Exhibit B2." (Doc. 14-1 at 6). However, regarding the resourcing of the development of MOSFETs, Plaintiff does indicate in the Complaint that Defendant "failed to ensure that it could continue to supply 3500 wafers/month as required by the Supply Agreement." (Doc. 14 at 16). Additionally, Plaintiff alleges that Defendant "severely limited [Plaintiff]'s use of engineering lots," which reduced the engineering lots required for the development of MOSFETs below the number needed to create the MOSFETs. (*Id.* at 10). In accepting these allegations as true, the Court finds that Plaintiff sufficiently pleaded damages stemming from this alleged theory of breach. (Doc. 14 at 18-19, 10). Accordingly, the Complaint satisfies all four requirements for a breach of contract claim under New York law regarding the resourcing of the development of MOSFETs.

### 2.    Implied Covenant of Good Faith and Fair Dealing

Under New York law, "implicit in all contracts is a covenant of good faith and fair dealing." *ARI & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 521 (S.D.N.Y. 2003). Certainly, "breach of this covenant may give rise to a claim of relief." *Id.* at 522. New York law, however, does not "recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also [pleaded]." *Sikarevich Family L.P. v. Nationwide Mut. Ins. Co.*, 30 F. Supp. 3d 166, 170 (E.D.N.Y. 2014) (quoting *Funk v. Allstate Ins. Co.*, No. 13-CV-5933 (JS)(GRB), 2013 WL 6537031, at *4 (E.D.N.Y. Dec. 13, 2013)) (internal quotation marks omitted). When a claim for breach of the implied covenant of good faith and fair dealing is based upon the same facts as a breach of contract claim, the claim for breach of the implied covenant of good faith and fair dealing "should be dismissed as

redundant." *Id.*

Defendant contends that Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is based upon the same facts as Plaintiff's claim for breach of contract, and should therefore be dismissed as redundant. (Doc. 20 at 13-14). Plaintiff argues that the beaches of the implied covenant of good faith and fair dealing are "separate and distinct from [Defendant]'s various breaches of the Supply Agreement," and offers that these separate breaches are described in "Paragraphs 35-41" of the Complaint. (Doc. 14 at 20). However, the allegations contained therein, and the allegations in other paragraphs discussing the implied covenant of good faith and fair dealing, are based on Defendant's failure to fully resource the development of all generations of MOSFETs. These claims are duplicative of the breach of contract claims and do not support an independent claim for breach of the implied covenant of good faith and fair dealing.

Plaintiff does separately assert that the implied covenant of good faith and fair dealing was breached by Defendant's failure to assist in Plaintiff's obtaining of alternative fabrication arrangements and by Defendant's refusal to purchase or assist in the transfer of the DRIE etcher. (Doc. 14 at 11). Even in accepting these assertions as true, "it is the 'intent and reasonable expectations' of parties entering into a given contract that fix the boundaries of the covenant of good faith and fair dealing, provided that those expectations are consistent with the express terms of the contract." *ARI & Co.*, 273 F. Supp. 2d at 522 (quoting *Cross & Cross Props., Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989)). This necessarily means that any breach of the implied covenant of good faith and fair dealing must be grounded in the terms of the underlying contract. *See Geler v. National Westminster Bank USA*, 770 F.Supp. 210, 215 (S.D.N.Y. 1991). The Supply Agreement neither provides that Defendant will assist Plaintiff in establishing alternative fabrication arrangements after notice of termination, nor that Defendant will purchase or assist in the transfer of the DRIE etcher. (Doc. 14-1). Consequently, the implied covenant of good faith and fair dealing cannot create these

new obligations under the Supply Agreement.

Plaintiff's claim for breach of the implied covenant of good faith and fair dealing arises from the same facts as Plaintiff's breach of contract claim and asserts violations that are not grounded in the terms of the underlying contract. (Doc. 14 at 9-11, 20-21). The Court finds that Plaintiff did not plead facts supporting a claim for breach of the implied covenant of good faith and fair dealing on which relief can be granted. Accordingly, this claim is dismissed.

### 3. Promissory Estoppel

Defendant contends that Plaintiff's promissory estoppel claim should be dismissed as duplicative of Plaintiff's breach of contract claims. (Doc. 20 at 15). Plaintiff responds by arguing that it has made the duplicative promissory estoppel claim should the Court find the Supply Agreement unenforceable. (Doc 21 at 16). However, both Arizona and New York law provide that promissory estoppel is inapplicable where there is an express contract covering the subject matter at issue, and promissory estoppel cannot be asserted unless it is based on a promise outside of the contract at issue. *See Arizona Radiation Therapy Mgmt. Servs. Inc. v. Translation Research Mgmt. LLC*, No. CV-15-01138-PHX-DGC, 2015 WL 6384318, at \*2 (D. Ariz. Oct. 22, 2015); *Schroeder v. Pinterest Inc.*, 133 A.D.3d 12, 33 (N.Y. App. Div. 2015). Because Defendant does not argue that the Supply Agreement is unenforceable Plaintiff's promissory estoppel claim arises from the enforceable contract that is the subject of Plaintiff's breach of contract claim. (Doc. 22 at 10). Accordingly, Plaintiff's promissory estoppel claim is dismissed.

### 4. Fraud

Defendant asserts that New York law applies to Plaintiff's fraud claim and that the allegations in the Complaint fall short of stating a valid fraud claim. (Doc. 20 at 15). Regarding choice of law, "[c]laims arising in tort are not ordinarily controlled by a contractual choice of law provision." *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992) (citing *Consolidated Data Terminals v. Applied Digital Data Systems*, 708 F.2d 385, 390 n. 3 (9th Cir. 1983)). Arizona law recognizes

that fraud is a tort "based on a duty independent of those imposed by contract." *KD & KD Enterprises, LLC v. Touch Automation, LLC*, No. CV-06-2083-PHX-FJM, 2006 WL 3808257, at *2 (D. Ariz. Dec. 27, 2006).

Arizona law provides that a claim "sounding in tort should be resolved under the law of the state having the most significant relationship to both the occurrence and the parties with respect to the particular issue." *Winsor v. Glasswerks PHX, L.L.C.*, 63 P.3d 1040, 1044 (Ariz. Ct. App. 2003) (citing Conflict of Laws Restatement § 145(1)). Fraud is indeed a claim sounding in tort. *See, e.g.*, *Stanford Ranch, Inc. v. Maryland Cas. Co.*, 89 F.3d 618, 625 (9th Cir. 1996). In deciding which state has the most significant relationship with respect to the fraud claim, the Court considers: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, place of incorporation, and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Id.* (citing Conflict of Laws Restatement § 145(2); *Bates v. Superior Court of State of Ariz., In & For Maricopa Cty.*, 749 P.2d 1367, 1370 (Ariz. 1988)).

Here, the alleged injury occurred in Arizona, the alleged fraud was initiated in Arizona, the party allegedly injured is a company based in Arizona, and the relationship between the parties is centered in Arizona by way of the Supply Agreement. Therefore, Arizona has the most significant relationship to both the parties and occurrence, and the fraud claim should be resolved under Arizona law. Under Arizona law, a successful fraud claim requires proof of nine elements:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely on it; (9) the hearer's consequent and proximate injury.

*Comerica Bank v. Mahmoodi*, 229 P.3d 1031, 1033-34 (Ariz. Ct. App. 2010) (citation omitted).

In the Complaint, Plaintiff alleges that: (1) Defendant's employee made a

representation that Defendant intended to fully support Plaintiff's MOSFETs; (2) this representation was false, as Defendant did not intend to fully support Plaintiff's MOSFETs; and (3) the representation was material to Plaintiff's continued good faith negotiations with Defendant after Defendant attempted to improperly terminate the Supply Agreement. (Doc. 14 at 22). Plaintiff further alleges that: (4) Defendant either knew the representation was false or was recklessly unaware of its truth or falsity; (5) Defendant made the representation intending for Plaintiff to act on it in the negotiations over the improper termination of the Supply Agreement; and (6) Plaintiff was ignorant as to the falsity of the representation. (*Id.*). Plaintiff also alleges that: (7) it relied on the representation in negotiating the improper termination of the Supply Agreement; (8) it rightfully relied on the representation in these negotiations in good faith; and (9) the representation proximately caused Plaintiff's harm by encouraging Plaintiff to continue to negotiate the termination of the Supply Agreement in good faith, rather than immediately file a claim for breach of contract. (*Id.* at 22-23). Accordingly, the Complaint satisfies all of the requirements for a fraud claim under Arizona law.

### 5. Punitive Damages

Arizona law makes clear that "punitive damages are not recoverable in every fraud case, even though fraud is an intentional tort." *Dawson v. Withycombe*, 163 P.3d 1034, 1062 (Ariz. Ct. App. 2007) (quoting *Rawlings v. Apodaca*, 726 P.2d 565, 578 (Ariz. 1986)). Defendant asserts that Plaintiff's claim for punitive damages should be dismissed because the Complaint fails to establish the required mental state for punitive damages under a fraud claim. (Doc. 20 at 17). To recover punitive damages, a plaintiff must show that the defendant's conduct was aggravated, wanton, *reckless*, or malicious. *Dawson*, 163 P.3d at 1062 (citing *Hunter Contracting Co. v. Sanner Contracting Co.*, 492 P.2d 735, 742 (Ariz. 1972) (emphasis added)).

Here, Plaintiff alleges that when Defendant made its fraudulent representation, Defendant "either knew it had no intent to fully support [Plaintiff]'s MOSFETs throughout the termination period or made the representation as a positive assertion with

*reckless* disregard to its truth or falsity." (Doc. 14 at 22 (emphasis added)). Accordingly, the Court finds that Plaintiff's assertion that Defendant's alleged fraud was committed "reckless[ly]" is sufficient to support Plaintiff's claim for punitive damages at this stage. *See Dawson*, 163 P.3d at 1602 (citation omitted). Accordingly, the motion to dismiss the punitive damages allegation is denied.

### C. Amendment

Plaintiff requests leave to amend the Complaint should the Court grant Defendant's 12(b)(6) motion. (Doc. 21 at 13). Defendant opposes this request, arguing that Plaintiff has already amended the Complaint once before and that the Court has broad discretion to deny leave to amend where a plaintiff already had one or more opportunities to amend. (Doc. 22 at 6).

Given the stage of this case, and Defendant's opposition, Plaintiff may only amend with leave of the Court. Fed. R. Civ. P. 15(a)(2). "The [C]ourt should freely give leave when justice so requires." *Id.* "This policy is to be applied with extreme liberality." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (quoting *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990)). In evaluating whether to grant leave to amend, a court should consider: "[1] bad faith, [2] undue delay, [3] prejudice to the opposing party, and/or [4] futility." *Id.* (quoting *Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877, 880 (9th Cir. 1999) (alterations added)). Defendant contends that the Court should reject Plaintiff's request for leave to amend simply because Plaintiff "already amended [the] [C]omplaint once before, yet failed to remedy the pleading defects therein." (Doc. 22 at 6). Defendant merely notes that the Court "has 'especially broad' discretion to deny leave to amend where the plaintiff has had one or more opportunities to amend a complaint." *Aguilar v. Casinos*, No. CV-14-01509-PHX-NVW, 2014 WL 12614445, at *1 (D. Ariz. Aug. 6, 2014) (citation omitted). Defendant does not claim that Plaintiff's request should be denied on the grounds of bad faith, undue delay, prejudice, or futility. Because Defendant makes no argument regarding any of the applicable considerations under the Ninth Circuit standard, the Court is not compelled to

bar leave to amend under the circumstances.

## III.   CONCLUSION

Based on the foregoing,

**IT IS ORDERED** denying Defendant's Motion to Dismiss (Doc. 20 at 1-10) for lack of personal jurisdiction under Rule 12(b)(2).

**IT IS FURTHER ORDERED** granting in part and denying in part Defendant's Motion to Dismiss (Doc. 20 at 11-17) for failure to state a claim upon which relief can be granted under Rule 12(b)(6). Plaintiff's claims for breach of contract premised on mask costs, breach of the implied covenant of good faith and fair dealing, and promissory estoppel are dismissed without prejudice; Defendant's Motion to Dismiss (Doc. 20) is denied as to Plaintiff's breach of contract claim premised on other grounds, as well as Plaintiff's fraud claim and Plaintiff's request for punitive damages.

**IT IS FURTHER ORDERED** that, if after reviewing this Order Plaintiff still seeks leave to amend, Plaintiff may file a motion to amend, consistent with the Local Rules, within the time to be set at the Rule 16 conference.

Dated this 6th day of July, 2018.

James A. Teilborg
Senior United States District Judge