Nicole Goodwin (SBN 024593)
**GREENBERG TRAURIG, LLP**
2375 East Camelback Road, Suite 700
Phoenix, Arizona 85016
Tel.: (602) 445-8000
goodwinn@gtlaw.com

Matthew A.C. Zapf (*pro hac vice*), (IL ARDC # 6197084)
Jonathan H. Claydon (*pro hac vice*), (IL ARDC # 6289235)
**GREENBERG TRAURIG, LLP**
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Tel.: (312) 456-8400
zapfm@gtlaw.com
claydonj@gtlaw.com

*Attorneys for Defendant Omron Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IceMOS Technology Corporation, | Case No. 2:17-cv-02575-JAT |
| Plaintiff/Counter-Defendant, | |
| v. | **OMRON CORPORATION'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S FIRST AMENDED COMPLAINT & DEFENDANT OMRON CORPORATION'S COUNTERCLAIMS** |
| Omron Corporation, | |
| Defendant/Counter-Plaintiff. | **(JURY TRIAL DEMANDED)** |

Defendant/Counter-Plaintiff Omron Corporation ("Omron") hereby answers and raises affirmative defenses to the First Amended Complaint (the "Complaint," ECF No. 14) filed by Plaintiff/Counter-Defendant IceMOS Technology Corporation ("IceMOS"). Omron further asserts the following counterclaims against IceMOS.

1.    Plaintiff IceMOS Technology Corporation ("Plaintiff" or "IceMOS"), by and through its undersigned counsel, files this First Amended Complaint against Defendant Omron Corporation, as follows:

**ANSWER:**  Omron admits that IceMOS has filed a complaint against Omron by and through IceMOS's counsel.  Omron denies that the complaint has any merit.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

2.      IceMOS is a Delaware corporation with its principal place of business at 7855 South River Parkway, #122, Tempe, Arizona 85284.

**ANSWER:**  Omron admits the allegations in Paragraph 2.

3.      Defendant Omron Corporation ("Omron") is a corporation formed under the laws of Japan with its principal place of business at Shiokoji Horikawa, Shimogyo-ku, Kyoto 600-8530 Japan.

**ANSWER:**  Omron admits the allegations in Paragraph 3.

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because this action is between a United States entity and a foreign entity and the matter in controversy exceeds $75,000.00.

**ANSWER:**  Paragraph 4 contains conclusions of law to which no response is required. To the extent a response is required, Omron denies that this Court properly has jurisdiction over this action.

5.      Arizona's long-arm statute allows courts in this State to exercise jurisdiction over nonresident defendants to the extent allowed by the Constitution.

**ANSWER:**  Paragraph 5 contains conclusions of law to which no response is required. To the extent a response is required, Omron does not dispute that Arizona's long-arm statute authorizes federal courts in Arizona to exercise jurisdiction over a nonresident defendant if doing so would comport with constitutional principles of due process.

6.      This Court has personal jurisdiction over Omron because Omron has purposefully directed activities and transactions towards Arizona and has availed itself of the privilege of conducting business in Arizona; IceMOS's claims arise out of and relate to Omron's activities in Arizona; and exercising specific jurisdiction over Omron is reasonable.

**ANSWER:**  Paragraph 6 contains conclusions of law to which no response is required. To the extent a response is required, Omron denies the allegations in Paragraph 6.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

7.     Specifically, Omron has engaged in a multi-year contractual relationship with IceMOS. IceMOS is an Arizona citizen that Omron has deliberately engaged in contractual activities with [sic].

**ANSWER:**  Omron denies that the allegations in Paragraph 7 are sufficient to confer personal jurisdiction over Omron in this Court.

8.     IceMOS has had its principal place of business in Tempe, Arizona since 2004, which predates the parties' contacts by three years.

**ANSWER:**  Omron lacks knowledge and information sufficient to form a belief regarding the location of IceMOS's principal place of business prior to the parties' contacts, and therefore denies the allegations in Paragraph 8.

9.     In 2007, Omron approached IceMOS **in Arizona** to present Omron's foundry business to IceMOS. On numerous occasions, Omron personnel have visited IceMOS's headquarters in Tempe in furtherance of either obtaining IceMOS's business, or (after the parties entered their contract discussed below) to meet regarding their contractual relations. Such meetings occurred in at least 2007, 2011, 2012, 2013, and 2015. The March 2015 meeting at which Omron purported to verbally give notice of termination of the IceMOS-Omron Supply Agreement dated February 28, 2011 ("Supply Agreement") occurred at IceMOS headquarters in Tempe. (Emphasis in original.)

**ANSWER:**  Omron admits visiting IceMOS in Tempe, Arizona once in 2011 and twice in 2014 regarding production forecasts. Omron further admits visiting IceMOS in Tempe, Arizona in March 2015 and January 2017 to discuss the termination and transition of the Supply Agreement. Omron denies approaching IceMOS in Arizona in 2007 to present Omron's foundry business to IceMOS, as Omron instead presented its foundry business to a distinct entity named Great Wall Semiconductor ("GWS"). Omron denies all other allegations in Paragraph 9.

10.     Omron has further directed the following actions toward Arizona—all of which involve the business relationship upon which this lawsuit is based: (1) during the

1   course of Omron's relationship with IceMOS, Omron has shipped all production and
2   engineering lots it manufactured for IceMOS to IceMOS's Arizona headquarters; (2)
3   sent all planning requests to IceMOS's Arizona headquarters; (3) negotiated the Supply
4   Agreement identified below with IceMOS's business representatives based in Arizona;
5   (4) requested payment from IceMOS's Arizona headquarters and received payments
6   from IceMOS's Bank of America Arizona account; (5) directed numerous emails and
7   other correspondence to IceMOS in Arizona relating to the products that are the subject
8   of the Supply Agreement at issue; (6) sent invoices and payment plans to IceMOS in
9   Arizona; (7) called IceMOS president Sam Anderson in Arizona on many occasions to
10  discuss the business relationship at issue.

11      **ANSWER:**  Omron denies "directing" actions toward Arizona. Although Omron
12  admits shipping an engineering sample to *GWS* in Arizona on one occasion in 2010,
13  Omron denies shipping production and engineering lots to *IceMOS* in Arizona. Omron
14  admits that IceMOS's business representatives are based in Arizona, but denies that the
15  parties negotiated the Supply Agreement in Arizona. Omron admits to communicating
16  with IceMOS representatives in Arizona, sending invoices and payment plans to
17  IceMOS in Arizona, and receiving payments from IceMOS's Arizona bank account, but
18  denies such allegations are sufficient to create personal jurisdiction. Omron denies all
19  other allegations in Paragraph 10.

20      11.    Omron has created continuing obligation [sic] between itself and IceMOS,
21  a resident of this forum, by voluntarily entering into the Supply Agreement. All items
22  manufactured by Omron under the Supply Agreement were deliverable to IceMOS in
23  Arizona. Further, Omron has traveled to Arizona to meet with IceMOS and has made
24  fraudulent representations and anticipatorily breached its obligations to IceMOS during
25  such meetings.

26      **ANSWER:**  Omron admits that IceMOS is a resident of Arizona and that Omron
27  met with IceMOS in Arizona on a certain number of minimal occasions. Omron further
28

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

4

admits that it voluntarily entered into the Supply Agreement.  Omron denies all other allegations in Paragraph 11.

12.    IceMOS's claims arise out of and relate to Omron's contacts with, and extra-contractual behavior directed to, Arizona. "A defendant has purposely availed himself of the benefits of a forum if he has deliberately engaged in significant activities within a State **or has created continuing obligations between himself and residents of the forum**." *Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 (9th Cir. 1990) (emphasis added) (internal quotes omitted).

**ANSWER:**  To the extent that Paragraph 12 quotes the Ninth Circuit's opinion in *Gray*, this paragraph contains legal conclusions to which no response is required. Omron denies all other allegations in Paragraph 12.

13.    The Ninth Circuit applies a "but for" test for determining whether a plaintiff's cause of action arise [sic] out of the defendant's forum-related activities. Id. at 761. If Omron had not contracted with IceMOS to manufacture and deliver products to Arizona, IceMOS would not have been injured by Omron's breach of contract. See id. Likewise, if Omron had not traveled to Arizona and made false representations to IceMOS, IceMOS would not have been injured by Omron's fraud.

**ANSWER:**    To the extent Paragraph 13 discusses the Ninth Circuit's jurisdictional standards or quotes the Ninth Circuit's opinion in *Gray*, this paragraph contains legal conclusions to which no response is required. Omron denies that it has breached the parties' contract and denies making false representations to IceMOS. Omron denies that IceMOS has been "injured" by any alleged breach of the Supply Agreement and denies that IceMOS has been "injured" by any alleged fraud. Omron further denies that the Court may validly exercise personal jurisdiction over Omron and denies all other allegations in Paragraph 13.

14.    Exercise of jurisdiction over Omron is reasonable because Omron has purposefully availed itself of a contractual relationship with an Arizona citizen by its voluntary dealings with IceMOS. Because Omron is a foreign corporation, the burden of

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

litigating in this forum would not be substantially greater than in any other U.S. forum, nor is there a conflict between this forum's sovereignty and the sovereignty of another U.S. forum. Arizona has an interest in seeing that its residents are not misled by fraud or harmed by breaches of contract, and Arizona is an efficient forum for litigating this suit because many of the U.S. witnesses are in Arizona. See id. (listing factors for reasonableness of personal jurisdiction).

**ANSWER:** To the extent that Paragraph 14 cites the Ninth Circuit's opinion in *Gray*, this paragraph contains legal conclusions to which no response is required. Omron denies all other allegations in Paragraph 14.

15.     Venue in this District is proper as to Omron under 28 U.S.C. § 1391(c)(3) because Omron is not a resident of the United States and may, therefore, be sued in any judicial district.

**ANSWER:** Paragraph 15 is a legal conclusion to which no response is required. To the extent a response is required, Omron denies that venue and jurisdiction are properly before this Court.

16.     Founded in 2004, IceMOS offers and provides high quality super junction metal oxide semiconductor field-effect transistors ("Super Junction MOSFETs"), microelectromechanical systems ("MEMS") solutions, and advanced engineering substrates. It is a small privately held company with its headquarters in Tempe, Arizona and operations in Belfast, Northern Ireland and Japan.

**ANSWER:** Omron admits that IceMOS offers Super Junction MOSFETs, and admits that IceMOS has its headquarters in Tempe, Arizona and operations in Belfast, Northern Ireland, and Japan. Omron lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 16, and therefore denies the same.

17.     Omron is an 86-year old Japanese company founded by Kasuma Tateisi. Omron claims its corporate culture can be summarized by Tateisi's favorite phrase,

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

6

"Don't just say 'I can't.' Try and find a way to do it." As detailed below, Omron did not apply that spirit to its relationship with IceMOS.

**ANSWER:**  Omron admits it is a Japanese company founded by Kasuma Tateisi. Omron denies all other allegations in Paragraph 17.

18.    In 2007, Omron purchased a wafer fabrication facility in Yasu, Japan (the "Yasu Fab") that fabricated 200mm complementary metal-oxide semiconductor (CMOS) wafers with a 50,000 wafer/month capacity. Omron offered contract manufacturing services to utilize extra capacity above what it needed for internal customers and its external expansion. Omron's general manager Yoshio Sekiguchi approached IceMOS and Great Wall Semiconductor (GWS) to be customers of the Yasu Fab. Both IceMOS and GWS ultimately entered supply agreements with Omron.

**ANSWER:**   Omron admits that its asset purchase of the Yasu Fab was consummated in 2007 and admits that it offered contract manufacturing services to utilize extra capacity above what it needed for internal customers and its external expansion. Omron denies that the Yasu Fab "fabricated 200mm complementary metal-oxide semiconductor (CMOS) wafers with a 50,000 wafer/month capacity"; the Yasu Fab instead employed an *8-inch* CMOS production line with a *10,000* wafer/month capacity.  Omron denies that Mr. Sekiguchi approached IceMOS to be a customer of the Yasu Fab; instead, IceMOS representative Raymond Wiley approached Omron on October 12, 2006 to propose potential business transactions between Omron and IceMOS. Omron further denies that Mr. Sekiguchi approached GWS to be a customer of the Yasu Fab; instead, a Japanese marketing consultant introduced GWS to Mr. Sekiguchi. Omron admits that both IceMOS and GWS ultimately entered supply agreements with Omron. Omron denies all other allegations in Paragraph 18.

19.    When it solicited IceMOS's business, Omron knew IceMOS was a small company with no meaningful ability to shift production facilities from the Yasu Fab and no ability to qualify a second source of production for wafer fabrication simultaneously with designing, engineering, and producing products at Omron's Yasu Fab. Simply

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

stated, Omron knew that it would be IceMOS's sole supplier of wafer fabrication services.

**ANSWER:**  Omron denies the allegations in Paragraph 19.

20.     From 2008 through 2011, IceMOS and Omron had a customer-supplier relationship. During this time, IceMOS began designing and developing its Super Junction MOSFETs for manufacture at the Yasu Fab.

**ANSWER:**  Omron denies that its relationship with IceMOS from 2008 and 2011 was that of "customer and supplier."  On information and belief, Omron admits that during this time, IceMOS began designing and developing its Super Junction MOSFETs.

21.     The sales cycle for microelectronic components like Super Junction MOSFETs is long and complex. IceMOS Super Junction MOSFETs are "designed into" customers' end products (e.g. power supplies and light ballasts). The process includes the customer providing functional specifications, size or package requirements and interoperability conditions.

**ANSWER:**  Omron denies the allegations in Paragraph 21.

22.     Because of the detailed selling process, marketing Super Junction MOSFETs requires extensive work with customers. This work is done by sales/application engineers who work closely with the fabrication facility's engineers. The work needed just to start products into production—design work, application compatibility, fine-tuning with the fabrication facility and customer, creating and adjusting mask sets, producing and qualifying samples, process engineering—takes up to **three years**. IceMOS performs this work for customer devices that have multi-year life cycles. Once IceMOS wins a design battle to have its products included in a device, it must commit to the customer that it can continuously supply the devices for the expected life of the products in which they are used. (Emphasis in original.)

**ANSWER:**  Omron denies the allegations in Paragraph 22.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

8

23.     The foundry where semiconductors are manufactured is critical for a semiconductor company like IceMOS. IceMOS's customers will only approve and purchase products produced at fabrication facilities that the customers have qualified for making products for the customers' finished devices. Once a semiconductor company's foundry has been approved by customers, the semiconductor company needs the foundry to continue manufacturing products. This is why, even if the semiconductor company and foundry manifest an intent to cease mutual operations, the semiconductor company needs the foundry to continue supplying products until a new foundry has been located, manufacturing processes transferred, the new foundry proves it can make products with sufficient yields, and the customers qualify the new foundry under their own policies and procedures. Thus, withdrawal from a foundry agreement requires the foundry and semiconductor company to work together to ensure the semiconductor's customers obtain the products they need.

**ANSWER:**  Omron lacks knowledge and information sufficient to form a belief regarding IceMOS's customers' approval of or purchase from foundries, and therefore denies allegations concerning the same. Omron denies all other allegations in Paragraph 23.

24.     When customers choose IceMOS, they contract for an uninterrupted supply of IceMOS Super Junction MOSFETs for a period that extends continuously into the future for the life of the customer's device. Failure to meet customer demand means that if IceMOS is the first source for the customer's needs, it will be replaced by a second source until it could meet production needs (and if the customer would accept IceMOS products after a supply gap). If IceMOS is the second source of the customer's requirements because it is filling in another supplier's inability to fulfill the customer's orders, and IceMOS has a supply gap, it will simply be replaced by the customer and not used again.

**ANSWER:**  Omron lacks knowledge and information sufficient to form a belief concerning IceMOS's contracts with its customers or any related allegations in

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

Paragraph 24, and therefore denies the same. Omron denies all other allegations in Paragraph 24.

25.     Supply chain problems are anathema to IceMOS, which serves the power management industry. IceMOS must work with its customers to design and qualify IceMOS products for use in customer systems. One missed shipment or delivery problem can undo thousands of man-hours worth of work to obtain a design win.

**ANSWER:**  Omron lacks knowledge and information sufficient to form a belief concerning IceMOS's supply-chain problems, interaction with customers on its design process, or shipment and delivery of customer goods, and therefore denies the same. Omron denies all other allegations in Paragraph 25.

26.     The cycle time for running a production lot of MOSFET wafers exceeds 7 months. To order and receive raw materials takes three months, Omron's processing of the raw materials takes another three months, and then IceMOS and Omron need 4-6 weeks to test and assemble the products for the customers. For an engineering lot (which is used for testing and design-in work and creating samples for marketing to customers), the process requires an additional four weeks.

**ANSWER:**  Omron denies the allegations in Paragraph 26.

27.     What IceMOS describes above is the basic nature of how the microelectronics industry works. Omron had actual knowledge of IceMOS's product cycles from design to production when Omron solicited IceMOS in 2007 and when it entered the Supply Agreement. Omron has had extensive consultation and interaction with IceMOS's engineers and principles [sic] throughout the decade-long course of the parties' dealings. And Omron has been in the electronics business for nearly a century, therefore it has full knowledge of the nature of IceMOS's products and the Yasu Fab's critical importance to IceMOS's ability to meet its own customer obligations.

**ANSWER:**  Omron admits that it has "been in the electronics business for nearly a century." Omron denies all other allegations in Paragraph 27.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

10

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

28.     On February 28, 2011, IceMOS and Omron entered into the Supply Agreement for Omron to fabricate and supply semiconductor wafers for IceMOS's Super Junction MOSFETs. A true and correct copy of said Supply Agreement is attached hereto as "Exhibit 1" and is incorporated by reference as if fully set forth herein.

**ANSWER:**   Omron admits the allegations in Paragraph 28. Omron further admits that the document designated as Exhibit 1 to the Complaint is a true and correct copy of the Supply Agreement.

29.     The intent of the Supply Agreement was to provide IceMOS with a reliable and consistent supply of wafers for its Super Junction MOSFETs to allow IceMOS to develop super junction platforms and meet growing demand by timely delivering products from those platforms to its customers.

**ANSWER:**   Omron denies the allegations in Paragraph 29, as they are inconsistent with the "Recitals" section of the Supply Agreement. That section, which speaks for itself, states that Omron's intent in entering the Supply Agreement was instead to "expand its' [sic] customer base."

30.     To that end, in the Supply Agreement, Omron agreed to (1) "perform the fabrication requested by IceMOS"; (2) "share equally in the production mask costs (initial sets) applicable to the products listed in Exhibit A and future products"; and (3) "fully resource the development of all generations of Super Junction MOSFETs" through the duration of the Supply Agreement. Supply Agreement, §§ 2.0, 4.0, & 4.2.1.

**ANSWER:**   Omron denies any allegations in Paragraph 30 inconsistent with the language of the Supply Agreement, which speaks for itself.

31.     From their negotiations of the Supply Agreement, Omron knew that IceMOS depended upon Omron to support IceMOS's business due to the global dearth of fabrication facilities that could support IceMOS's manufacturing requirements. IceMOS has developed two generations of Super Junction MOSFETs at the Yasu Fab.

While developing these products, IceMOS has created substantial intellectual property, including approximately 50 patents.

**ANSWER:** Omron admits that IceMOS had developed two generations of Super Junction MOSFETs at the Yasu Fab, but denies any alleged dependence on it by IceMOS due to any purported shortage of fabrication facilities to support IceMOS's manufacturing requirements. Omron lacks knowledge and information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 31, and therefore denies the same.

32.     IceMOS dedicated a team of Japanese engineers to work with Omron to develop the high voltage Super Junction MOSFET technology, and improve yields in processing—the cost to IceMOS of this engineering capacity was $600,000 per year. IceMOS further invested in the Omron relationship by purchasing silicon wafers for development and production, and by purchasing mask sets from Omron.

**ANSWER:** Omron admits that IceMOS dedicated a team of Japanese engineers to work with Omron and further admits that IceMOS purchased silicon wafers for development and production and mask sets. Omron lacks knowledge and information sufficient to form a belief regarding the annual costs IceMOS incurred, and therefore denies allegations related to the same.

33.     Because the global availability of fabrication facilities like Omron's Yasu Fab is so low, and the design-to-production time for IceMOS's products is long, the Supply Agreement term is 10 years and early termination could only be effectuated upon three years' **written** notice, including one year of support to transfer production to another wafer fabrication facility before termination. The transition year is not separate from the three-year period where production and product development and support continue until termination. The transition work must continue in parallel while Omron continues to fulfill its obligations to make products and support research and development. Supply Agreement §§ 6.0, 6.2. (Emphasis in original.)

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

**ANSWER:**  Omron admits that the ordinary term of the Supply Agreement would have been ten years had Omron not validly exercised its termination options under the Supply Agreement. Omron denies all other allegations in Paragraph 33. Section 6.2 of the Supply Agreement, which speaks for itself, explicitly provides that "either party can terminate this Agreement without any cause and liability by giving a written notice to the other Party at least three (3) years, *which include one (1) year period of transfer to other wafer fabrication facilities*, prior to termination." Supply Agreement § 6.2 (emphasis added). Thus, the three-year termination period includes two years of ordinary performance under the Supply Agreement followed by one year of transfer to other wafer fabrication facilities.

34.     To enable Omron to support IceMOS's contracted-for 3,500 wafer/month capacity, IceMOS agreed to purchase a deep reactive ion etcher (DRIE) necessary for Super Junction MOSFET manufacturing, which cost IceMOS $1,235,666 to purchase and $112,000 for installation. IceMOS agreed to pay the expenses necessary to install the DRIE in the Yasu Fab. Supply Agreement § 4.14. The DRIE was configured for use in Japan and IceMOS cannot use it at any facility outside Japan until it is substantially modified. Omron has refused to purchase the DRIE and has refused to help IceMOS to ship it outside Japan.

**ANSWER:**  Omron denies that IceMOS "agreed" to purchase the DRIE etcher and pay the expenses necessary to install the DRIE in the Yasu Fab "to enable Omron to support IceMOS's contracted-for 3,500 wafer/month capacity"; instead, IceMOS voluntarily purchased the DRIE etcher of its own volition.  Answering further, and as set forth in detail below in its Counterclaim, Omron affirmatively states that IceMOS fraudulently and/or recklessly inflated the forecast for monthly wafers and ordered only 2.2% of the forecasted amount over the life of the contract.  Omron denies that IceMOS cannot use the DRIE etcher at any facility outside Japan, as the DRIE is suitable for use outside of Japan with minor modifications. Omron lacks knowledge and information sufficient to form a belief regarding the costs IceMOS voluntarily paid to purchase and

install the DRIE etcher, and therefore denies allegations concerning the same. Omron admits that it has refused to purchase the DRIE or ship the DRIE outside of Japan, but denies it is under any legal obligation to do so. Omron denies all other allegations in Paragraph 34.

35.     Omron further agreed to take all preventive measures necessary to provide continuous supply to IceMOS. Supply Agreement § 4.15, Ex. H.

**ANSWER:**  Section 4.15 of the Supply Agreement, which speaks for itself, does not require Omron to "take *all* preventive measures necessary to provide continuous supply" as IceMOS insists; instead, the Supply Agreement only requires Omron to "take all preventive measures *listed in Exhibit H* necessary to provide continuous supply to IceMOS during the term of this AGREEMENT." Supply Agreement § 4.15 (emphasis added). Thus, Omron did not agree to take any preventive measures not listed in Exhibit H of the Supply Agreement. Omron therefore denies the allegations in Paragraph 35 to the extent they are inconsistent with the plain language of the Supply Agreement.

36.     It took four years of the 10-year Supply Agreement's term, and tremendous efforts by IceMOS in design, development and engineering, for Omron to finally obtain a 75% wafer yield on IceMOS's first generation (GEN1) Super Junction MOSFET products. Even the best manufacturing Omron could achieve resulted in Super Junction MOSFET wafers with 25% of the die on them useless.

**ANSWER:**  Omron denies the allegations in Paragraph 36.

37.     Upon information and belief, in 2015 Omron's new president determined that acquiring the Yasu Fab was a mistake. Despite its long-term contracts with GWS and IceMOS, Omron now wanted to exit the contract manufacturing business and redirect the engineers and capacity to Omron's internal customers.

**ANSWER:**  Omron denies the allegations in Paragraph 37.

38.     The Supply Agreement requires that all notices under the agreement "be in writing and delivered personally or via facsimile or via registered or certified mail" to the party's address listed in the agreement. Supply Agreement, § 9.4. Omron never

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

provided IceMOS with notice of its intent to terminate the Supply Agreement that meets the § 9.4 requirements.

**ANSWER:**  Omron admits that Section 9.4 of the Supply Agreement, which speaks for itself, contains the language quoted above. Omron denies the allegations in Paragraph 38 to the extent they are inconsistent with the Supply Agreement's plain language. Omron denies that it failed to provide IceMOS a termination notice that satisfied the requirements of Section 9.4, as Omron representative Yoshitake Ito personally delivered a copy of a printed power point presentation stating that the Supply Agreement was terminated to IceMOS representative Samuel Anderson on March 6, 2015.

39.     The design-in process for IceMOS's Super Junction MOSFETs is complex. IceMOS products need to be designed to meet the needs of customers. The process requires designing prototypes, testing samples, ensuring applications work with the MOSFETs, fine tuning the process with the fabrication facility and customer and repeating as necessary to create the final production design. This is a normal process for microelectronic component suppliers and their fabrication facilities.

**ANSWER:**  Omron lacks knowledge and information sufficient to form a belief concerning IceMOS's design-in process or any related allegations in Paragraph 39, and therefore denies the same. Omron denies all other allegations in Paragraph 39.

40.     IceMOS moved its fabrication work to Omron because of the support Omron initially offered and later promised, which included engineering services and the availability of engineering lots in numbers sufficient to support the research and development of multiple generations of Super Junction MOSFET products. IceMOS would use engineering lots (12 wafers) to work on product designs. The Supply Agreement did not place limits on engineering lots that IceMOS could use to design and test its products. Instead, Omron had to supply all engineering lots necessary to create the Super Junction MOSFETs IceMOS was developing.

**ANSWER:**  Omron denies the allegations in Paragraph 40.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

41.     In late 2012, after IceMOS had consigned the DRIE etcher to Omron and had commenced work on its GEN1 products, Omron severely limited IceMOS's use of engineering lots to just 3 lots per month. This constituted a 90% reduction in the amount IceMOS needed to prepare its products and forced IceMOS to purchase production lots for use as engineering lots and send specific instructions to Omron for each lot's processing to obtain the testing and product review Omron had previously indicated would cost IceMOS nothing. Despite Omron's decision, which thwarted the purpose of the Supply Agreement, IceMOS had to remain with Omron because there were no alternative fabrication facilities in Japan and IceMOS had committed all available capital resources to fulfilling its obligations under the Supply Agreement.

**ANSWER:**  Omron admits that the parties reduced the number of engineering lots to three lots per month; however, IceMOS and Omron mutually agreed to that limitation. Omron denies all other allegations in Paragraph 41.

42.     Omron thwarted the intent of the parties by reducing its engineering budget to just 10% of its original commitment to IceMOS after IceMOS purchased the DRIE and started Super Junction MOSFET development into the Yasu fabrication facility. This support reduction caused Omron's ongoing inability to obtain adequate yields. It also contributed to numerous process and manufacturing problems that resulted in low-quality products from Omron. Only in 2015 did Omron's production on IceMOS's first generation products (GEN1) reach the minimally acceptable 75% yield threshold to commence high-volume production, which was at least two years later than what would have occurred if Omron had not curtailed its engineering budget and instead had fulfilled its obligations as originally promised.

**ANSWER:**  Omron denies the allegations in Paragraph 42.

43.     These delays caused by Omron's actions that denied IceMOS the fruits of the Supply Agreement cost IceMOS millions of dollars in development time, destroyed or prevented relationships with customers who should have had qualified products years earlier, and severely devalued IceMOS's contemplated IPO because the Super Junction

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

16

MOSFET sales have been stalled and impeded. Ultimately, Omron severely constrained IceMOS's ability to develop its Super Junction MOSFET business, which cost IceMOS years of product sales prior to Omron's breach and into the future.

**ANSWER:**  Omron denies the allegations in Paragraph 43.

44.    IceMOS has started bringing up its second generation of Super Junction MOSFETs (GEN2) at contract manufacturer Phenitec Semiconductor Corporation (Phenitec). Omron has removed substantially all resources from supporting IceMOS and its GEN2 products, which impairs IceMOS's ability to supply customers while IceMOS transfers its GEN2 production from Omron to Phenitec.

**ANSWER:**  Omron lacks knowledge and information sufficient to form a belief regarding IceMOS's development of a second generation of Super Junction MOSFETs or relationship with Phenitec Semiconductor Corporation, and therefore denies the same. Omron denies all other allegations in Paragraph 44.

45.    Omron's failure to support IceMOS's customers and concurrently fulfill its obligations to transfer IceMOS product fabrication to other wafer facilities has caused additional damages. Such failures include Omron's refusal to purchase for itself or assist IceMOS in transferring IceMOS's DRIE etcher, Omron's removal of resources to support IceMOS in transferring its GEN1 production to a new fabricator, Omron's denying IceMOS the ability to continue design-in work for GEN1 customers during the transition of fabrication services from Omron to a new wafer fabrication, Omron's denying IceMOS the ability to complete GEN2 product development during the Supply Agreement term, Omron's refusal to ensure continued supply of fabrication services during IceMOS's transition to a subsequent facility by failing to maintain adequate end-of-life inventory of IceMOS Super Junction MOSFETs, and Omron's failure to assist IceMOS in obtaining alternative fabrication arrangements.

**ANSWER:**  Omron denies the allegations in Paragraph 45.

46.    On March 6, 2015, Omron met with IceMOS in Phoenix, Arizona and through a non-officer employee **orally** indicated that Omron intended to close its Yasu

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

Fab at the end of March 2017, and therefore that Omron would not accept any new orders from IceMOS after December 31, 2016. Omron made no unequivocal statement that it would not honor the Supply Agreement in some way, only that the Yasu Fab was closing and no orders would be accepted that could not be completed by the end of March. (Emphasis in original.)

**ANSWER:**   Omron admits that, on March 6, 2015, Omron representative Yoshitake Ito met with IceMOS representative Samuel Anderson in Phoenix, Arizona and informed Mr. Anderson that Omron was exercising the Supply Agreement's early termination clause. Omron denies that it only delivered this information "orally"; Omron also conveyed written notice of termination to Mr. Anderson on this same date. Omron denies all other allegations in Paragraph 46.

47.   IceMOS did not accept the statement from Omron's employee or acknowledge in any way that the Supply Agreement had been or could be terminated without following the Supply Agreement's express terms. IceMOS never accepted any oral termination and never acknowledged that the Supply Agreement was no longer in full force and effect.

**ANSWER:**   Omron denies that it failed to "follow the Supply Agreement's express terms" with respect to early termination and denies that it failed to provide Mr. Anderson with written notice of termination.   Omron denies all other allegations in Paragraph 47.

48.   The Supply Agreement's [sic] requires a termination notice in written form providing three years [sic] notice and full compliance right up to the end date. The Supply Agreement additionally requires that during the last year – while Omron continues to meet its manufacturing, engineering and other support obligations – it **also** must cooperate and support transition to another wafer fabrication facility. Supply Agreement, § 6.2. (Emphasis in original.)

1   **ANSWER:**  Omron denies the allegations in Paragraph 48. Section 6.2 of the

2   Supply Agreement, which speaks for itself, provides that the three-year early

3   termination period includes a one-year wind-down period.

4       49.    Omron did not deliver written notice to IceMOS during the March 6, 2015

5   meeting. Further, Omron's employee, Yoshitake Ito, recognized that the discussed

6   factory shutdown date did not comply with the three-year notice requirement in the

7   Supply Agreement, even if Omron had provided notice in compliance with the Supply

8   Agreement.

9       **ANSWER:**  Omron denies that it "did not deliver written notice to IceMOS

10   during the March 6, 2015 meeting," as Omron representative Yoshitake Ito personally

11   delivered a written termination notice to IceMOS representative Samuel Anderson on

12   that date. Omron denies all other allegations in Paragraph 49.

13       50.    The March 6, 2015 meeting discussions of a potential Yasu Fab shutdown

14   did not constitute proper notice of early termination because the intended shut down

15   date was March 6, 2017, less than three years from the date of the meeting.

16       **ANSWER:**  Omron denies the allegations in Paragraph 50. Section 6.2 of the

17   Supply Agreement provides that the three-year early termination period includes a one-

18   year wind-down period, and Omron's notice of termination, which IceMOS did not

19   object to at that time, contemplated an inventory buildup that would see IceMOS

20   through the final transition year.

21       51.    The March 6, 2015 meeting further did not constitute proper notice of

22   early termination because the notice of termination was not in writing and delivered

23   personally or via facsimile or via registered or certified mail.

24       **ANSWER:**  Omron denies the allegations in Paragraph 51. Omron

25   representative Yoshitake Ito personally delivered a written termination notice to

26   IceMOS representative Samuel Anderson during the March 6, 2015 meeting.

27

28

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

52.     The March 6, 2015 meeting further did not constitute proper notice of early termination because the notice of termination was not communicated by an officer, director or other person with any authority to terminate the Supply Agreement.

**ANSWER:**   Omron denies the allegations in Paragraph 52. The Supply Agreement, which speaks for itself, does not require termination notice to be communicated by an officer, director, or other person with authority. *See* Supply Agreement §§ 6.2 and 9.4. Omron denies all allegations inconsistent with the language of the Supply Agreement. Omron further denies that Mr. Ito lacked authority to communicate Omron's termination of the Supply Agreement.

53.     Omron confirmed its own failure to comply with the notice requirements for early termination during a meeting between Omron and IceMOS on December 9, 2015. Omron's meeting minutes, which Mr. Ito sent by email to IceMOS president Sam Anderson, stated:

> *IcMOS [sic] will request Omron to change payment terms for the inventory build because Omron terminate [sic] one year advanced, Omron officially informed IceMOS of the termination in Mar. 2015. Though supply agreement shows at least three years required prior to termaination [sic], Omron stated to terminate on Mar. 31, 2017. It's not three years but two years.*

**ANSWER:**  Omron admits that the December 9, 2015 meeting minutes contain the language quoted above, which reflect the comments made by Mr. Anderson and in no way reflect or constitute the position of Omron.  Omron denies all other allegations contained in Paragraph 53.

54.     A true and correct copy of said meeting minutes is attached hereto as "Exhibit 2" and is incorporated by reference as if fully set forth herein. Thus, Omron has acknowledged that its faulty effort at termination is, even if accepted as a termination, in breach of the Supply Agreement. The meeting minutes also do not constitute proper notice of termination because Omron did not furnish them as required by the terms of the Supply Agreement.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

20

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1    **ANSWER:**  Omron admits that Exhibit 2 to the Complaint is a true and correct

2    copy of the meeting minutes and refers to its response to Paragraph 53. Omron denies

3    all other allegations in Paragraph 54.

4    55.    At both the March 6, 2015 meeting and the December 9, 2015 meeting,

5    Omron falsely represented its intent to fully support IceMOS's Super Junction

6    MOSFETs throughout the "termination period" that Omron had proposed but for which

7    it had not issued written notice. Such support has not occurred. The promises of

8    uninterrupted service and support until March 2017 were made to induce IceMOS to

9    accept an early termination based upon assurances the transition would be handled in a

10   way that would prevent any additional harm to IceMOS. Omron knew IceMOS had no

11   other viable options.

12   **ANSWER:**  Omron denies the allegations in Paragraph 55.

13   56.    As of the date of the Original Complaint in this matter, Omron had not

14   provided proper written notice to IceMOS sufficient to trigger the early termination

15   provision of the Supply Agreement. IceMOS has never accepted the oral termination as

16   proper. This is a material breach of the Supply Agreement.

17   **ANSWER:**  Omron denies the allegations in Paragraph 56.

18   57.    Omron has further breached the Supply Agreement by actions and

19   inaction other than its breach of the early termination provision.

20   **ANSWER:**  Omron denies the allegations in Paragraph 57.

21   58.    First, Omron has failed to ship one or more IceMOS orders. The Supply

22   Agreement requires lead time of no more than 10 weeks for products with fewer than 15

23   photo layers. Supply Agreement § 4.11. A shipment scheduled to ship on August 5,

24   2016, which had a lead time of 10 weeks, did not ship until October 14, 2016. The delay

25   occurred because Omron failed to exercise proper process control and had to replace a

26   failed process run. IceMOS lost the customer due to Omron's fabrication failure and

27   sought to return the late product because the customer had switched to an IceMOS

28

competitor. Omron did not credit IceMOS for the failed process run and instead claimed an outstanding invoice for the rejected product.

**ANSWER:** Omron admits that Section 4.11 of the Supply Agreement, which speaks for itself, provides that "Production lead time will not exceed ten (10) weeks for the products which have less than fifteen (15) photo layers." Omron denies all allegations in Paragraph 58 inconsistent with the plain terms of the Supply Agreement. Omron denies all other allegations in Paragraph 58. Omron shipped the lots that were scheduled to ship on August 5, 2016, on October 12, 2016 and October 21, 2016 pursuant to IceMOS's direction. The shipping delay occurred in part because IceMOS itself directed Omron to delay the production process. Omron incorporates the allegations raised in its Counterclaims below to its answer to Paragraph 58.

59.     Second, Omron failed to ensure continuous uninterrupted supply despite § 4.15 of the Supply Agreement and its Exhibit H.

**ANSWER:** Omron denies the allegations in Paragraph 59, and denies all allegations in Paragraph 59 inconsistent with the plain terms of the Supply Agreement, which speak for themselves.

60.     Third, Omron has rejected the return of unusable wafers rejected by IceMOS.

**ANSWER:** Omron denies the allegations in Paragraph 60.  Answering further, Omron states that Section 4.9 of the Supply Agreement does not permit IceMOS to return "unusable" wafers, but only permits IceMOS to reject lots that are "found to fail the 'Design Specification' per Exhibit A for a given device title." Supply Agreement § 4.9.

61.     Fourth, Omron has refused to accept new purchase orders from IceMOS, in violation of, inter alia, §§ 2.0, 4.15 and 6.2 of the Supply Agreement.

**ANSWER:** Omron denies the allegations in Paragraph 61.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

22

62.     Fifth, Omron has refused to effectuate a sufficient inventory build to service IceMOS during the transition of fabrication services from Omron's Yasu Fab to a subsequent fabrication facility in violation of § 6.2 of the Supply Agreement.

**ANSWER:**  Omron denies the allegations in Paragraph 62.

63.     Since meeting with Omron and learning of Omron's intent to terminate the Supply Agreement, IceMOS has maintained that Omron is not permitted to terminate the Supply Agreement and must continue to support the design, development, and manufacture of IceMOS's Super Junction MOSFETs for at least three years after proper termination notice.

**ANSWER:**  Omron denies the allegations in Paragraph 63.

64.     Nonetheless, in a good faith endeavor to minimize/mitigate any potential damages, and in reliance upon Omron's representations regarding ongoing support during the termination period, IceMOS has negotiated with Omron to resolve the termination issue and has attempted to find alternative facilities to meet its manufacturing demands.

**ANSWER:**  Omron lacks sufficient information regarding whether IceMOS has "attempted to find alternative facilities to meet its manufacturing demands," and therefore denies such allegations. Omron denies that IceMOS has "negotiated with Omron" in "good faith," as IceMOS has made unreasonable, unjustifiable, and unacceptable demands that Omron purchase the DRIE etcher and pay IceMOS $3 million. Omron denies all other allegations in Paragraph 64.

65.     Given the term of the Supply Agreement and the nature of semiconductor fabrication, IceMOS developed the manufacturing processes for its Super Junction MOSFETs specifically for Omron's wafer manufacturing facility and equipment.

**ANSWER:**  Omron denies the allegations in Paragraph 65.

66.     Despite its best efforts, IceMOS has been unable to identify a comparable manufacturing facility with adequate supply capability or capacity that will not cause substantial delay, costs, and further loss to IceMOS.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1  **ANSWER:**  Omron lacks knowledge and information sufficient to form a belief

2  as to the truth of the allegations in Paragraph 66, and therefore denies the same.

3  67.    Additionally, IceMOS has learned that the DRIE etcher that it purchased

4  at Omron's insistence and consigned to Omron's facility cannot be transferred and

5  supported outside of Japan, severely limiting IceMOS's options for alternative

6  manufacturers without the substantial loss of the millions of dollars invested in the

7  purchase and installation of the DRIE etcher.

8  **ANSWER:**  Omron denies that IceMOS purchased the DRIE etcher "at Omron's

9  insistence"; IceMOS purchased the DRIE etcher of its own volition. Omron denies that

10  the DRIE etcher cannot be transferred or supported outside of Japan, as the DRIE etcher

11  is suitable for use outside of Japan with minor modifications. Omron denies all other

12  allegations in Paragraph 67.

13  68.    Recognizing its failure to comply with the three-year notice period or its

14  obligations to continue to fully support IceMOS during a transition, Omron has since

15  shifted its intended termination date to March 6, 2018, which is still fewer than three

16  years from the first possible written notice date.

17  **ANSWER:**  Omron denies that it has failed to comply with the three-year notice

18  period or its obligations under the Supply Agreement, and therefore denies that it has

19  "recogniz[ed]" any alleged failure to do either. Omron denies all other allegations in

20  Paragraph 68.

21  69.    Such shift also violates the Supply Agreement because the March 6, 2018

22  date Omron decided upon is less than three years from the time Omron indicated its

23  intent to terminate on that date.

24  **ANSWER:**  Omron denies the allegations in Paragraph 69.

25  70.    The March 6, 2018 date for termination is in further violation of the

26  Supply Agreement because Omron has not provided IceMOS with notice in writing and

27  delivered personally or via facsimile or via certified or registered mail.

28  **ANSWER:**   Omron denies the allegations in Paragraph 70.

24

71.     Nonetheless, Omron now maintains an intent to terminate the Supply Agreement as of March 6, 2018. But Omron has provided no assurances to IceMOS that it will fully support new product development with engineering lots or provide the necessary level of engineering support.

**ANSWER:**  Omron denies the allegations in Paragraph 71.

72.     Despite its covenant to fully resource the development of IceMOS's Super Junction MOSFETs, no later than early 2014, Omron began to redirect engineering resources from IceMOS's development activities to Omron's internal business activities. In so doing, Omron failed to ensure that it could continue to supply 3,500 wafers/month as required by the Supply Agreement.

**ANSWER:**  Omron denies the allegations in Paragraph 72.

73.     Omron's reduction of support for IceMOS has been ongoing and has worsened from 2015 to 2016, causing disruption and delays in the development and manufacture of IceMOS's Super Junction MOSFETs and its ability to meet customer demands. Such disruption and delays have detrimentally impacted IceMOS's existing and prospective business relationships by preventing IceMOS from developing its products, selling those products into the market, and timely delivering products to existing customers.

**ANSWER:**  Omron denies the allegations in Paragraph 73.

74.     Additionally, Omron has recently taken the position that the Supply Agreement does not require it to fully support IceMOS's Super Junction MOSFETs for three years, including one year of concurrent transfer support, but rather requires only two years of product support and one year of transfer support, which conflicts with Omron's duty to ensure uninterrupted supply in § 4.15 of the Supply Agreement.

**ANSWER:**  Omron admits it has taken the position described in Paragraph 74. Omron denies the implication that it has only "recently" taken this position, as it has consistently taken this position as supported by the plain terms of Section 6.2 of the Supply Agreement. Omron denies that Section 4.15 of the Supply Agreement obligates

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

Omron to "ensure uninterrupted supply"; rather, Section 4.15—which speaks for itself—only requires Omron to "to take *all preventive measures listed in Exhibit H* necessary to provide continuous supply to IceMOS." (Emphasis added.) Omron therefore denies that it has any duty to "ensure uninterrupted supply" beyond the obligations explicitly enumerated in Section 4.15 and Exhibit H of the Supply Agreement. Omron denies all other allegations in Paragraph 74.

75.     Omron's position has no merit. Under Omron's interpretation, IceMOS would have agreed to a termination that would leave IceMOS with no ability to service its customers for a full year. IceMOS made no such agreement because that would kill the company. Because IceMOS Super Junction MOSFETs must be "designed in" to customer products, which products have a multi-year life cycle, a customer decision to include IceMOS Super Junction MOSFETs in its products in a device means IceMOS must commit to the customer that it can continuously supply the devices for the expected life of the products in which they are used. This is the nature of the microelectronics industry, and Omron had full knowledge of the life cycle and design-in processes when it courted IceMOS in 2007 and 2008, and when it entered the Supply Agreement in 2011. Omron's claim that the Supply Agreement can be interpreted in that manner demonstrates its bad faith and malicious intent.

**ANSWER:**  Omron denies the allegations in Paragraph 75.

76.     Omron previously represented, in the December 9, 2015 meeting minutes, that it would fully support IceMOS's Super Junction MOSFETs throughout the termination period. That representation was false.

**ANSWER:**  Omron denies the allegations in Paragraph 76. The meeting minutes state only that Omron committed to "do [its] best to support *transfer activities and inventory build* for Super Junction" products, which is not tantamount to a representation that Omron would "fully support IceMOS's Super Junction MOSFETs throughout the termination period" beyond its obligations under the plain terms of the Supply Agreement. *See* ECF No. 14-2, at p. 3 (emphasis added).

77.   On or about May 9, 2017, Omron sent a letter to IceMOS indicating that it intends to cease all manufacture of IceMOS's Super Junction MOSFETs by July 2017. A true and correct copy of said letter is attached hereto as "Exhibit 3" and is incorporated by reference as if fully set forth herein.

**ANSWER:**   Omron admits that Exhibit 3 is a true and correct copy of a letter Omron sent to IceMOS on or about May 9, 2017.   Omron denies any allegations in Paragraph 77 inconsistent with the terms of the letter.

78.   IceMOS has advised Omron of the detrimental impact of its efforts to improperly and prematurely terminate the Supply Agreement. Omron's continued efforts and plans to terminate the Supply Agreement have rendered IceMOS's supply chain uncertain and have inhibited IceMOS's ability to effectively and productively conduct its business. No customers will buy IceMOS's products without a qualified manufacturer identified, approved, and committed to manufacturing IceMOS's orders.

**ANSWER:**   Omron denies the implication in Paragraph 78 that Omron has "improperly and prematurely terminate[d] the Supply Agreement." Omron lacks knowledge and information sufficient to form a belief regarding the remaining allegations in Paragraph 78 and therefore denies the same.

79.   Additionally, IceMOS intends to make an initial public offering ("IPO") in 2018 with an expected valuation exceeding $100,000,000.00, of which Omron is aware. Early termination of the Supply Agreement without proper notice has seriously and detrimentally affected IceMOS's ability to make its intended IPO in 2018 and/or will negatively impact the valuation thereof.

**ANSWER:**   Omron lacks knowledge and information sufficient to form a belief as to whether IceMOS has an intention to make an initial public offering and therefore denies that allegation.   Omron denies the remaining allegations in Paragraph 79.

80.   Omron's past failures to satisfy its obligations under the Supply Agreement, its failure to provide proper notice of its intent to terminate the Supply Agreement, and its ongoing efforts to terminate the Supply Agreement early and

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

without proper support for IceMOS's products have caused, and will continue to cause, ongoing harm to IceMOS, including but not limited to, lost business opportunities, lost business reputation, and lost business valuation, for which IceMOS seeks redress, as follows:

**ANSWER:**  Omron denies the allegations in Paragraph 80.

81.    Based on the above facts, IceMOS brings this suit for the following causes of action: (i) breach of contract; (ii) breach of the implied duty of good faith and fair dealing; (iii) promissory estoppel, in the alternative; and (iv) fraud.

**ANSWER:**  Omron denies liability under all causes of action described in Paragraph 81.

**COUNT I: BREACH OF CONTRACT**

82.    IceMOS adopts and incorporates by reference all preceding paragraphs as if fully set forth herein.

**ANSWER:**  Omron adopts and incorporates by reference its responses to all preceding paragraphs as if fully set forth herein.

83.    The Supply Agreement is a valid and enforceable contract for breach of which IceMOS is a proper party to sue.

**ANSWER:**  The allegations in Paragraph 83 are legal assertions as to which no response is required.  To the extent an answer is required, Omron admits that the Supply Agreement was a valid contract until Omron properly exercised its early termination right.

84.    At all relevant times, IceMOS fully performed, tendered performance of, and/or was excused from performing its contractual obligations under the Supply Agreement.

**ANSWER:**  Omron denies the allegations in Paragraph 84. IceMOS materially breached the Supply Agreement and its implied covenant of good faith and fair dealing in the respects identified in Omron's counterclaims below. IceMOS was at no point

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

excused from performing any of its contractual obligations under the Supply Agreement.

85.   IceMOS has invested millions of dollars in the performance of its contractual obligations under the Supply Agreement, including but not limited to, purchasing the DRIE etcher, purchasing numerous mask sets and silicon wafers for development and production, and hiring a dedicated team of Japanese engineers to work with Omron to facilitate the development and manufacturing of IceMOS's Super Junction MOSFETs.

**ANSWER:**   Omron lacks knowledge and information sufficient to form a belief regarding the amount of money IceMOS has expended performing its obligations under the Supply Agreement. Omron therefore denies the allegations in Paragraph 85.

86.   Omron has engaged in multiple breaches of the Supply Agreement, including but not limited to, failing and/or refusing to "fully resource the development of all generations of Super Junction MOSFETs;" failing and/or refusing to "share equally in the production mask costs (initial sets) applicable to the products;" attempting to improperly terminate the Supply Agreement without proper notice; and repudiating its obligations to support development and manufacture IceMOS's Super Junction MOSFETs throughout the three-year termination period.

**ANSWER:**   Omron denies the allegations in Paragraph 86.

87.   Omron's breaches of the Supply Agreement have caused, and will continue to cause, ongoing harm to IceMOS, including but not limited to, actual damages in the form of increased costs, loss of business due to delay in reaching the market, harm to IceMOS's business reputation due to inability to timely meet customer demands, loss of business opportunities due to uncertainty of supply, and impairment of IceMOS's valuation in advance of its planned IPO.

**ANSWER:**   Omron denies the allegations in Paragraph 87.

88.   The harm to IceMOS's business reputation, the impairment of its valuation, and the loss of business opportunities—in particular, the harms that have

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

arisen and will arise from Omron's improper termination and repudiation of its obligation to support IceMOS throughout the termination period—are not adequately recompensable by monetary damages. IceMOS does not have an adequate remedy at law to compensate it for such harms.

**ANSWER:** Omron denies the allegations in Paragraph 87.

89.    The manufacturing processes for IceMOS's Super Junction MOSFETs are unique and were developed specifically for the Yasu Fab.

**ANSWER:** Omron denies the allegations in Paragraph 89.

90.    Additionally, IceMOS purchased specialized manufacturing equipment at Omron's insistence and consigned such equipment to the Yasu Fab. Such equipment was specifically configured for Omron's facility and cannot be serviced outside of Japan.

**ANSWER:**  Omron admits that IceMOS purchased specialized manufacturing equipment and consigned the equipment to the Yasu Fab. Omron admits that the equipment was configured for Omron's facility. However, Omron denies that it "insisted" that IceMOS purchase the equipment, which IceMOS obtained voluntarily. Omron further denies that the equipment cannot be serviced outside of Japan, as it may be serviced in other countries with minor modifications. Omron denies all other allegations in Paragraph 90.

91.    Because of the unique manufacturing processes and specialized equipment, IceMOS cannot avoid the harm to its business reputation and loss of business by transferring manufacturing to another facility in time to avoid the harm.

**ANSWER:** Omron denies the allegations in Paragraph 91.

92.    IceMOS has attempted in good faith to avoid and mitigate such harm and has been unable to locate a comparable facility with sufficient capacity and qualify it for customers within the time Omron has demanded. IceMOS has stood, and continues to stand, ready, willing, and able to perform its obligations under the Supply Agreement.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

**ANSWER:**  Omron denies that IceMOS has attempted in good faith to avoid or mitigate any harm and denies that IceMOS stands or previously stood "ready, willing, [or] able to perform its obligations under the Supply Agreement," as IceMOS materially breached both the Supply Agreement and the implied covenant of good faith and fair dealing in multiple respects detailed in Omron's counterclaims below. Omron lacks knowledge and information regarding whether IceMOS has been able to locate a comparable facility, and therefore also denies such allegations. Omron further denies the implication that Omron has "demanded" that IceMOS locate a comparable facility, as the Supply Agreement explicitly authorized Omron to terminate the Supply Agreement early.

93.    Because of the immeasurable nature of the harm to IceMOS and the unique nature of the supply services under the Supply Agreement, IceMOS seeks specific performance of the Supply Agreement. Specifically, IceMOS seeks to have Omron continue manufacturing and supporting IceMOS's Super Junction MOSFETs until the earlier of either February 28, 2021 or three years after the day proper written notice of termination is delivered in accordance with the Supply Agreement.

**ANSWER:**  Omron denies that IceMOS has suffered any harm, let alone "immeasurable" harm, and denies that the supply services under the Supply Agreement are "unique." Omron denies that IceMOS is entitled to specific performance.

94.    In the alternative, to the extent that the court finds that the harm to IceMOS's business reputation and valuation and the loss of business opportunities are recompensable by monetary damages, IceMOS seeks recovery of all actual damages suffered by it due to Omron's multiple breaches of the Supply Agreement in an amount to be proven at trial, which amount IceMOS believes exceeds $25,000,000.00.

**ANSWER:**  Omron denies that IceMOS has suffered any of the harm described in Paragraph 94 or that it has sustained actual damages. Omron denies that IceMOS is entitled to recover any damages, let alone an amount in excess of $25 million. Omron further denies breaching the Supply Agreement in any respect.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

## COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

95.    IceMOS adopts and incorporates by reference all preceding paragraphs as if fully set forth herein.

**ANSWER:**  No response to this allegation is required, as the Court dismissed this Count in its order dated July 6, 2018.

96.    In addition to the breaches of contract stated above, Omron has breached its implied duty of good faith and fair dealing.

**ANSWER:**  No response to this allegation is required, as the Court dismissed this Count in its order dated July 6, 2018.

97.    The parties agreed that the Supply Agreement "shall be governed by and construed in all respects under the laws of New York, without regard to rules concerning conflicts of laws." Supply Agreement, § 9.2.

**ANSWER:**  No response to this allegation is required, as the Court dismissed this Count in its order dated July 6, 2018.

98.    New York law holds that "in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing."

**ANSWER:**  No response to this allegation is required, as the Court dismissed this Count in its order dated July 6, 2018.

99.    The New York covenant of good faith and fair dealing implies in the Supply Agreement all promises that a reasonable person in the promisee's position would justifiably understand were included to ensure the promisee's expectations are not destroyed by the promisor's actions even if such actions are not specifically prohibited by the contract.

**ANSWER:**  No response to this allegation is required, as the Court dismissed this Count in its order dated July 6, 2018.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

100.   As described in Paragraphs 35-41 above, Omron has taken actions that have prevented IceMOS from receiving the "fruits of the contract." Such actions are separate and distinct from Omron's various breaches of the Supply Agreement.

**ANSWER:**  No response to this allegation is required, as the Court dismissed this Count in its order dated July 6, 2018.

101.   Because of the unique manufacturing processes and specialized equipment, IceMOS cannot avoid the harm to is [sic] business reputation and loss of business by transferring manufacturing to another facility.

**ANSWER:**  No response to this allegation is required, as the Court dismissed this Count in its order dated July 6, 2018.

102.   IceMOS has attempted in good faith to avoid and mitigate such harm and has been unable to locate a comparable facility with sufficient capacity and qualify it for customers within the time Omron has demanded.

**ANSWER:**  No response to this allegation is required, as the Court dismissed this Count in its order dated July 6, 2018.

103.   Omron's breaches of its covenant of good faith and fair dealing have damaged IceMOS by raising IceMOS's costs to comply with the Supply Agreement.

**ANSWER:**  No response to this allegation is required, as the Court dismissed this Count in its order dated July 6, 2018.

104.   Omron's breaches of its covenant of good faith and fair dealing have damaged IceMOS by harming its customer relations and damaging its goodwill.

**ANSWER:**  No response to this allegation is required, as the Court dismissed this Count in its order dated July 6, 2018.

**COUNT III: PROMISSORY ESTOPPEL, IN THE ALTERNATIVE**

105.   IceMOS adopts and incorporates by reference all preceding paragraphs as if fully set forth herein.

**ANSWER:**  No response to this allegation is required, as the Court dismissed this Count in its order dated July 6, 2018.

33

106.   Alternative to the foregoing cause of action for breach of contract, to the extent the Court finds that the Supply Agreement is unenforceable or that IceMOS is otherwise unable to recover thereunder, IceMOS brings this claim for promissory estoppel, seeking enforcement of Omron's promises.

**ANSWER:**  No response to this allegation is required, as the Court dismissed this Count in its order dated July 6, 2018.

107.   Omron made a promise to IceMOS. Specifically, Omron promised to manufacture and support IceMOS's Super Junction MOSFETs for a period of ten years unless earlier terminated upon three years' proper notice and support.

**ANSWER:**  No response to this allegation is required, as the Court dismissed this Count in its order dated July 6, 2018.

108.   IceMOS reasonably and substantially relied on this promise to its detriment by specifically tailoring its manufacturing processes to Omron's facility and investing substantial sums to facilitate development and manufacturing of its Super Junction MOSFETs at Omron's facility.

**ANSWER:**  No response to this allegation is required, as the Court dismissed this Count in its order dated July 6, 2018.

109.   IceMOS's reliance was reasonably foreseeable to Omron. Omron made the promise as an inducement for IceMOS to make use of Omron's manufacturing services.

**ANSWER:**  No response to this allegation is required, as the Court dismissed this Count in its order dated July 6, 2018.

110.   Injustice can only be avoided by enforcing Omron's promise to manufacture and support IceMOS's Super Junction MOSFETs for the promised term.

**ANSWER:**  No response to this allegation is required, as the Court dismissed this Count in its order dated July 6, 2018.

111.   Accordingly, IceMOS seeks to enforce Omron's promise by recovery of the damages suffered by IceMOS in reliance on Omron's promise, including but not

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

limited to, the depreciated value of the DRIE etcher and other equipment specifically purchased and consigned to Omron's wafer manufacture facility in reliance on Omron's promise.

**ANSWER:**   No response to this allegation is required, as the Court dismissed this Count in its order dated July 6, 2018.

**COUNT IV: FRAUD**

112.   *IceMOS adopts and incorporates by reference all preceding paragraphs as if fully set forth herein.*

**ANSWER:**   Omron adopts and incorporates by reference its responses to all preceding paragraphs as if fully set forth herein.

113.   At the March 6, 2015 meeting in Arizona, and again at the December 9, 2015 meeting in Japan, Omron's employee, Yoshitake Ito, represented to IceMOS's Sam Anderson that Omron intended to fully support IceMOS's Super Junction MOSFETs. See, e.g., Exhibit 2 (including provisions for inventory build through March 2017 and representation that Omron will "do [its] best to support transfer activities and inventory build for Super Junction").

**ANSWER:**   Omron denies the allegations in Paragraph 113. Exhibit 2 states only that Omron will do its best "to support *transfer activities and inventory build* for Super Junction," which is all that is required under the Supply Agreement.  Exhibit 2 does not state "that Omron intended to fully support IceMOS's Super Junction MOSFETs" as Paragraph 113 incorrectly asserts. *See* ECF No. 14-2, at p. 3 (emphasis added).

114.   This representation was material to the negotiations over Omron's attempts to improperly terminate the Supply Agreement.

**ANSWER:**   Omron denies the allegations in Paragraph 114. Omron denies that it "attempt[ed] to improperly terminate the Supply Agreement," as Omron validly terminated the Supply Agreement in March 2015. Because the termination was valid, no

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

representation Omron made could have been "material to the negotiations" over the termination.

115.   This representation was false because Omron has indicated it will not fully support IceMOS's Super Junction MOSFETs through the termination period but will provide only transfer support for one year of the termination period.

**ANSWER:**   Omron denies the allegations in Paragraph 115.

116.   When Omron made the representation, it either knew that it had no intent to fully support IceMOS's Super Junction MOSFETs throughout the termination period or made the representation as a positive assertion with reckless disregard to its truth or falsity.

**ANSWER:**   Omron denies the allegations in Paragraph 116.

117.   Omron made its representation as part of the negotiations over its admittedly improper termination efforts with the intent that IceMOS rely on the representation as the parties sought a business solution to their impasse.

**ANSWER:**   Omron denies the allegations in Paragraph 117.

118.   IceMOS did, in fact, rely on the representation in its decision to attempt to mitigate damages by looking for an alternative manufacturing facility and to work in good faith with Omron despite Omron's improper termination efforts.

**ANSWER:**   Omron denies that IceMOS has "work[ed] in good faith with Omron" and denies that its termination efforts were "improper." Omron lacks sufficient knowledge and information to form a belief regarding IceMOS's efforts to look for an alternative manufacturing facility, and therefore denies such allegations. Omron denies all other allegations contained in Paragraph 118.

119.   IceMOS did not know, nor did it have reason to know, that Omron's representation was false.

**ANSWER:**   Omron denies the allegations in Paragraph 119.

120.   Omron's fraudulent misrepresentation has caused, and continues to cause, harm to IceMOS by rendering its supply chain uncertain and impairing IceMOS's

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1 ability to effectively and profitably conduct business, develop products, qualify

2 production for customers, and service customers, for which IceMOS seeks to recover

3 actual damages in an amount to be proven at trial.

4        **ANSWER:** Omron denies the allegations in Paragraph 120.

5        121.   IceMOS requests that the Court enter a preliminary injunction against

6 Omron enjoining Omron from ceasing to manufacture IceMOS's Super Junction

7 MOSFETs or providing IceMOS less support than Omron provides for its own

8 manufacturing during the pendency of this suit. Good cause exists for such relief in that

9 there is a substantial likelihood that IceMOS will succeed on its claim for breach of

10 contract and will suffer irreparable harm in the absence of an injunction.

11        **ANSWER:** Omron denies that IceMOS is entitled to any injunctive relief, let

12 alone the injunctive relief described in Paragraph 121, and denies that good cause exists

13 for injunctive relief. Omron denies that there is a substantial likelihood that IceMOS

14 will succeed on its breach of contract claim or any of its other claims. Omron denies

15 that IceMOS will suffer irreparable harm in the absence of an injunction. Omron denies

16 all other allegations in Paragraph 121.

17        122.   There is a substantial likelihood that IceMOS will succeed on its claim for

18 breach of contract in that Omron has admitted and acknowledged that it did not comply

19 with the three-year notice period. During the December 9, 2015 meeting Omron

20 acknowledged that its attempted notice on March 6, 2015 was less than three years prior

21 to the termination date. Exhibit 2, p. 1.

22        **ANSWER:** Omron denies the allegations in Paragraph 122.

23        123.   Further, Omron has never provided IceMOS with written notice of early

24 termination that conforms to the notice requirements set forth in the Supply Agreement.

25        **ANSWER:** Omron denies the allegations in Paragraph 123.

26        124.   In the absence of an injunction, IceMOS is substantially likely to suffer

27 irreparable harm. The loss of its manufacturer would prevent IceMOS from satisfying

28

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

its commercial obligations, causing IceMOS to lose customers and suffer damage to its business reputation.

**ANSWER:**  Omron denies the allegations in Paragraph 124.

125.   Such harm to its business would not be recompensable by an award of monetary damages.

**ANSWER:**  Omron denies that IceMOS faces any harm to its business, much less harm that "would not be recompensable by an award of monetary damages."

126.   Further, such harm outweighs any potential injury to Omron from being enjoined. Requiring Omron to continue manufacturing IceMOS's Super Junction MOSFETs in accordance with the Supply Agreement that Omron voluntarily entered will not cause Omron irreparable harm comparable to the loss of business reputation, business opportunities, and business valuation faced by IceMOS in the absence of such injunction.

**ANSWER:**  Omron denies the allegations in Paragraph 126.

127.   Finally, the public interest would not be disserved by enjoining Omron as the public has an interest in contracts being enforced and in parties satisfying their contractual obligations. Enjoining Omron to comply with the obligations it voluntarily accepted serves this interest and does not run counter to any other public interest.

**ANSWER:**  Omron admits that "the public has an interest in contracts being enforced and in parties satisfying their contractual obligations," but denies that granting injunctive relief here would serve such interest, as it is IceMOS, not Omron, that has failed to satisfy its contractual obligations. Omron denies all other allegations in Paragraph 127.

128.   For these reasons, IceMOS requests that the Court enjoin Omron from ceasing to manufacture IceMOS's Super Junction MOSFETs or providing less support to IceMOS than Omron contracted to provide during the pendency of this suit.

**ANSWER:**  Omron denies that IceMOS is entitled to the relief described in Paragraph 128.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

## AFFIRMATIVE DEFENSES

Omron gives notice that it may rely upon the following affirmative defenses to the claims set forth in the Complaint. Omron does not hereby assume the burden of proof on such defenses that would otherwise rest on IceMOS. Omron incorporates by reference, as if fully set forth herein, each of the factual averments contained in the Answer above, as well as the allegations contained in the Counterclaims that follow.

## FIRST AFFIRMATIVE DEFENSE

IceMOS's claims are barred in whole or in part due to IceMOS's failure to minimize or mitigate its damages. IceMOS never obtained a replacement for Omron's foundry services after Omron exercised its contractual right to terminate the Supply Agreement.  By asserting this defense, Omron preserves its denial of liability and its denial of the existence of damages.

## SECOND AFFIRMATIVE DEFENSE

IceMOS's claims are barred to the extent that IceMOS seeks to recover damages incurred outside of the termination notice period. By asserting this defense, Omron preserves its denial of liability and its denial of the existence of damages.

## THIRD AFFIRMATIVE DEFENSE

IceMOS's claims are barred in whole or in part because IceMOS has acted in bad faith by providing Omron grossly overstated demand forecasts.  Indeed, as set forth in Omron's Counterclaims, IceMOS ordered a mere 2.2% of the wafers that it projected would be ordered in pre-contractual negotiations.

## FOURTH AFFIRMATIVE DEFENSE

IceMOS's claims are barred in whole or in part because IceMOS's material breach(es) of the Supply Agreement excused Omron from performing under the Supply Agreement.

## FIFTH AFFIRMATIVE DEFENSE

IceMOS's claims are barred in whole or in part, by express and/or implied consent granted (and/or authorized to be granted) by IceMOS.

39

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

## SIXTH AFFIRMATIVE DEFENSE

IceMOS's claims are barred in whole or in part by the equitable doctrines of waiver, acquiescence, release, unclean hands, and/or estoppel.

## SEVENTH AFFIRMATIVE DEFENSE

IceMOS's claims are barred on the ground that IceMOS excused Omron from one or more of Omron's duties to perform under the Supply Agreement.

## EIGHTH AFFIRMATIVE DEFENSE

IceMOS's claims are barred in whole or in part because Omron validly terminated the Supply Agreement by its own terms, thereby excusing Omron from performing thereunder.

## NINTH AFFIRMATIVE DEFENSE

IceMOS's claims are barred in whole or in part by the doctrine of laches.

## TENTH AFFIRMATIVE DEFENSE

IceMOS's claims are barred to the extent that IceMOS seeks damages or other relief for actions taken outside the applicable statute of limitations.

## ELEVENTH AFFIRMATIVE DEFENSE

As described more fully in the Counterclaims below, Omron has affirmative claims against IceMOS. As a result, Omron has a right to set-off against IceMOS in the event Omron is ultimately found liable to IceMOS. By asserting this defense, Omron preserves its denial of liability and its denial of the existence of damages.

## TWELFTH AFFIRMATIVE DEFENSE

Any award of punitive damages against Omron would be unconstitutional as violative of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Excessive Fines Clause of the Eighth Amendment to the United States Constitution. By asserting this defense, Omron preserves its denial of liability and its denial of the existence of damages.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

### THIRTEENTH AFFIRMATIVE DEFENSE

IceMOS's claims are barred on the ground that the Court lacks personal jurisdiction over Omron.

### FOURTEENTH AFFIRMATIVE DEFENSE

IceMOS's claims are barred in whole or in part by the doctrine of unconscionability.

### FIFTEENTH AFFIRMATIVE DEFENSE

Omron hereby reserves the right to amend its affirmative defenses to add any defenses not alleged herein, in the event discovery uncovers previously unknown facts supporting such defenses.

### COUNTERCLAIMS

Defendant/Counter-Plaintiff Omron Corporation ("Omron"), for its complaint against Plaintiff/Counter-Defendant IceMOS Technology Corporation ("IceMOS"), states as follows:

### The Parties

1.     IceMOS is a Delaware corporation with its principal place of business in Arizona.

2.     Omron is a Japanese corporation with its principal place of business in Japan.

### Jurisdiction

3.     The Court may exercise personal jurisdiction over IceMOS because IceMOS has availed itself of this Court's jurisdiction by filing its Complaint against Omron in the District of Arizona.

4.     The Court may exercise subject matter jurisdiction over Omron's counterclaims. Omron's counterclaims arise out of the same common nucleus of operative fact as the claims IceMOS asserts against Omron in its First Amended Complaint. The Court may also exercise diversity jurisdiction over Omron's

41

counterclaims because this action is between a United States entity and a foreign entity and the matter in controversy exceeds $75,000.

### The Supply Agreement

5.     On February 28, 2011, Omron and IceMOS entered into a Supply Agreement, a copy of which is filed at ECF No. 14-1.

6.     Pursuant to the Supply Agreement, Omron agreed to manufacture, and IceMOS agreed to purchase, super junction metal oxide semiconductor field-effect transistors ("Super Junction MOSFETs"). *See generally* Supply Agreement.

7.     The Supply Agreement specifies that "[p]ayment will be made by IceMOS to OMRON at net sixty (60) days [end-of-month ("EOM")]." *Id*. § 4.4.

8.     Section 4.3.1 of the Supply Agreement provides: "In order to permit OMRON to plan for the manufacture of wafers reasonably in line with the estimated demand of IceMOS[,] IceMOS shall provide OMRON a monthly rolling forecast of its estimated demand for wafers over the next twelve (12) months."

9.     To date, Omron has performed all of its obligations under the Supply Agreement, except those which have been excused by IceMOS.

### IceMOS Provides Omron Grossly Inaccurate Demand Forecasts

10.     Based on IceMOS's representations of robust demand for Super Junction MOSFETs, the "Background" section of the Supply Agreement states that "[d]emand for IceMOS Super Junction MOSFETs is estimated to reach a volume of up to three thousand and five hundred (3,500) wafers per month by year 2014." *Id*. at p. 1.

11.     Based on IceMOS's representations regarding the expected demand for Super Junction MOSFETs, the parties appended a volume forecast as an exhibit to the Supply Agreement, which states that monthly demand would reach 3,850 wafers per month by the fourth quarter of 2012.  *See id*. at p. 13.

12.     In reliance on these fraudulently and/or recklessly inflated projections, Omron agreed to enter into the Supply Agreement with IceMOS.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

13. Both before and during the term of the Supply Agreement, IceMOS supplied Omron with demand forecasts indicating that IceMOS would order more than 240,000 wafers under the Supply Agreement between 2011 and 2017. However, such demand forecasts dramatically inflated the true amount of wafers IceMOS would come to order.

14. Had IceMOS ordered more than 240,000 wafers as it represented to Omron would be expected under the Supply Agreement, Omron would have earned approximately $108 million in revenue.

15. Notwithstanding IceMOS's demand forecasts, demand for Super Junction MOSFETs was nowhere near the levels IceMOS represented to Omron.

16. Despite IceMOS's demand forecast of several thousands of wafers to be ordered in 2011, IceMOS did not order a single wafer that year.

17. Despite IceMOS's demand forecast of tens of thousands of wafers to be ordered in 2012, IceMOS ordered only a few hundred in 2012.

18. In all, IceMOS ordered only 5,202 wafers between 2011 and 2017—a mere 2.2% of the forecasted demand figures IceMOS provided to Omron.

19. IceMOS's failure to fulfill its forecasted demand rendered the contract supremely unprofitable for Omron. Omron spent millions of dollars in development pursuant to the Supply Agreement that Omron has never recovered as a result of IceMOS's failure to fulfill its forecasted demand.

**IceMOS Repeatedly Fails to Pay its Invoices on Time**

20. As noted above, Section 4.4 of the Supply Agreement specifies that "[p]ayment will be made by IceMOS to OMRON at net sixty (60) days EOM."

21. Throughout the duration of the Supply Agreement, IceMOS habitually failed to pay its invoices within the timeframe specified by Section 4.4 of the Supply Agreement. To name just a few representative examples:

a. IceMOS was 27 days late in paying an invoice due on December 31, 2013.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

b.      IceMOS was 153 days late in paying an invoice due on January 31, 2014.

c.      IceMOS was 125 days late in paying an invoice due on February 28, 2014.

d.      IceMOS was 122 days late in paying an invoice due on March 31, 2014.

e.      IceMOS was 92 days late in paying an invoice due on April 30, 2014.

f.      IceMOS was 93 days late in paying an invoice due on May 31, 2014.

g.      IceMOS was 79 days late in paying an invoice due on June 30, 2014.

h.      IceMOS was 48 days late in paying an invoice due on July 31, 2014.

i.      IceMOS was 17 days late in paying an invoice due on August 31, 2014.

j.      IceMOS was 15 days late in paying an invoice due on September 30, 2014.

k.      IceMOS was 102 days late in paying an invoice due on October 31, 2014.

l.      IceMOS was 72 days late in paying an invoice due on November 30, 2014.

m.      IceMOS was 43 days late in paying an invoice due on December 31, 2014.

22.     Each of these failures to timely pay outstanding invoices, along with other similar failures to timely pay invoices not here listed, amounted to a material breach of the Supply Agreement and injured Omron.

**IceMOS Fails to Pay Other Invoices Entirely**

23.     On August 8, 2016, IceMOS instructed Omron to begin production on three lots of Super Junction MOSFETs pursuant to the Supply Agreement.

24.     Under IceMOS's direction, Omron commenced and completed production on each lot, only to have IceMOS subsequently place the Super Junction MOSFETs on hold.

25.     On October 12, 2016, at IceMOS's direction, Omron then shipped two of the three held lots and issued IceMOS Invoice No. MD161012IO16052401, pursuant to which IceMOS was obligated to pay Omron $23,500.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

44

26.     On October 21, 2016, at IceMOS's direction, Omron shipped the third held lot of Super Junction MOSFETs and issued IceMOS Invoice No. MD161021IO16060301, pursuant to which IceMOS was obligated to pay Omron $11,750.

27.     IceMOS accepted these lots without protest or complaint at the time they were shipped.

28.     Pursuant to Section 4.4 of the Supply Agreement, IceMOS was obligated to pay Invoice No. MD161012IO16052401 and Invoice No. MD161021IO16060301 by the end of December 2016. *See* Supply Agreement § 4.4 ("Payment will be made by IceMOS to OMRON at net sixty (60) days EOM.").

29.     IceMOS did not pay the outstanding invoices by the due date set by Section 4.4 of the Supply Agreement.

30.     It was not until November 30, 2016, long after IceMOS had already received and accepted the replacement lots, that IceMOS first claimed it was not obligated to pay for the products.

31.     IceMOS insisted it was entitled to "return" the lots due to "delays" in the manufacturing process. However, the Supply Agreement does not permit IceMOS to return lots as a result of alleged manufacturing delays. It only permits IceMOS to reject lots which are "found to fail the 'Design Specification' per Exhibit A for a given device title," *id.* § 4.9—a provision inapplicable to the lots in question.

32.     To date, IceMOS has not paid either of the outstanding invoices noted above.

33.     To date, IceMOS retains possession of the lots that are the subject of the unpaid invoices.

34.     As a result, Omron has been forced to write off the substantial production costs of three lots of Super Junction MOSFETs specifically ordered, placed on hold, and subsequently requested and received by IceMOS.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

45

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

## CAUSES OF ACTION

35.     Based on the above facts, Omron asserts the following causes of action against IceMOS.

### COUNT I

### Breach of the Implied Covenant of Good Faith and Fair Dealing

36.     Omron incorporates by reference Paragraphs 1 through 35 as if fully stated herein.

37.     The Supply Agreement was a valid and enforceable contract before Omron validly exercised its option to terminate it.

38.     The Supply Agreement imposed a duty of good faith and fair dealing upon IceMOS.

39.     While the parties were negotiating the Supply Agreement, IceMOS forecasted that monthly demand for Super Junction MOSFET wafers would reach 3,850 wafers per month by the fourth quarter of 2012.

40.     IceMOS indicated that it would order more than 240,000 wafers for Super Junction MOSFETs between 2011 to 2017.

41.     Based on that representation, the parties memorialized that forecast in the Supply Agreement itself.  *See* Supply Agreement, Ex. A.

42.     Omron justifiably understood that IceMOS would order a quantity of Super Junction MOSFET wafers reasonably close to the forecasted demand figures that IceMOS supplied to Omron.

43.     IceMOS breached its duty of good faith and fair dealing by ordering only 2% of the forecasted quantity of Super Junction MOSFET wafers.

44.     IceMOS's failure to order a quantity of Super Junction MOSFET wafers coming anywhere close to its forecasted demand figures deprived Omron of its right to receive the fruits of the Supply Agreement.

45.     IceMOS's breach of its duty of good faith and fair dealing proximately caused Omron to recognize only approximately $2 million in revenue from the Supply

Agreement, rather than the approximately $108 million in revenue Omron would have earned had IceMOS ordered a quantity of Super Junction MOSFETs approximating the forecasted demand figures IceMOS supplied to Omron.

46.   As a proximate cause of IceMOS's failure to order a quantity of Super Junction MOSFET wafers anywhere close to the demand figures IceMOS provided to Omron, Omron has been unable to recoup the millions of dollars in development costs it expended under the Supply Agreement.

47.   IceMOS's breach of its duty of good faith and fair dealing proximately caused Omron damages, which include, but are not limited to (i) the revenue Omron would have realized if IceMOS had not provided Omron grossly overinflated demand forecasts; (ii) the development costs which Omron has been unable to recoup as a result of IceMOS's breach; and (iii) the legal fees Omron has incurred as a result of IceMOS's breach.

## COUNT II

### Breach of Contract – Failure to Timely Make Payments

48.   Omron incorporates by reference Paragraphs 1 through 47 as if fully stated herein.

49.   The Supply Agreement was a valid, enforceable, and binding contract before Omron properly exercised its option to terminate it.

50.   To date, Omron has performed all of its obligations under the Supply Agreement, except those which have been excused as a result of IceMOS's material breaches.

51.   The Supply Agreement obligated IceMOS to pay its invoices net of sixty days end-of-month ("EOM"). *See* Supply Agreement § 4.4.

52.   IceMOS materially breached the Supply Agreement by failing to make multiple payments by the sixty day EOM deadline, including but not limited to the late payments described in Paragraph 21 above.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

53.     No circumstances exist which would have excused IceMOS from paying its invoices within the timeframe established by Section 4.4 of the Supply Agreement.

54.     IceMOS's breaches of the Supply Agreement caused Omron to sustain damages, including, but not limited to (i) damages resulting from IceMOS's failure to make the required payments in a timely manner; and (ii) the legal fees Omron has incurred as a result of IceMOS's breaches.

## COUNT III

### Breach of Contract – Failure to Pay Invoices

55.     Omron incorporates by reference Paragraphs 1 through 54 as if fully stated herein.

56.     The Supply Agreement was a valid, enforceable, and binding contract before Omron properly exercised its option to terminate it.

57.     To date, Omron has performed all of its obligations under the Supply Agreement, except those which have been excused as a result of IceMOS's material breaches.

58.     The Supply Agreement obligated IceMOS to pay Invoice No. MD161012IO16052401 and Invoice No. MD161021IO16060301 by the end of December 2016. *See* Supply Agreement § 4.4.

59.     IceMOS materially breached the Supply Agreement by failing to pay Invoice No. MD161012IO16052401 and Invoice No. MD161021IO16060301 by the deadline established by Supply Agreement § 4.4.

60.     To date, IceMOS has not paid Invoice No. MD161012IO16052401 or Invoice No. MD161021IO16060301, yet IceMOS retains possession of the products which are the subject of those invoices.

61.     IceMOS's breaches of the Supply Agreement caused Omron to sustain damages, including but not limited to (i) the amount of the invoices which remains unpaid, (ii) damages resulting from IceMOS's failure to make the required payments in

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

48

a timely manner; and (iii) the legal fees Omron has incurred as a result of IceMOS's breach.

### COUNT IV

### Fraud in the Inducement

62.     Omron incorporates by reference Paragraphs 1 through 61 as if fully stated herein.

63.     While the parties were negotiating the Supply Agreement, IceMOS represented to Omron its forecast that monthly demand for Super Junction MOSFET wafers would reach 3,850 wafers per month by the fourth quarter of 2012.

64.     During negotiations, IceMOS also represented to Omron that monthly demand for Super Junction MOSFETs would remain at a forecasted volume of up to 3,500 wafers per month by the year 2014.

65.     IceMOS repeatedly presented Omron with forecasts drastically above its intended orders throughout the parties' relationship under the Supply Agreement.

66.     IceMOS's fraudulent forecasts were material to Omron's decision to enter the Supply Agreement and to manufacture Super Junction MOSFETs for IceMOS, as Omron would not have entered an agreement to produce only 5,202 Super Junction MOSFETs over a six-year period.

67.     IceMOS indicated that between 2011 and 2017, it would order more than 240,000 wafers for Super Junction MOSFETs under the Supply Agreement.

68.     IceMOS's representations concerning its forecasts were false and misleading, forecasting a need for approximately 98% more wafers than IceMOS actually ordered under the Supply Agreement.

69.     IceMOS knew such statements and forecasts were false at the time they were made, or at a minimum, acted with reckless disregard of the statements' truth and viability.

70.     IceMOS made its forecasts with the intent that Omron rely upon the numbers IceMOS represented therein, and to induce Omron into a manufacturing

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

relationship. Omron did in fact rely upon IceMOS's forecasts in entering the Supply Agreement and agreeing to manufacture Super Junction MOSFETs for IceMOS pursuant to the Supply Agreement's specifications.

71.     Omron was unaware of the falsity of IceMOS's statements at the time Omron acted in reliance thereon, and justifiably understood that IceMOS would order a quantity of Super Junction MOSFET wafers reasonably close to its forecasted demand figures.

72.     IceMOS's representations caused Omron to enter the Supply Agreement, caused Omron to manufacture Super Junction MOSFETs for IceMOS, and precluded Omron from engaging in other lucrative manufacturing opportunities.

73.     IceMOS's representations have caused Omron to sustain damages, including but not limited to (i) damages resulting from lost business opportunities in which Omron could have reasonably engaged using the time and resources expended to support IceMOS's Super Junction MOSFET wafers pursuant to the Supply Agreement; (ii) manufacturing costs to prepare its facilities to handle a volume of more than 240,000 units, and (iii) the legal fees Omron has incurred as a result of IceMOS's fraudulent inducement.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Omron hereby demands a trial by jury on all issues triable to a jury.

## PRAYER

WHEREFORE, having fully answered IceMOS's Complaint and having set forth the foregoing Counterclaims, Omron prays for judgment as follows:

(a)     That IceMOS take nothing by way of the Complaint; and

(b)     That the Court enter judgment for Omron and against IceMOS for breach of the Supply Agreement, breach of the implied covenant of good faith and fair dealing, and fraud in the inducement in an amount to be determined at trial, plus any further relief at law or in equity to which Omron may show itself to be entitled.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1          RESPECTFULLY SUBMITTED this 16th day of July, 2018.

2                      GREENBERG TRAURIG, LLP

By: */s/ Nicole M. Goodwin*
Nicole M. Goodwin
Matthew A.C. Zapf*
Jonathan H. Claydon*
*Pro Hac Vice
*Attorneys for Defendant Omron Corporation*

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1

2

**CERTIFICATE OF SERVICE**

3

☒   I hereby certify that on July 16, 2018, I electronically transmitted the attached

4   document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

5   Robert D. Atkins

6   PATENT LAW GROUP: Atkins and Associates, P.C.
55 North Arizona Place, Suite 104

7   Chandler, Arizona 85225
main@plgaz.com

8   Michael W. Shore

9   Alfonso G. Chan
Paul T. Beeler

10   SHORE CHAN DEPUMPO LLP
901 Main Street, Suite 3300

11   Dallas, Texas 75202
mshore@shorechan.com

12   achan@shorechan.com
pbeeler@shorechan.com

13

14

15           /s/      *Carla Martin*

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000