# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IceMOS Technology Corporation, | No. CV-17-02575-PHX-JAT |
| Plaintiff/Counter-Defendant, | **ORDER** |
| v. | |
| Omron Corporation, | |
| Defendant/Counter-Claimant. | |

Pending before the Court is Plaintiff/Counter-Defendant's Motion for Judgment on the Pleadings (Doc. 69) pursuant to Federal Rule of Civil Procedure ("Rule") 12(c). The Court now rules on the motion.

## I. BACKGROUND

On November 30, 2018, Plaintiff/Counter-Defendant IceMOS Technology Corporation (hereinafter "Counter-Defendant") filed the pending Motion for Judgment on the Pleadings (Doc. 69). Defendant/Counter-Claimant Omron Corporation (hereinafter "Counter-Claimant") filed a timely Response (Doc. 93) on January 2, 2019, and Counter-Defendant subsequently filed a Reply (Doc. 96) on January 9, 2019.

### A. Facts

The following facts are either undisputed or construed in the light most favorable to the non-moving party.[1] *See Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658,

---

[1] To be clear, the Court is applying the appropriate factual standard for judgment on the pleadings in recounting the facts; the Court is not finding any facts at this stage. The factual background stated here may differ in some ways from the Court's Order (Doc. 25) of July 6, 2018 because the Court applied a different factual presumption in analyzing

661 (9th Cir. 1998). Counter-Defendant sets out to sell super junction metal oxide semiconductor field-effect transistors ("Super Junction MOSFETs") to third-parties. (Doc. 60 at 6–7). On October 12, 2006, Counter-Defendant's representative approached Counter-Claimant and suggested that the parties enter into a business relationship. (*Id.* at 11). Counter-Claimant's representatives entered into "preliminary discussions" with Counter-Defendant in April 2007. (*Id.* at 12).

During negotiations, Counter-Defendant represented to Counter-Claimant that monthly demand for Super Junction MOSFETs would "remain at a forecasted volume of up to 3,500 wafers per month by the year 2014." (Doc. 28 at 49). Additionally, Counter-Defendant indicated that it would order "more than 240,000 wafers for Super Junction MOSFETs" between 2011 and 2017. (*Id.*) Counter-Defendant and Counter-Claimant eventually entered into an agreement ("Supply Agreement") on February 28, 2011 for Counter-Claimant to fabricate and supply semiconductor wafers for Counter-Defendant's Super Junction MOSFETs. (Doc. 60 at 15).

The Supply Agreement obligated Counter-Defendant to provide a "monthly rolling forecast of its estimated demand for wafers over the next twelve months" in order to allow Counter-Claimant to plan for the manufacture of wafers reasonably in line with the estimated demands" of Counter-Defendant. (Doc. 59-1 at 6). Additionally, the Supply Agreement required Counter-Defendant to provide updated forecasts to Counter-Claimant "no later than fourteen days before the end of each calendar month." (*Id.*). After Counter-Claimant fabricated and supplied the semiconductor wafers, the Supply Agreement required Counter-Defendant to pay Counter-Claimant at net sixty (60) days EOM. (*Id.*). Between December 2013 and December 2014, Counter-Defendant made thirteen late payments. (Doc. 28 at 43–44). Additionally, Counter-Defendant ordered only 5,202 semiconductor wafers between 2011 and 2017, approximately two percent of its forecasted need represented during negotiations. (*Id.* at 49).

The Supply Agreement would have had a term of ten years from the effective date,

---

Counter-Claimant's Motion to Dismiss (Doc. 20) Counter-Defendant's claims as Plaintiff.

but Counter-Claimant exercised its termination options under the Supply Agreement. (Doc. 60 at 20). Following Counter-Claimant's termination of the Supply Agreement, Counter-Defendant initiated the current litigation, alleging, among other claims, breach of contract and fraud. (Doc. 14 at 18–23). In response, Counter-Claimant brought counterclaims against Counter-Defendant, asserting the following causes of action: (i) breach of the implied covenant of good faith and fair dealing, (ii) breach of contract for failure to timely make payments, (iii) breach of contract for failure to pay invoices, and (iv) fraud in the inducement. (Doc. 28 at 41–50; *see also* Doc. 60 at 63).

On November 30, 2018, Counter-Defendant moved for Judgment on the Pleadings on the following three claims: (i) breach of implied covenant of good faith & fair dealing, (ii) breach of contract for failure to timely make payments, and (iii) fraud in the inducement. (Doc. 69).[2]

## II. LEGAL STANDARD

"A judgment on the pleadings is properly granted when, taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law." *Nelson v. City of Irvine*, 143 F.3d 1196, 1200 (9th Cir. 1998) (citation omitted). In other words, dismissal pursuant to Rule 12(c) is appropriate if the facts as pleaded would not entitle the plaintiff to a remedy. *See Merchs. Home Delivery Serv., Inc., v. Hall & Co.*, 50 F.3d 1486, 1488 (9th Cir. 1995). "Federal courts generally hesitate to grant judgment on the pleadings, because 'hasty or imprudent use of this summary procedure by the courts violates the policy in favor of ensuring to each litigant a full and fair hearing on the merits of his claim or defense.'" *Carrasco v. Fiore Enters.*, 985 F. Supp. 931, 934 (D. Ariz. 1997) (quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, Civil 2d § 1368 (1990)). A motion for judgment on the pleadings under Rule 12(c) is "functionally identical" to a Rule 12(b)(6) motion to dismiss. *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011). Therefore, "the same standard of review applies to motions made under either rule." *Id.* (internal quotations and citation omitted).

---

[2] As Counter-Defendant chose not to challenge the breach of contract claim for failure to pay invoices, the Court will not address that counterclaim.

To survive a Rule 12(b)(6) motion for failure to state a claim, a complaint must meet the pleading requirements of Rule 8. Rule 8 requires that the pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To meet this standard, a complaint must contain sufficient factual matter, which, if accepted as true, states a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To have facial plausibility, a complaint must include factual content that allows the Court to "draw the reasonable inference" that the defendant is liable for the alleged misconduct. *Iqbal*, 556 U.S. at 678. "Legal conclusions couched as factual allegations are not entitled to the assumption of truth and therefore are insufficient to defeat a motion to dismiss for failure to state a claim." *Arvizu v. Medtronic, Inc.*, 41 F. Supp. 3d 783, 786 (D. Ariz. 2014) (citations omitted). The analysis is "context-specific" and is driven by "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. In deciding a motion to dismiss, the Court must construe the facts alleged in the complaint in the light most favorable to the non-moving party. *See Cafasso*, 637 F.3d at 1053; *Wyler Summit P'ship*, 135 F.3d at 661.

## III. ANALYSIS

In moving for judgment on the pleadings, Counter-Defendant argues that: (1) the counterclaim for breach of the implied covenant of good faith and fair dealing fails to allege a breach; (2) the counterclaim for breach of contract for failure to timely make payments fails because Counter-Claimant waived timely payment; and (3) the counterclaim for fraud in the inducement both fails for lack of particularity and fails to allege an actionable fraudulent representation. (Doc. 69).

### A. Implied Covenant of Good Faith and Fair Dealing

Per Article IX of the Supply Agreement, New York law governs the Supply Agreement. (Doc. 59-1 at 9).

#### 1. Legal Standard

Under New York law, "all contracts imply a covenant of good faith and fair dealing." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y.

2002); *see also Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995). The implied obligation of each promisor to exercise good faith encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Dalton*, 663 N.E.2d at 291 (citation omitted). This covenant includes an implicit promise that "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 2006). "Whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." *Int'l Tech. Mktg., Inc. v. Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 368 (S.D.N.Y. 2016) (quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007)).

"[B]reach of this covenant may give rise to a claim of relief." *ARI & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003). However, the covenant only applies "where an implied promise is so interwoven into the contract as to be necessary for effectuation of the purposes of the contract." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006) (internal quotations and citations omitted). "It is the 'intent and reasonable expectations' of parties entering into a given contract that fix the boundaries of the covenant of good faith and fair dealing, provided that those expectations are consistent with the express terms of the contract." *ARI & Co.*, 273 F. Supp. 2d at 522 (quoting *Cross & Cross Props., Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989)). This necessarily means that any breach of the implied covenant of good faith and fair dealing must be grounded in the terms of the underlying contract and does not create new contractual rights between the parties. *See Geler v. Nat'l Westminster Bank USA*, 770 F. Supp. 210, 215 (S.D.N.Y. 1991). Moreover, "[t]he implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *M/A-COM Sec. Corp.*, 904 F.2d at 136 (internal quotations and citations omitted).

### 2. Analysis

Here, Section 4.3 of the Supply Agreement requires Counter-Defendant to provide updated monthly forecasts in order to "permit Omron to plan for the manufacture of wafers reasonably in line with the estimated demands of IceMOS." (Doc. 59-1 at 6). The Supply Agreement does not include a mandatory monthly minimum purchase. (*See generally id.*). Counter-Claimant alleges that Counter-Defendant breached the implied covenant of good faith and fair dealing by failing to order a quantity of Super Junction MOSFET wafers "reasonably close to the forecasted demand figures." (Doc. 28 at 46). Counter-Claimant alleges that this breach—ordering only two percent of the forecasted quantity—deprived it of its right to receive the fruits of the Supply Agreement. (*Id.*).

Counter-Defendant argues that: (1) this implied covenant fails because it seeks to obligate Counter-Defendant to comply with a new contractual term, "the duty to order wafers in quantities commensurate with the demand forecasts;" and (2) the implied covenant fails because the obligation to order the forecasted amount would be inconsistent with other terms of the Supply Agreement that require updated forecasts. (Doc. 69 at 9–10).

Counter-Defendant is correct that the Supply Agreement does not explicitly call for an order reasonably close to the forecasted amount. (*See generally* Doc. 59-1). However, the fact that the Supply Agreement is silent on this issue is not necessarily fatal to Counter-Claimant's claim because New York law does not require that a breach of the duty of good faith and fair dealing be tied to a specific contractual provision. *See Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 407 (E.D.N.Y. 2012) (citing *Havel v. Kelsey-Hayes Co.*, 445 N.Y.S.2d 333, 382 (N.Y. App. Div. 1981) ("[T]hat a specific promise has not been expressly stated does not always mean that it was not intended.")). Rather than requiring an explicit term, New York law dictates the Court look to the "intent and reasonable expectations" of the parties. *See ARI & Co.*, 273 F. Supp. 2d at 522. While the Supply Agreement does not include a term explicitly mandating monthly purchases in line with forecasts, Counter-Claimant pleaded that it reasonably understood the Supply

Agreement to state a duty to order reasonably close to the forecasted amount. (Doc. 28 at 46). Additionally, Counter-Claimant alleged that this breach of the implied covenant effectively deprived it of the fruits of the contract—orders for production wafers. (*Id.* at 46–47); *see also 511 W. 232nd Owners Corp.*, 773 N.E.2d at 500; *Dalton*, 663 N.E.2d at 291.

The parties' dispute as to whether this implied covenant is consistent with the term of the agreement that requires updated monthly forecasts is based on the parties' divergent understandings of the purpose of the term. (*Compare* Doc. 69 at 9–11 *with* Doc. 93 at 15). Counter-Defendant argues that an implied covenant is inconsistent because the monthly forecast requirement represents the prospective and uncertain nature of customer demand. (Doc. 69 at 9–11). Conversely, Counter-Claimant alleges that an implied covenant is consistent because the monthly forecast requirement allows it to tailor its operations to provide for reasonable deviations in month-to-month orders. (Doc. 93 at 15).

The Court finds that implied covenant does not necessarily contradict the express terms of the agreement. At this early stage in the litigation, the Court does not reach the full merits of Counter-Claimant's claim. *See Carrasco*, 985 F. Supp. at 934. The pleadings demonstrate that Counter-Claimant states a plausible claim for breach of the implied covenant of good faith and fair dealing. Disputes about the intent and understanding of the parties are plausible on this record; thus, the Court finds that Counter-Defendant fails to establish that it is entitled to judgment on the pleadings with respect to the counterclaim for breach of the implied covenant of good faith and fair dealing.

**B.     Breach of Contract for Failure to Timely Make Payments**

Per Article IX of the Supply Agreement, New York Law governs the Supply Agreement. (Doc. 59-1 at 9).

**1.     Legal Standard**

"To state a claim for breach of contract under New York law, a complaint need only allege: (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages." *Designers N.*

*Carpet, Inc. v. Mohawk Indus., Inc.*, 153 F. Supp. 2d 193, 197 (E.D.N.Y. 2001) (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).

### 2. Analysis

Counter-Claimant asserts that the Supply Agreement exists as a valid and enforceable agreement, and that Counter-Claimant either performed or was excused from performance as a result of Counter-Defendant's material breaches. (Doc. 28 at 47). Counter-Defendant neither argues that the Supply Agreement is unenforceable, nor that Counter-Claimant failed to adequately perform. (Doc. 69 at 11–13). Accordingly, the Court finds that Counter-Claimant satisfies the first two elements for the breach of contract counterclaim.

#### a. Breach

Regarding the third element, Counter-Claimant alleges that Counter-Defendant breached the contract by failing to make multiple payments by the sixty-day EOM deadline, including, but not limited to, thirteen late payments occurring from December 2013 to December 2014. (Doc. 28 at 43–44, 47). Section 4.4 of the Supply Agreement states that "[p]ayment will be made by [Counter-Defendant] to [Counter-Claimant] at net sixty (60) days EOM." (Doc. 59-1 at 6). Counter-Defendant contends that Counter-Claimant's breach of contract claim fails because "any such breach was extinguished and waived by [Counter-Claimant's] repeated knowledgeable acceptance of [Counter-Defendant]'s allegedly late payments over an extended period of time and [Counter-Claimant] failed to plead that its waiver had been withdrawn." (Doc. 69 at 13).

"A waiver is the voluntary abandonment or relinquishment of a known right. It is essentially a matter of intent which must be proved." *Jefpaul Garage Corp. v. Presbyterian Hosp.*, 462 N.E.2d 1176, 1178–79 (N.Y. 1984) (denying a plaintiff's motion for summary judgment because waiver is a question of fact). At this early stage in the litigation, the Court finds that Counter-Claimant's allegations satisfy the third element.

#### b. Damages

Regarding the fourth element, Counter-Claimant alleges that Counter-Defendant's

breaches caused Counter-Claimant to sustain damages, including, but not limited to: (i) damages resulting from Counter-Defendant's failure to make the required payments in a timely manner; and (ii) the legal fees Counter-Claimant has incurred as a result of Counter-Defendant's breaches. (Doc. 28 at 48). Counter-Defendant contends that the claim should be dismissed to the extent that Counter-Claimant seeks to recover legal fees, because Section 9.5 of the Supply Agreement specifically provides that "No Attorney's Fees will be paid by the other Party in the event of a dispute." (Doc. 59-1 at 9).[3] The Court finds, however, that Counter-Claimant's first theory of damages provides a sufficient basis to establish the element of damages at this stage. Drawing all inferences in Counter-Claimant's favor, it is plausible to infer that late payments caused some damage to Counter-Claimant. *See CAE Indus. Ltd. V. KPMG Peat Marwick*, 597 N.Y.S.2d 402, 404 (N.Y. App. Div. 1993) (denying a defendant's motion to dismiss because the plaintiffs sufficiently pleaded allegations "from which damages attributable to the defendant's breach might be reasonably inferred"). Additionally, nominal damages are generally available for a breach of contract under New York law. *See Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 348 (S.D.N.Y. 2009) (citations omitted). Thus, Counter-Claimant's allegations satisfy the fourth element.

Accordingly, the Court finds that Counter-Defendant fails to establish that it is entitled to judgment on the pleadings with respect to the counterclaim for breach of contract for failure to timely make payments.

**C.     Fraud in the Inducement**

Both parties analyze this claim under Arizona law. (Doc. 69 at 4; Doc. 93 at 4). For the purpose of this Motion, the Court likewise assumes that Arizona law applies because the parties did not advocate for any other choice of law.

---

[3] Attorney's fees may only be recovered "when an award is authorized by agreement between the parties or by statute or [C]ourt rule." *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 106 N.E.3d 1176, 1185–86 (N.Y. 2018). Because the Supply Agreement explicitly provided that attorney's fees will not be paid by the other party in the event of the dispute, a theory of damages based solely on attorney's fees under the Supply Agreement fails. (*See id.*). At this time, the Court need not address whether Counter-Claimant may recover attorney's fees by statute or by Court rule.

### 1. Legal Standard

To prevail on a fraud claim under Arizona law, a claimant must show:

> (1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of the [representation's] falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the right to rely on it; [and] (9) [the hearer's] consequent and proximate injury.

*Echols v. Beauty Built Homes, Inc.*, 647 P.2d 629, 631 (Ariz. 1982); *see Comerica Bank v. Mahmoodi*, 229 P.3d 1031, 1033–34 (Ariz. Ct. App. 2010) (citation omitted). A fraud claim generally fails where the allegedly false representation pertains to "matters of estimate or judgment." *See Law v. Sidney*, 53 P.2d 64, 66 (Ariz. 1936). Additionally, representations "as to the future value or profitableness or prospects of a business are mere expressions of opinion, and a representation that something will be done in the future or a promise to do it is at most a contract and not a fraudulent representation." *Id.* However, "the promise to perform a future act" is actionable when it was "made with a present intention on the part of the promisor that he would not perform it." *Id.*; *see also Allstate Life Ins. Co., v. Robert W. Baird & Co.*, 756 F. Supp. 2d 1113, 1165 (D. Ariz. 2010) (finding an actionable representation when Defendants made forward-looking statements "with actual knowledge that projections, promises, or expectations will not be met").

### 2. Analysis

Here, Counter-Claimant alleges that: (1) Counter-Defendant made representations to Counter-Claimant prior to the execution of the Supply Agreement that its monthly demand for Super Junction MOSFET wafers would reach 3,850 wafers per month by the end of 2012 and that demand would remain at a volume of up to 3,500 production wafers per month by 2014; (2) these representations were false; and (3) the representations were material to Counter-Claimant's election to enter into the Supply Agreement. (Doc. 28 at 49–50). Counter-Claimant further alleges that: (4) Counter-Defendant knew the forecasts were false or made them with reckless disregard for their truth; (5) Counter-Defendant made the representations with the intent that Counter-Claimant enter the Supply

Agreement; and (6) Counter-Claimant was unaware of the falsity of the representations. (*Id.*). Counter-Claimant then alleges that: (7) Counter-Claimant relied on the representations in agreeing to the Supply Agreement; (8) Counter-Claimant's acted rightfully in relying on the representations; and (9) the representations proximately caused Counter-Claimant harm by inducing Counter-Claimant to devote resources and funds to manufacture test wafers, prepare the capacity to produce the anticipated volume of wafers, and forego other business opportunities. (*Id.*).

### a. Rule 9(b)

In its Reply, Counter-Defendant argues that Counter-Claimant failed to plead its fraud in the inducement claim with the particularity required by Rule 9(b). (Doc. 96 at 1–2). The Court will not consider an argument raised for the first time in a reply brief. *See Padgett v. Wright*, 587 F.3d 983, 985 n.2 (9th Cir. 2009) (declining to consider a matter on appeal that was "not specifically and distinctly raised and argued in [a party's] opening brief"); *Kim v. Kang*, 154 F.3d 996, 1000 (9th Cir. 1998) ("[I]t would be especially unfair for us to consider an argument that was raised for the first time in the reply brief.").

### b. Economic Loss Doctrine

The Court ordered Counter-Claimant to address whether the economic loss doctrine bars Counter-Claimant's fraud in the inducement claim. (Doc. 82). In its Reply, Counter-Defendant did not address this issue. (*See generally* Doc. 96). Accordingly, the Court accepts Counter-Claimant's arguments that the economic loss doctrine does not bar this claim for the purpose of this Order.

### c. The Representation

Counter-Defendant argues that Counter-Claimant's claim fails because: (1) a forecast is not a representation; and (2) Counter-Claimant's answer admitted that the forecasts in the Supply Agreement are not representations. (Doc. 69 at 5–8). Counter-Claimant contends that the forecast was a representation because Counter-Defendant made the forecast with actual knowledge that it would not be met. (Doc. 28 at 49). Additionally, Counter-Claimant argues that its answer regarding the absence of representations in the

Supply Agreement is separate from the representation at issue in this claim. (Doc. 93 at 8–9). Counter-Claimant claims that the fraudulent representation on which it relied was not the forecasts in the Supply Agreement, but rather the "pre-contractual representations" made "while the parties were negotiating." (*Id.* at 9).

Assuming the truth of Counter-Claimant's allegations at this stage, Counter-Claimant alleged an actionable representation. Counter-Claimant alleged that Counter-Defendant made a representation it knew it would not perform, and "forward-looking statements are actionable when the Defendants make the statements with actual knowledge that projections, promises, or expectations will not be met." *Allstate Life Ins. Co.*, 756 F. Supp. 2d at 1164–65. While Counter-Claimant's answer admitted that the Supply Agreement does not contain representations as to demand, Counter-Claimant's fraud claim relies on the representations Counter-Defendant made during the negotiations prior to the Supply Agreement. (*Compare* Doc. 60 at 18 *with* Doc. 28 at 49; Doc. 60 at 63).

### d.  Falsity of the Representation

Counter-Defendant argues that the representation could not have been false when it was made because it was an estimate. (Doc. 69 at 5–6). A future projection or estimate, however, is a sufficient basis for a fraud claim when the promisor made the representation with the present intention not to perform it. *See Allstate Life Ins. Co.*, 756 F. Supp. 2d at 1165 (finding that plaintiffs sufficiently alleged the falsity of a projection); *Sidney*, 53 P.2d at 66. Accordingly, the Court finds that Counter-Claimant sufficiently alleged that Counter-Defendant made the forecast with the present intention not to perform it.

### e.  Knowledge of the Falsity of the Representation

Counter-Defendant also argues that Counter-Claimant's allegations did not establish that the forecasts were false when made. (Doc. 69 at 6–7). Counter-Defendant claims it was incapable of having an intention not to perform because the estimate was based on customer demand. (*Id.*). Counter-Claimant alleged that Counter-Defendant knew the representation was false, forecasted a need for approximately ninety-eight percent more wafers than Counter-Defendant actually ordered, and intended "to induce Counter-

Claimant into a manufacturing relationship" through this inflated forecast. (Doc. 28 at 49–50).

Counter-Claimant does not need to provide detailed factual allegations, but it must plausibly allege that Counter-Defendant knew its representation was false. *See Twombly*, 550 U.S. at 545. Taking Counter-Claimant's allegations as true, Counter-Claimant sufficiently pleaded that Counter-Defendant knew its representation was false. A reasonable fact-finder could infer Counter-Defendant's knowledge of the falsity of its representation based on its alleged intent to induce Counter-Claimant into a manufacturing relationship and the drastic difference between its representations during negotiations and its actual order. (*See* Doc. 28 at 49). It stands to reason that such a wide gulf between the representations and the order amount provides sufficient alleged inference of Counter-Defendant's knowledge of the falsity of the representation for the fraud claim to survive under the highly deferential Rule 12(c) standard. *See Carrasco*, 985 F. Supp. at 934. Accordingly, the Court finds that Counter-Defendant fails to establish that it is entitled to judgment on the pleadings with respect to Counter-Claimant's fraud in the inducement claim.

## IV. CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Plaintiff/Counter-Defendant IceMOS's Motion for Judgment on the Pleadings. (Doc. 69) is **DENIED**. The Clerk of Court shall not enter judgment at this time.

*///*
*///*
*///*
*///*
*///*
*///*
*///*

**IT IS FURTHER ORDERED** that the Court finds that Plaintiff/Counter-Defendant IceMOS's pending Motion for Partial Summary Judgment (Doc. 145) and Motion for Rule 11 Sanction (Doc. 151) are both premature, given that they were filed before the Court ruled on the Motion for Judgment on the Pleadings. (Doc. 69). Therefore, the motions are both denied, without prejudice to re-filing, if appropriate in view of this Order.[4]

Dated this 4th day of April, 2019.

*/s/ James A. Teilborg*
James A. Teilborg
Senior United States District Judge

---

[4] Because the Court has denied Doc. 145 in this manner, it does not "count" as Plaintiff/Counter-Defendant IceMOS's one motion for summary judgment. (Doc. 35 at 4).