**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IceMOS Technology Corporation, | No. CV-17-02575-PHX-JAT |
|         Plaintiff/Counter-Defendant, | **ORDER** |
| v. | |
| Omron Corporation, | |
|         Defendant/Counter-Claimant. | |

Pending before the Court, among other things, are IceMOS Technology Corporation's ("Plaintiff") Motion for Partial Summary Judgment (Doc. 153), Omron Corporation's ("Defendant") Motion for Partial Summary Judgment (Doc. 229), and Defendant's Motion to Preclude Testimony of Plaintiff's Business Valuation Expert Greg Mischou (Doc. 296). This Order substantially addresses these motions and also rules on other pending motions.

## I.    BACKGROUND

The Court has previously articulated the basic facts underlying this case:

> Plaintiff offers super junction metal oxide semiconductor field-effect transistors ("MOSFETs"), microelectromechanical systems solutions, and advanced engineering substrates to third parties. (Doc. 25 at 2). To produce these products, Plaintiff needs fabrication services. (*Id.*). In 2007, Defendant purchased a fabrication facility and began fabricating "complementary metal-oxide semiconductor" products. (*Id.*). Around this time, Defendant approached Plaintiff to suggest that Defendant and Plaintiff enter into business together. (*Id.*).

Plaintiff and Defendant came to an agreement ("Supply Agreement") on February 28, 2011 after negotiations. (*See id.*). Their agreement included, *inter alia*, that Defendant would "perform the fabrication requested by Plaintiff" and that Defendant would "fully resource the development of all generations of" Plaintiff's super junction MOSFET ("SJ MOSFET") for the duration of the Supply Agreement. (*Id.*; *see also* Doc. 59 at 10; Doc. 60 at 15). Defendant asserts that Plaintiff represented that "[d]emand for Plaintiff's Super Junction MOSFETs is estimated to reach a volume of up to three thousand and five hundred (3,500) wafers per month by year 2014." (*See* Doc. 28 at 42 (alteration in original) (quoting Doc. 14-1 at 2)). Defendant also alleges that the parties forecasted, based on Plaintiff's representations regarding expected demand for its product, that "monthly demand would reach 3,850 wafers per month by the fourth quarter of 2012." (*Id.* (citing Doc. 14-1 at 14)). On March 6, 2018, the Supply Agreement terminated. (Doc. 60 at 37).

Plaintiff alleges breach of contract and fraud and seeks damages. (Doc. 59 at 33–38). Plaintiff claims that Defendant breached several provisions of the Supply Agreement. (*Id.* at 33–35). Plaintiff's allegations include that Defendant improperly terminated the Supply Agreement, which, according to Plaintiff, has resulted in lost profits, lost business value, and lost development support costs. (*Id.*).

Defendant has counterclaimed and alleges breach of the implied covenant of good faith and fair dealing, two counts of breach of contract, and fraud in the inducement (relating to the alleged projections by Plaintiff) and also seeks damages. (Doc. 28 at 46–50).

## II. LEGAL STANDARD

A party is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As such, a court must grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant must establish the basis for summary judgment and the elements of the claims upon which the nonmovant will be unable to show a genuine issue of material fact.

1  *Id.* at 323. Then, the burden shifts to the nonmovant to show the existence of any dispute

2  of material fact. *Id.* at 323–24. To meet this burden, the nonmovant must point to competent

3  evidence, meaning that the evidentiary content—but not necessarily its form—must be

4  admissible at trial. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).[1] This evidence

5  "must do more than simply show that there is some metaphysical doubt as to the material

6  facts," it must show "that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v.

7  Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963)).

8  A genuine issue of material fact exists if the disputed issue of fact "could reasonably be

9  resolved in favor of either party." *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir.

10  2004). A dispute is about a *material* fact when the dispute is about "facts that might affect

11  the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The

12  Court must "construe all facts in the light most favorable to the non-moving party." *Ellison*,

13  357 F.3d at 1075–76 (citing *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257

14  (9th Cir. 2001)). However, the nonmovant's bare assertions, standing alone, are insufficient

15  to create a material issue of fact that would defeat the motion for summary judgment.

16  *Anderson*, 477 U.S. at 247–48.

---

[1] Plaintiff objects to certain evidence that Defendant cites in its controverting statement of facts (Doc. 193). (Doc. 223 at 8 n.1). In short, Plaintiff's objections to leading, relevance, and improper legal conclusion are inappropriate for summary judgment because they are either superfluous to the summary judgment standard or are objections relating to form rather than content. *See Fraser*, 342 F.3d at 1036; *Dillon v. Cont'l Cas. Co.*, 278 F. Supp. 3d 1132, 1137 (N.D. Cal. 2017). Thus, these objections are overruled. Plaintiff also objects to Takahiro Hasegawa's deposition, suggesting Hasegawa did not have personal knowledge sufficient to testify on behalf of Defendant as a corporation. (Doc. 223 at 8 n.1). However, Plaintiff's counsel specifically states during the deposition that Hasegawa was testifying as Defendant's "corporate representative," and the transcript indicates that Hasegawa's deposition was under Federal Rule of Civil Procedure 30(b)(6). (Doc. 190-7 at 1, 4–5). This fact belies Plaintiff's objection. Moreover, it is not clear what specific testimony Plaintiff is objecting to. This objection is thus overruled. Plaintiff's objection to Docs. 190-9 to 109-11 and Doc. 190-13 are overruled because the Court did not consider these materials. Defendant's objection to Doc. 190-14 as an unauthenticated document is moot because the Court did not rely on this evidence in its analysis.

### III.   ANALYSIS

#### a.   Plaintiff's Motion for Partial Summary Judgment

Plaintiff seeks summary judgment on Defendant's counterclaims for fraud and breach of contract. (Doc. 153 at 7–21).[2]

#### 1.   Fraud Counterclaim

Plaintiff moves for summary judgment on Defendant's fraud counterclaim. Plaintiff argues that Defendant's fraud counterclaim is barred by the statute of limitations. (Doc. 153 at 7–8). It also asserts that Defendant cannot prove certain elements of its fraud counterclaim as a matter of law. (*Id.* at 9–13).

#### A.   Statute of Limitations

First, Plaintiff contends that summary judgment must be entered on the fraud counterclaim because it is barred by the statute of limitations under Arizona law. (Doc. 153 at 7–8). As the Court has noted, Arizona law applies to Defendant's fraud counterclaim for choice of law purposes. (*See* Doc. 152 at 9; *see also* Doc. 25 at 19–20 (stating Arizona law applies to Plaintiff's fraud claim)). As such, the Court must apply the Arizona statute of

---

[2] Plaintiff argues that the Court must grant its Motion for Partial Summary Judgment (Doc. 153) because it asserts Defendant did not comply with District of Arizona Local Rule of Civil Procedure 56.1. (Doc. 223 at 7–10). Specifically, Plaintiff contends that Defendant "failed to controvert [Plaintiff]'s facts as required by LRCiv. 56.1(b)," and thus, the Court should deem Plaintiff's entire statement of facts as admitted, or alternatively, disregard additional explanation or argument. Plaintiff's argument relies on *Marceau v. International Brotherhood of Electrical Workers*, 618 F. Supp. 2d 1127, 1141 (D. Ariz. 2009). (Doc. 153 at 9–10). There, the court stated "LRCiv 56.1 'does not permit explanation and argument supporting the party's position to be included in the . . . statement of facts.'" *Marceau*, 618 F. Supp. 2d at 1141 (citation omitted). The *Marceau* court adopted that proposition from *Pruett v. Arizona*, 606 F. Supp. 2d 1065, 1075 (D. Ariz. 2009). *See Marceau*, 618 F. Supp. 2d at 1141 (quoting *Pruett*, 606 F. Supp. 2d at 1075). In *Pruett*, the defendant identified specific responses in the plaintiff's controverting statement of facts that it asserted violated Local Rule 56.1. 606 F. Supp. 2d at 1075. The *Pruett* court did not strike the entire controverting statement of facts but instead disregarded the additional explanation and argument that the defendant specifically objected to. 606 F. Supp. 2d at 1075. In contrast, here, Plaintiff makes a vague challenge to the entirety of Defendant's controverting statement of facts, and the Court cannot identify any particular response within it that Plaintiff takes issue with as violative of Local Rule 56.1 or why Plaintiff specifically objects to any of Defendant's responses. The issue is further complicated by the fact that Plaintiff itself is guilty of the same briefing technique in its controverting statement of facts to Defendant's Motion for Partial Summary Judgment (Doc. 229). (*See* Doc. 308). Accordingly, the Court will take no action.

limitations for Defendant's counterclaim. *See Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 528 (9th Cir. 2011).

Arizona law provides that the statute of limitations for a fraud claim is three years. Ariz. Rev. Stat. Ann. § 12-543(3). However, the time for calculating the statute of limitations does not begin to "accrue[] until the discovery by the aggrieved party of the facts constituting the fraud or mistake." *Id.* In other words, "[t]he statute of limitations begins to run for [fraud claims] when the plaintiff knew or through reasonable diligence could have learned of the fraud or the misrepresentation." *Cavan v. Maron*, 182 F. Supp. 3d 954, 962 (D. Ariz. 2016) (citing *Coronado Dev. Corp. v. Superior Court*, 678 P.2d 535, 537 (Ariz. Ct. App. 1984)); *see Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 898 P.2d 964, 966 (Ariz. 1995).

Plaintiff argues that it provided the forecasts that serve as the basis of Defendant's fraud counterclaim in September 2011, and thus, Defendant should have known that these forecasts, assuming they were fraudulent representations, were inaccurate in September 2011, which started the clock on the statute of limitations. (Doc. 153 at 7–8). Plaintiff also argues Defendant knew that Plaintiff was not meeting the projections at least as early as March 6, 2015, which it contends was the latest date that the time on Defendant's fraud counterclaim could have begun accruing. (*Id.*). As such, Plaintiff argues that Defendant's fraud counterclaim was barred by the Arizona statute of limitations because Defendant did not file the counterclaim until July 16, 2018. (*Id.*). Defendant responds that the time to file its fraud counterclaim did not begin accruing until it could have discovered the fraud with reasonable diligence, which is a question of fact that precludes summary judgment. (Doc. 189 at 9–11; *see e.g.*, Doc. 191 at 3–5[3]; Doc. 192 at 2–4; Doc. 193 at 27–28).

"[D]etermination of a claim's accrual date usually is a question of fact . . . ." *Logerquist v. Danforth*, 932 P.2d 281, 287 (Ariz. Ct. App. 1996) (citation omitted). "[T]he inquiry center[s] on the plaintiff's knowledge of the subject event and resultant injuries,

---

[3] Plaintiff's relevance objection to particular paragraphs within Takahiro Hasegawa's declaration (Doc. 191), (Doc. 223 at 11 n.7), is overruled because it is an inappropriate objection at the summary judgment stage. *See Dillon*, 278 F. Supp. 3d at 1137.

whom the plaintiff believed was responsible, and plaintiff's diligence in pursuing the claim." *Id.* (citation omitted). Whether to apply the discovery rule generally "depends on resolution of such factual issues," and thus, a court cannot resolve these questions on summary judgment. *See id.*; *see also Gust, Rosenfeld & Henderson*, 898 P.2d at 969 ("The statute of limitations did not commence on [plaintiff]'s claim until [plaintiff] knew or in the exercise of reasonable diligence should have known that it had been injured. The trial court was correct to let the jury decide when that event occurred.").

Defendant asserts there is a dispute of material fact as to when it discovered Plaintiff's alleged fraud. (Doc. 189 at 11). The Court agrees. Arizona law makes clear that when a claim begins to accrue is a question of fact that generally cannot be determined on summary judgment. But, Plaintiff argues that a party cannot "invoke[] the discovery rule in the [r]esponse" to a motion for summary judgment. (Doc. 223 at 12 (quoting *Breeser v. Menta Grp., Inc.*, 934 F. Supp. 2d 1150, 1159 (D. Ariz. 2013))). Plaintiff cites *Breeser*, 934 F. Supp. 2d 1150, for this proposition. *Breeser* did not proclaim such an edict. *Cf. Long v. Ford Motor Co.*, No. CV07-2206-PHX-JAT, 2008 WL 2937751, at *8 (D. Ariz. July 23, 2008) (allowing plaintiff to raise discovery rule despite the fact that plaintiffs did not plead factual allegations relevant to the discovery rule in its complaint). Rather, the issue in *Breeser* was that both parties indicated that the date of accrual of the plaintiff's claim was beyond the limitations period. 934 F. Supp. 2d at 1158–60. Indeed, there, plaintiff's "own words" established the date of accrual. *See id.* Although plaintiff contradicted her earlier statements regarding the date of accrual, the court invoked the doctrine of judicial estoppel in determining that her later inconsistent statements did not create a genuine issue of material fact as to the issue of accrual. *See id.* In contrast, here, it is disputed as to when Defendant discovered Plaintiff's alleged fraud, and thus, when the Defendant's fraud counterclaim began to accrue. Thus, *Breeser* is distinguishable because there was no *genuine* dispute of fact there, *id.* at 1159–60, while there is one here. Because there is a

genuine dispute of material fact as to the fraud counterclaim's date of accrual, the Court cannot grant summary judgment.[4]

### B. Merits of Fraud Counterclaim

Plaintiff also argues that summary judgment should be entered on the fraud counterclaim because Defendant cannot establish all its elements. (Doc. 153 at 9–13). The gist of Defendant's fraud counterclaim is that Plaintiff fraudulently induced Defendant to enter into the Supply Agreement with Plaintiff based on projections of monthly demand that it knew it could never meet. (*See* Doc. 28 at 49–50; Doc. 152 at 3; Doc. 189 at 6–8). Defendant asserts that, during the negotiations that ultimately culminated in the Supply Agreement, Plaintiff fraudulently represented to Defendant that monthly demand for its SJ MOSFETs would be at a forecasted volume of up to 3,500 wafers per month by 2014. (*See* Doc. 189 at 6–8). Moreover, Defendant contends that it relied on these projections in deciding to enter into the Supply Agreement with Plaintiff. (Doc. 189 at 6–8, 16).

A party must show the following elements to establish a fraud claim under Arizona law:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of the [representation's] falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the right to rely on it; [and] (9) [the hearer's] consequent and proximate injury.

---

[4] Should the jury find for Defendant on its fraud counterclaim and should it conclude that the date of discovery was on July 15, 2015, or earlier, Plaintiff may raise the statute of limitations issue again. The Court notes that it has made no determination as to whether the statute of limitations was tolled or suspended as a result of Plaintiff's action being filed on August 2, 2017. *Compare W.J. Kroeger Co. v. Travelers Indem. Co.*, 541 P.2d 385, 397 (Ariz. 1975) (in division) ("[I]f a claim would be barred originally by a statute of limitation, it is barred as a counterclaim even if it arises from the same transaction except as it falls within the principles of recoupment."), *quoted in Unispec Dev. Corp. v. Harwood K. Smith & Partners*, 124 F.R.D. 211, 214 (D. Ariz. 1988), *and Occidental Chem. Co. v. Connor*, 604 P.2d 605, 607 (Ariz. 1979) ("If one is not entitled to relief in a direct action, he is not entitled to assert a setoff or counterclaim."), *with Religious Tech. Ctr. v. Scott*, 82 F.3d 423 (9th Cir. 1996) (table) ("[A] compulsory counterclaim relates back to the filing of the original complaint."), *and* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1419, at 179 (3d ed. 2010) ("[T]he majority view appears to be that the institution of plaintiff's suit tolls or suspends the running of the statute of limitations governing a compulsory counterclaim.").

*Echols v. Beauty Built Homes, Inc.*, 647 P.2d 629, 631 (Ariz. 1982) (in division); *see Comerica Bank v. Mahmoodi*, 229 P.3d 1031, 1033–34 ¶ 14 (Ariz. Ct. App. 2010). Plaintiff contends that the undisputed facts prevent Defendant from establishing the first, second, third, seventh, and eighth elements of its fraud counterclaim. (Doc. 153 at 9). Defendant responds that Plaintiff has not shown that Defendant cannot prove each element of its fraud counterclaim. (Doc. 189 at 13).

### i.    Representation

A projection can be a representation for purposes of establishing fraud. *See Law v. Sidney*, 53 P.2d 64, 66 (Ariz. 1936). "[T]he promise to perform a future act" is actionable when it "was made with a present intention on the part of the promisor that he would not perform it." *Id.*; *see also Allstate Life Ins. v. Robert W. Baird & Co.*, 756 F. Supp. 2d 1113, 1165 (D. Ariz. 2010) (determining forward-looking statements made "with actual knowledge that projections, promises, or expectations will not be met" are actionable representations). Plaintiff argues that there is no dispute of material fact as to whether Defendant can establish a representation because Defendant "has provided no evidence to support any allegation that [Plaintiff] did not intend to perform its obligations under the Supply Agreement." (Doc. 153 at 12). Therefore, Defendant must show that it has evidence to support that there is an actionable representation here. *See Celotex Corp.*, 477 U.S. at 322–23.

Although Defendant did not specify in its Response that it has evidence that shows Plaintiff never intended to perform,[5] it does offer evidence that Plaintiff knew its projections were false. (*See* Doc. 189 at 14–15; Doc. 193 at 22–24). For example, Defendant offers evidence that Plaintiff only ordered approximately two percent of the

---

[5] The Court notes that Defendant seems to rely on the Court's holding on Plaintiff's Motion for Judgment on the Pleadings (Doc. 69). (*See* Doc. 189 at 13–14 (citing Doc. 152 at 11–12)). At summary judgment, a party cannot rely on bare allegations alone, and thus, Defendant cannot base its argument that summary judgment is not appropriate on the issue of representation simply because the Court has previously determined that, based on Defendant's allegations, it had stated a claim for fraud. *Anderson*, 477 U.S. at 247–48. It is axiomatic that allegations are not sufficient on summary judgment; instead, the nonmovant must offer proof of its claims. *See Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004).

forecasted volume. (Doc. 193 at 22 (citing Doc. 191 at 5); *see also* Doc. 241-1 at 8–9). A reasonable fact-finder could find that such a disparity means that Plaintiff knew its forecasts were false. Construing the evidence in the light most favorable to Defendant, there is a dispute of material fact as to whether Plaintiff knew its projections were false, and thus, whether it never intended to meet the projections of monthly demand.[6] *See Orlando v. Carolina Cas. Ins.*, No. CIV F 07-0092AWISMS, 2007 WL 781598, at *8 (E.D. Cal. Mar. 13, 2007). Thus, the Court cannot say Defendant will be unable to establish that Plaintiff made an actionable representation.[7]

### ii. Falsity of Representation

Plaintiff contends that Defendant cannot establish that the representation was false. (*See* Doc. 153 at 9). In response, Defendant offers evidence that supports its claim that Plaintiff knew its projections of monthly demand were false. (*See* Doc. 189 at 14–16; Doc. 193 at 22–24; *see also* Doc. 241-1 at 8–9). A projection or estimate typically cannot be deemed a false representation. *See Allstate Life Ins.*, 756 F. Supp. 2d at 1164–65; *Sidney*, 53 P.2d at 66. However, if one makes a projection or estimate "with actual knowledge that projections, promises, or expectations will not be met," there is a false representation. *See Allstate Life Ins.*, 756 F. Supp. 2d at 1164–65. Thus, for the same reason that the Court found that Defendant has offered sufficient evidence to create a dispute of material fact on

---

[6] Plaintiff objects to a statement in Susumu Nukii's declaration (Doc. 192) as being irrelevant, (Doc. 223 at 16 n.10), an inappropriate objection that the Court therefore overrules. *See Dillon*, 278 F. Supp. 3d at 1137. Plaintiff objects to a statement in Takahiro Hasegawa's declaration (Doc. 191) as being an inadmissible legal conclusion, (Doc. 223 at 17 n.11), another objection that is inappropriate at the summary judgment stage. *See Dillon*, 278 F. Supp. 3d at 1137.

[7] Plaintiff also suggests that Defendant's fraud counterclaim fails as a matter of law because it cannot show the projections were a representation as Defendant "has admitted that the 'Supply Agreement contains no representations, promises, or guarantees by [Plaintiff] as to demand or minimum monthly purchases.'" (Doc. 153 at 9 (quoting Doc. 60 at 18)). Although that might be true, Defendant has made clear that its fraud counterclaim is based on the projections of monthly demand Plaintiff made during negotiations prior to signing of the Supply Agreement. (Doc. 189 at 14). The Court even noted this fact when it denied Plaintiff's Motion for Judgment on the Pleadings (Doc. 69). (Doc. 152 at 11–12). If Defendant's admission that the "Supply Agreement contains no representations, promises, or guarantees by [Plaintiff] as to demand or minimum monthly purchases" did not entitle Plaintiff to judgment on the pleadings, it is unclear why Plaintiff believes it entitles it to summary judgment now.

the issue of representation here, it has done the same on the issue of the falsity of such a representation.

### iii. Materiality of Representation

Plaintiff contends that Defendant cannot establish the materiality of its alleged fraudulent representation because Defendant admitted in the pleadings that "[t]he material terms of the Supply Agreement had already been negotiated before the forecasts in Exhibit A were prepared." (Doc. 153 at 10 (quoting Doc. 60 at 19)). However, Plaintiff leaves out a key part of Defendant's Answer; Defendant "denie[d] that Exhibit A to the Supply Agreement contains the only forecasts that [Plaintiff] provided to [Defendant]." (Doc. 60 at 19; Doc. 193 at 3–4; *see also* Doc. 191-1 at 15 (draft agreement with projections)). Additionally, as the Court noted above, Defendant's fraud counterclaim relates to alleged false representation that occurred during negotiations prior to signing of the Supply Agreement; it is not necessarily based on the terms of the Supply Agreement alone.

At any rate, "[q]uestions about materiality . . . usually are for the jury." *See Lerner v. DMB Realty, LLC*, 322 P.3d 909, 914 ¶ 15 (Ariz. Ct. App. 2014). "A misrepresentation is material if a reasonable person 'would attach importance to its existence or nonexistence in determining [his or her] choice of action in the transaction in question.'" *Caruthers v. Underhill*, 287 P.3d 807, 815 ¶ 28 (Ariz. Ct. App. 2012) (quoting Restatement (Second) of Torts § 538(2)(a) (1977)); *see also M & I Bank, FSB v. Coughlin*, No. CV 09-02282-PHX-NVW, 2011 WL 5445416, at *4 (D. Ariz. Nov. 10, 2011). Defendant has offered sufficient evidence to create a dispute of material fact as to whether the alleged false representation mattered to it because it has evidence showing Plaintiff's projections of monthly demand were relevant to its decision to enter the Supply Agreement. (Doc. 189 at 16; Doc. 193 at 24); *see M & I, FSB*, 2011 WL 5445416, at *4 (holding alleged false representation was material because plaintiff offered evidence that false representation was relevant to plaintiff's decision to agree to a loan); *Lerner*, 322 P.3d at 915 ¶ 19 (noting that materiality depended on whether the "alleged misrepresentation was *material* to the transaction" (emphasis added)).

For example, it is "simple business sense" that projections specifying monthly demand would be material to Defendant's decision to enter the Supply Agreement. *See M & I, FSB*, 2011 WL 5445416, at *4; *see Radware, Ltd. v. F5 Networks, Inc.*, 147 F. Supp. 3d 974, 1012 (N.D. Cal. 2015). The jury could reasonably infer that the projections included in a prior draft agreement, (Doc. 191-1 at 15), would translate to future business revenue for Defendant, and thus, would be material. Indeed, as *Caruthers* makes clear, materiality is an objective standard, and thus, the jury must determine if a reasonable person, under the circumstances, would attach importance to the projections of monthly demand in deciding whether to enter the Supply Agreement. Additionally, Defendant offers evidence that the projections were relevant to Defendant's decision to enter the Supply Agreement. (*See* Doc. 191 at 2–3).[8] In sum, Defendant has offered sufficient evidence to create a genuine dispute of material fact as to materiality.

### iv.    Reliance on Representation

Next, Plaintiff asserts Defendant cannot establish that Defendant relied on the projections. (Doc. 153 at 10–11). Plaintiff raises three primary arguments: (1) the projections "were not representations but rather just estimates of future events based on factors beyond [Plaintiff's] control," (2) that Plaintiff's ability to meet the forecasts depended on Defendant, and (3) that Defendant signed the Supply Agreement because it was "desperate for customers" and the projections were irrelevant to its decision to enter

---

[8] Plaintiff objects to a statement regarding the materiality of the projections in Takahiro Hasegawa's declaration (Doc. 190), arguing that it is based on a lack of personal knowledge. (Doc. 223 at 17 n.12). However, Plaintiff's Reply specifically asserts "the only people [Defendant] identified as participating in the negotiation of the Supply Agreement were Yoshio Sekiguchi and Takahiro Hasegawa." (Doc. 223 at 14 n.8; *see also* Doc. 204-01 at 49 ("[Defendant] states that Yoshio Sekiguchi and Takahiro Hasegawa negotiated the Supply Agreement with [Plaintiff].")). It is unclear how Hasegawa would lack personal knowledge as to the materiality of the projections if he was part of the negotiations that led to the signing of the Supply Agreement. At any rate, although the Hasegawa declaration is relevant as to this issue, the other evidence that the Court discussed that is relevant to this issue sufficiently creates a dispute of material fact. The objection is overruled.

the Supply Agreement. (*Id.*). Defendant responds that evidence supports a finding that Defendant did rely on the projections. (Doc. 189 at 16–17; Doc. 193 at 5–6, 24).

A party relies on a misrepresentation when the party acts or refrains from acting based on it. *See Sw. Non-Profit Hous. Corp. v. Nowak*, 322 P.3d 204, 212 ¶ 29 (Ariz. Ct. App. 2014). Defendant asserts that it acted on the alleged misrepresentation because it "spent a large amount of money out of pocket" that resulted in losses. (Doc. 189 at 17). Defendant also points to the fact that it agreed to resource the development of the SJ MOSFET and that it agreed to take on fifty percent of the cost of producing the "mask sets" of the SJ MOSFETs. (*Id.* (citing Doc. 190-1 at 5–6 (§§ 4.0 and 4.2.1 of the Supply Agreement))). In fact, at thirty thousand feet, Defendant's claim is that it would not have entered into the Supply Agreement with Plaintiff and sustained monetary losses but for the alleged misrepresentations as to the projections of monthly demand. This fact alone creates a dispute as to whether Defendant relied on the alleged misrepresentation. *Cf. Int'l Franchise Sols. LLC v. BizCard Xpress LLC*, No. CV13-0086 PHX DGC, 2013 WL 2152549, at *3 (D. Ariz. May 16, 2013) (denying motion to dismiss on fraud claim where the allegation was that party agreed to do business and lost money as a result of misrepresentation). And, nothing indicates that Defendant did not believe the projections, which would show it did not rely on the projections. *See Sw. Non-Profit Hous. Corp.*, 322 P.3d at 212 ¶ 29; (*cf.* Doc. 191 at 2–5). Simply put, none of Plaintiff's arguments overcome the fact that Defendant has evidence that it did rely on the projections of monthly demand when it decided to enter the Supply Agreement with Plaintiff. Thus, there is a dispute of material fact on this issue as well.

### v.       Right to Rely on Representation

Finally, Plaintiff contends that Defendant cannot establish that Defendant had a right to rely on Plaintiff's alleged representation because it "cannot establish that such forecasts are representations of fact to be relied upon." (Doc. 153 at 9). Plaintiff notes that Defendant "has admitted that the 'Supply Agreement contains no representations, promises, or guarantees by [Plaintiff] as to demand or minimum monthly purchases.'" (*Id.*

(quoting Doc. 60 at 18)). As the Court has noted, a promise of future performance is generally not an actionable basis for fraud unless the party that made the promise had no intent to perform. *See supra* Section III.a.1.B.i.

Here, Defendant has offered evidence to create a dispute of material fact as to whether Plaintiff never intended to perform its promise. Therefore, the Court cannot say that Defendant cannot establish its right to rely on Plaintiff's alleged representation because that question must be answered by the jury. *Lerner*, 322 P.3d at 914 ¶¶ 15–16; *cf. Staheli v. Kauffman*, 595 P.2d 172, 175 (1979) (in division) (noting there is no right to rely on promises, expressions of intent, or statements regarding future events "unless such were made with the present intention not to perform").

As indicated above, Defendant offers evidence that supports a reasonable inference that Plaintiff knew it would never reach the monthly demand it was projecting and that Plaintiff's alleged representations of forecasted monthly demand were material to Defendant's decision to agree to the provisions of the Supply Agreement.[9] "Reliance is justifiable where the misrepresentation is material." *St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins.*, 742 P.2d 808, 817 (Ariz. 1987) (holding that party reasonably relied on misrepresentation because misrepresentation was material); *see Maki v. N. Sky Partners II LP*, No. CV-15-02625-PHX-SRB, 2017 WL 10128386, at *6 (D. Ariz. Dec. 11, 2017) ("Yet justifiability is effectively subsumed into the materiality inquiry." (quoting *Sitton v. Deutsche Bank Nat'l Tr. Co.*, 311 P.3d 237, 243 ¶ 31 (Ariz. Ct. App. 2013))). Plaintiff has

---

[9] Plaintiff objects to statements in Susumu Nukii's declaration (Doc. 192) and Takahiro Hasegawa's declaration (Doc. 191) relating to whether Defendant took part in creating the forecasts that were incorporated into the Supply Agreement. (Doc. 223 at 13–14 n.8). Plaintiff appears to argue that Nukii and Hasegawa lack personal knowledge on this subject. (*Id.*) But, Plaintiff indicates that Defendant identified Hasegawa as being a participant in the negotiation of the Supply Agreement. (*Id.*). Because Plaintiff effectively acknowledges Hasegawa took part in the Supply Agreement negotiations, the objection to Hasegawa's statements is overruled, and thus, the objection to Nukii's statements on this topic is rendered moot for purposes of deciding Plaintiff's Motion for Partial Summary Judgment (Doc. 153).

not shown, based on the undisputed material facts, that Defendant cannot establish at trial that it had a right to rely on Plaintiff's alleged representations.[10]

Accordingly, because there are genuine disputed issues of material fact on the elements of Defendant's fraud counterclaim, Plaintiff's motion for summary judgment on this counterclaim is denied.[11]

### 2.     Breach of Contract Counterclaims

Plaintiff asserts it is entitled to summary judgment on Defendant's breach of contract counterclaims. (Doc. 153 at 13–21). Defendant alleges that Plaintiff breached the Supply Agreement by failing to make timely payments ("Late Payment Counterclaim"). (Doc. 28 at 47–48). Defendant also alleges Plaintiff breached the Supply Agreement by failing to pay invoices ("No Payment Counterclaim"). (*Id.* at 48–49).

Preliminarily, the Supply Agreement provides that New York law governs the Supply Agreement. (Doc. 59-1 at 9 (§ 9.2 of the Supply Agreement)). To prevail on a breach of contract action under New York law, a plaintiff must show "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." *Harris v. Seward Park Hous. Corp.*, 913 N.Y.S.2d 161, 162 (App. Div. 2010).

### A.     Late Payment Counterclaim

Plaintiff makes three general arguments in support of its claim that it is entitled to summary judgment on the Late Payment Counterclaim. First, Plaintiff argues that

---

[10] Plaintiff also seems to argue that Defendant did not have a right to rely on the projections in deciding whether to enter the Supply Agreement because Defendant understood the projections of monthly demand were not guarantees. (Doc. 153 at 9–10; Doc. 193 at 6–7). Plaintiff then cites a bevy of quotes from discovery that it suggests support this proposition. (Doc. 153 at 9–10; Doc. 193 at 6–8). Though it may be understood that Plaintiff's projections were not guarantees, this undisputed fact does not prevent Defendant from establishing that Plaintiff's projections were representations, and, if so, whether Defendant had a right to rely on them. *See Anderson*, 477 U.S. at 247–48; *cf. Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469, 1475 n.4 (9th Cir. 1994) (concluding that a dispute of fact was not material when it was not dispositive to court's legal analysis).

[11] Plaintiff did not raise arguments as to whether Defendant can establish the fourth, fifth, sixth, or ninth element of its fraud claim. As such, Plaintiff has failed to shift the burden to Defendant on these elements because Plaintiff, as the movant, must show that the Defendant, as the nonmovant, will be unable to establish a genuine issue of material fact as to these elements.

Defendant committed material breaches of the Supply Agreement that excused Plaintiff from further performance, including having to pay any invoice on time. (Doc. 153 at 13–16). Second, Plaintiff contends that it did not breach the Supply Agreement as a matter of law based on the undisputed facts. (*Id.* at 16–17). Third, Plaintiff claims Defendant waived the right to timely payment. (*Id.* at 17–19). The Court evaluates each argument in turn.

### i.  Material Breach

If a party commits a material breach, the other party is excused from further performance. *See Hadden v. Consol. Edison Co. of N.Y.*, 312 N.E.2d 445, 449 (N.Y. 1974); *Markham Gardens L.P. v. 511 9th LLC*, 954 N.Y.S.2d 811, 815 (Sup. Ct. 2012). But, when a material breach occurs, the party must elect to either terminate the contract or to continue under it. *Awards.com, LLC v. Kinko's, Inc.*, 834 N.Y.S.2d 147, 156 (App. Div. 2007). If it chooses the latter, "it loses its right to terminate the contract because of the default." *Id.*

A breach is material when it is "so substantial that it defeats the object of the parties in making the contract." *In re Dissolution of Ongweoweh Corp.*, 14 N.Y.S.3d 212, 213 (App. Div. 2015); *Residential Holdings III LLC v. Archstone-Smith Operating Tr.*, 920 N.Y.S.2d 349, 352 (App. Div. 2011) (stating that a breach is not material unless "the act failed to be performed [goes] to the root of the contract or . . . render[s] the performance of the rest of the contract a thing different in substance from that which was contracted for" (alterations in original)). Whether a breach is material is generally a question of fact for the jury that precludes summary judgment. *See F. Garofalo Elec. Co. v. N.Y. Univ.*, 754 N.Y.S.2d 227, 230 (App. Div. 2002); *see also Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*, 361 F. Supp. 2d 283, 295 (S.D.N.Y. 2005) ("[T]he question of materiality of breach is a mixed question of fact and law—usually more of the former and less of the latter—and thus is not properly disposed of by summary judgment."). Therefore, because Plaintiff suggests that Defendant's breach of contract claim is barred due to Defendant's alleged material breaches of the Supply Agreement, which is a question of fact that the Court cannot determine on summary judgment, this argument fails.

## ii.    No Breach

Plaintiff also contends that Defendant cannot show breach of the Supply Agreement. There are thirty-three invoices that Defendant alleges Plaintiff did not pay on time that serve as the basis of its breach of contract claim for late payments.

Plaintiff argues that one of the invoices that it did not pay on time "is not covered by the Supply Agreement" because it "relates to cavity lid wafer process," which is not an SJ MOSFET product. (Doc. 153 at 16). Although Defendant agrees that this invoice relates to cavity lid wafer process, (Doc. 193 at 11), Defendant asserts that this invoice is nonetheless covered by the Supply Agreement but provides no evidence to support this assertion. (Doc. 189 at 20). The Court finds that Defendant did not carry its burden in rebutting Plaintiff's argument that the Supply Agreement does not apply to this invoice (No. MD140611OM150514). Defendant, as the nonmovant, "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87 (quoting Fed. R. Civ. P. 56(e) (1963)). Accordingly, the Court grants summary judgment on this issue in favor of Plaintiff.

Plaintiff also claims it did not breach the Supply Agreement by failing to pay Invoice No. MD140401-2. (Doc. 153 at 16). Plaintiff specifically argues that this invoice relates to development costs and that Defendant is required to pay all development costs under § 4.2.1 of the Supply Agreement, which relieved Plaintiff of any duty to pay Invoice No. MD140401-2 under the Supply Agreement. (*Id.*). However, it is unclear what "fully resource the development of all generations of Super Junction MOSFETs" means under § 4.2.1 of the Supply Agreement. (*See* Doc. 59-1 at 6). In other words, this provision is ambiguous. Indeed, neither party even attempted to provide the Court with an argument as to whether the provision applies to Invoice No. MD14040401-2 based on a reasonable construction of § 4.2.1.[12] Thus, there is a dispute of material fact as to whether Plaintiff

---

[12] Section 4.2.1 of the Supply Agreement is also at issue in Defendant's Motion for Partial Summary Judgment (Doc. 229). The parties do offer conflicting interpretations of the provision within that discussion, as will be discussed. *Infra* Section III.b.1.C.

breached the Supply Agreement by not paying Invoice No. MD140401-2. *See Five Corners Car Wash, Inc. v. Minrod Realty Corp.*, 20 N.Y.S.3d 578, 579 (App. Div. 2015).

Finally, Plaintiff contends it was not required to pay for any late paid invoices where the invoice is for a lot that Plaintiff asserts it was not required to pay for under the Supply Agreement. (Doc. 153 at 16–17). Specifically, Plaintiff argues that the Supply Agreement required that Defendant meet a target yield[13] of eighty percent for each lot and that certain lots did not meet this alleged requirement. (*Id.*). Thus, Plaintiff claims it does not need to pay invoices relating to the lots that did not meet the target yield requirement. (*See id.*). Defendant responds that there was no agreement that it needed to meet an eighty-percent target yield, and even if there was, such a requirement would not relieve Plaintiff of its duty to pay. (Doc. 189 at 20–21; Doc. 191 at 1–2 ("There was never any agreement reached on the meaning of 'Target Yield[]' . . . .")).

The parties therefore dispute whether there was an agreement on target yield, (Doc. 193 at 16–17), which precludes the Court from granting summary judgment. And, even if Plaintiff is correct that there was an agreement as to target yield, as noted above, a party is only relieved from performance of a contractual provision if the other party commits a material breach. *See supra* Section III.a.2.A.i. Under New York law, Plaintiff is not relieved from timely payment of invoices unless Defendant's failure to produce lots with a target yield of eighty percent—assuming that this requirement exists under the Supply Agreement—constituted a material breach, which creates another dispute of material fact that the Court cannot answer on summary judgment. *See supra* Section III.a.2.A.i. In short, Plaintiff, as the movant, has not carried its burden of establishing that there are no disputes of material fact relating to whether Defendant has failed to establish breach of the Supply Agreement for invoices that relate to SJ MOSFET lots that Plaintiff claims were below eighty-percent target yield.

---

[13] The Supply Agreement defines "Target Yield" as "an average number of good Products resulting from production wafers which shall be agreed between [Plaintiff] and [Defendant]." (Docket 59-1 at 4 (§ 1.0 of the Supply Agreement)).

### iii.    Waiver

The Court also rejects Plaintiff's argument that Defendant waived the requirement for timely payment "by repeatedly and knowingly accepting late payments from [Plaintiff] over an extended period of time." (Doc. 153 at 17–18). The Supply Agreement specifies, "No term or condition of this A[greement] shall be deemed waived unless such a waiver is in a writing executed by the Party against whom the waiver is sought to be enforced." (Doc. 59-1 at 9 (§ 9.1 of the Supply Agreement)). Non-waiver clauses are "uniformly enforced" under New York law. *Awards.com, LLC*, 834 N.Y.S.2d at 155–56 (holding that contractual provision specifying there was no waiver of a provision of the contract unless the provision was waived in writing meant that acceptance of late payments did not effectuate a waiver of the requirement for timely payments). Plaintiff has offered no evidence that Defendant waived timely payment in writing. Moreover, whether a party waived a contractual provision is a question of fact for the jury because the party asserting waiver must show that there was an intent to waive. *See Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006). Thus, Plaintiff has not shown it is entitled to summary judgment on the Late Payment Counterclaim as a result of waiver.

### B.    No Payment Counterclaim

Plaintiff also contends that it is entitled to summary judgment on the No Payment Counterclaim for invoices Defendant alleges Plaintiff did not pay. (Doc. 153 at 19–21). First, the Court again denies summary judgment to Plaintiff on its argument that it was not required to pay these invoices because the lots were below the eighty-percent target yield it claims Defendant was required to meet or because Defendant did not timely produce the lots. *Supra* Section III.a.2.A.ii; (*see* Doc. 153 at 19–20). Second, Plaintiff's argument that it is entitled to summary judgment because Defendant said Plaintiff did not have to pay these invoices fails as well. (Doc. 153 at 19–21). Plaintiff states that Defendant agreed that Plaintiff would not have to pay for these two invoices if Plaintiff destroyed the lots. (*Id.* at 20). No proof has been offered that Plaintiff destroyed the lots. (*See id.* at 19–21; Doc. 153-

21 at 8–11; Doc. 189 at 22; Doc. 193 at 19). Thus, there are disputed issues of material fact that preclude summary judgment on the No Payment Counterclaim.

### 3.    Conclusion

Accordingly, the Court grants summary judgment in Plaintiff's favor on Defendant's breach of contract counterclaim for Invoice No. MD140611OM150514 for the reason specified above. The Court denies summary judgment as to the rest of Defendant's counterclaims.

### b.    Defendant's Motion for Partial Summary Judgment

Defendant seeks summary judgment on Plaintiff's claims for lost profits damages, lost business value damages, and lost development support cost damages which Plaintiff asserts arise from its breach of contract claim. (Doc. 229 at 9–22). Defendant also asserts summary judgment must be entered on Plaintiff's fraud claim. (*Id.* at 22).

### 1.    Breach of Contract Claim

Defendant only asserts that certain types of damages Plaintiff seeks for its breach of contract claim are unavailable, not that summary judgment is appropriate on Plaintiff's breach of contract claim in toto. The Court will evaluate each type of damages Defendant asserts is unavailable here in turn.

As the Court has noted, New York law governs the Supply Agreement. *See supra* Section III.a.2. There are two overarching classifications of damages that can arise from a breach of contract under New York law. First, "the nonbreaching party may recover general damages which are the natural and probable consequence of the breach." *Yenrab, Inc. v. 794 Linden Realty, LLC*, 892 N.Y.S.2d 105, 110 (App. Div. 2009). Second, a party may recover "'special' or extraordinary damages that do not flow directly from the breach." *Id.* A party seeking special damages must "plead that the damages were foreseeable and within 'the contemplation of the parties at the time the contract was made.'" *Id.* (quoting *Am. List Corp. v. U.S. News & World Report*, 549 N.E.2d 1161, 1164 (N.Y. 1989)).

### A. Lost Profits Damages Claim

"A claim for lost profits is generally a claim for special or extraordinary damages." *Yenrab, Inc.*, 892 N.Y.S.2d at 110. Therefore, lost profits must be foreseeable, and the party must show that lost profits were in "the contemplation of the parties at the time the contract was made." *Id.* Moreover, the party must establish lost profits with reasonable certainty. *Ashland Mgmt. Inc. v. Janien*, 624 N.E.2d 1007, 1011 (N.Y. 1993); *Kenford Co. v. Erie County*, 493 N.E.2d 234, 235 (N.Y. 1986) (per curiam). Therefore, the Court must evaluate whether Plaintiff's lost profits damages claim is capable of proof with reasonable certainty and that lost profits were foreseeable from breach and that they were within the contemplation of the parties when the Supply Agreement was made. *Kenford Co.*, 493 N.E.2d at 235; *see also Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013) ("Under New York law, in order to recover lost profits [the plaintiff] must prove that '(1) the damages were caused by the breach; (2) the alleged loss must be capable of proof with reasonable certainty, and (3) the particular damages were within the contemplation of the parties to the contract at the time it was made.'").

A party must show lost profit damages are "reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes." *Kenford Co.*, 493 N.E.2d at 235. Lost profit damages cannot be "merely speculative, possible or imaginary." *Id.* Generally, because a new business does not have "a reasonable basis of experience," a new business seeking lost profits must establish them under "a stricter standard." *See id.*; *Blinds to Go (U.S.), Inc. v. Times Plaza Dev., L.P.*, 931 N.Y.S.2d 105, 108 (App. Div. 2011); *see also Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 332 (2d Cir. 1993) (articulating same standard). This stricter standard requires a new business to "meet a higher evidentiary burden" than an established business. *Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp. N.V.*, 28 F. Supp. 2d 126, 131 (S.D.N.Y. 1998). In other words, "[w]hether a business is a 'new venture' or an ongoing operation of course will affect the quantity and quality of evidence relied upon by a plaintiff to prove lost future profits with 'reasonable certainty'" *Washington v. Kellwood Co.*, No. 05CV10034 MHD,

2015 WL 6437456, at *24 (S.D.N.Y. Oct. 14, 2015) (quoting *Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F. Supp. 1051, 1066 (S.D.N.Y. 1996)).

As such, the first question is whether Plaintiff's sale of SJ MOSFETs constituted a new business or venture. Plaintiff argues because it had been in business for years at the time of Defendant's alleged breach, it does not constitute a new business. (*See* Doc. 306 at 9–10). Defendant responds that "New York law requires a track record of profits" in the relevant market to support lost profits or the party is a new business. (Doc. 327 at 7–8).

An established business that attempts to enter into a new or different market is a new business. *See Blinds to Go (U.S.), Inc.*, 931 N.Y.S.2d at 108. For example, in *Blinds to Go (U.S.), Inc. v. Times Plaza Development*, the plaintiff operated a chain of stores. *Id.* at 107–08. A lease dispute arose between plaintiff and defendant, and plaintiff was left without space to sell its product in a new location that it had not sold in previously. *Id.* at 107. Plaintiff sought lost profit damages it asserted arose from that dispute. *See id.* The court found that the plaintiff's assertion that it was attempting "to break into a new market" illustrated it was a new business. *See id.* at 108; *see also Ho Myung Moolsan, Co. v. Manitou Mineral Water, Inc.*, No. 07 CIV.07483 RJH, 2010 WL 4892646, at *7 n.3 (S.D.N.Y. Dec. 2, 2010) ("The critical newness is not of the business itself or of the logistical foundations for sales, but for the attempt to sell a new product." (citing *Aviation Inc.*, 937 F. Supp. at 1068)).

Because Plaintiff was also breaking into a new market, it must be considered a new business. It is undisputed that Plaintiff never sold its SJ MOSFET until July 2011 and that Plaintiff was attempting to enter the Chinese SJ MOSFET market. (Doc. 308 at 33, 36). And importantly, Plaintiff has not offered any proof of a history of profit in the SJ MOSFET market. (*Id.* at 47). Plaintiff even notes in its Response to the Motion that it "was a new entrant to the SJ MOSFET market." (Doc. 306 at 14). Thus, just as in *Blinds to Go (U.S.), Inc.*, here, Plaintiff is a new business under New York law because it is breaking into a new market, and the Court must apply the stricter evidentiary standard.

When a business is new, projections of future profit typically will not be enough to establish reasonable certainty. *Kenford Co.*, 493 N.E.2d at 236. Indeed, in *Kenford Co. v. Erie County*, the New York Court of Appeals concluded, "despite [a] massive quantity of expert proof" that it found was reliable, the experts' projections of future profit were not sufficient to establish reasonable certainty as to lost profit damages. *Id.* The experts based their projections of profits on the following hypothetical scenario: "that the facility was completed, available for use and successfully operated by [the plaintiff] for 20 years, providing professional sporting events and other forms of entertainment, as well as hosting meetings, conventions and related commercial gatherings." *Id.* The court held that this type of speculation requiring a "multitude of assumptions" did not establish "proof with reasonable certainty" of lost profits. *Id.*

To establish reasonable certainty, a new business must generally support its lost profits damages claim with evidence of a history of profit or comparison of the new business with other comparable and profitable businesses. *See, e.g.*, *Schonfeld v. Hilliard*, 218 F.3d 164, 173–75 (2d Cir. 2000); *Blinds to Go (U.S.), Inc.*, 931 N.Y.S.2d at 108–09; *Vasquez v. Gesher Realty Corp.*, 985 N.Y.S.2d 819, 821 (App. Term. 2014) (per curiam). Moreover, a new business must account for "general market risks" that might negatively affect its future profits, such as: "(1) the entry of competitors; (2) technological developments; (3) regulatory changes; or (4) general market movements." *Schonfeld*, 218 F.3d at 174–75; *see also Trademark Research Corp.*, 995 F.2d at 333 ("On this record, the future of the CD-ROM market is subject to too many uncertain variables to project lost profits with the requisite certainty.").

Plaintiff has offered insufficient proof to show lost profit damages with reasonable certainty. Plaintiff's principal support for lost profits is the projections of its president, Sam Anderson ("Anderson"), and its experts Walter Bratic ("Bratic") and Uzi Sasson ("Sasson").[14] (Doc. 306 at 12–14). But, for a new business, like Plaintiff, projections are

---

[14] Plaintiff also apparently offers the fact that its business valuation expert, Greg Mischou, "so believed in [Plaintiff] and its products that he spent years working to help the company raise capital with no guarantee of any compensation unless he was successful" to show

generally not sufficient under New York law to establish lost profits with reasonable certainty. At bottom, if the "massive quantity of expert proof" behind the projections in *Kenford Co.* was not enough for the New York Court of Appeals to find reasonable certainty of lost profits there, then the opinion of Anderson and the expert testimony that relied upon it certainly cannot establish lost profits with reasonable certainty here.

Indeed, Plaintiff has failed to show a history of lost profits or any comparison with the profitability of other like ventures or businesses. It is undisputed that Plaintiff's lost profits experts failed to make comparisons between IceMOS and its competitors. Sasson failed to compare IceMOS to its competitors or Plaintiff's product to any of its competitors' products. (Doc. 308 at 35–36). Similarly, Bratic did not compare the efficacy of Plaintiff's product to competitors' products, its sale resources to competitors, any of its competitor's entry to the MOSFET marketplace, or how Plaintiff would have competed with its competitors. (*Id.* at 44). Without a history of profit or evidence showing the profitability of other like-businesses, Plaintiff cannot establish lost profit damages with the reasonable certainty New York law requires for new businesses.

It is also unclear if Plaintiff accounted for various factors that could affect its ability to make profit. Plaintiff stated, "a semiconductor-industry sales forecast . . . depends upon actions of third parties beyond the control of the forecaster." (Doc. 232-22 at 3). Plaintiff went on to say that these third parties include the buyers of the product, competitors who could introduce new products, and new market entrants that could cause Plaintiff to reduce the price for its product. (*Id.*) Plaintiff also suggested it may be required "to take other actions to preserve customer relationships," another scenario that could affects its ability to meet its projections. (*Id.*). Plaintiff noted that economic recession, supply disruptions, and "a myriad of other natural and man-made events" could affect its ability to make a profit on its product as well. (*See id.* at 4). A party's failure to account for "general market risks," such as "(1) the entry of competitors; (2) technological developments; (3) regulatory changes; or (4) general market movements," precludes a finding of

reasonable certainty of lost profits. (Doc. 306 at 14). As the case law above indicates, this fact cannot be proof of Plaintiff's lost profits claim.

reasonable certainty. *Schonfeld*, 218 F.3d at 174–75. Indeed, in *Trademark Research Co.*, the court concluded the uncertainty in the market and the plaintiff's failure to account for this uncertainty rendered lost profits damages too uncertain. Similarly here, Plaintiff cannot show the requisite certainty necessary to establish lost profit damages given the uncertainty that the above factors could foster that even Plaintiff recognizes are "beyond [its] control." (Doc. 232-22 at 3–4).

In sum, the Court concludes Plaintiff did not establish lost profit damages with reasonable certainty. As a new business, Plaintiff may not rely solely on projections but instead must offer proof of profitability to establish lost profits with reasonable certainty. Thus, Plaintiff's lost profit damages claim is simply too speculative to survive Defendant's summary judgment motion.

Nonetheless, Plaintiff argues that it could rely on its projections to establish lost profits damages with reasonable certainty because it has been an established business. (Doc. 306 at 14). Plaintiff contends that *Kenford Co.* and its progeny turned on the fact that, in those cases, evidence of lost profit "was based on products that never existed or businesses that never operated," and therefore, Plaintiff should not be classified as a new business. (*Id.*). Not so. As noted above, when an established company enters into a new market, it must show lost profits under the heightened evidentiary burden that New York law applies to new businesses. *See, e.g.*, *Blinds to Go (U.S.), Inc.*, 931 N.Y.S.2d at 108.

But, even if the Court assumes Plaintiff is correct, Plaintiff still must prove lost profit damages with reasonable certainty. *Ashland Mgmt. Inc.*, 624 N.E.2d at 1011 ("Whether the claim involves an established business or a new business, however, the test remains the same, i.e., whether future profits can be calculated with reasonable certainty."). While a party can approximate lost profits damages, the approximation must be "based upon known reliable factors without undue speculation." *Id.* at 1010–11 (citations omitted); *cf. Uncas Int'l LLC v. Crimzon Rose, Inc.*, No. 16 CIV. 9610 (JSR), 2017 WL 2839668, at *7 (S.D.N.Y. June 26, 2017) (noting a court can dismiss a claim for lost profit damages where it "would require an unreasonable level of speculation"). "[P]rojections of future

profits" based upon assumptions that require "speculation and conjecture" do not establish reasonable certainty of lost profit damages. *Louis Hornick & Co. v. Darbyco, Inc.*, No. 12CV5892 (VSB) (DCF), 2015 WL 13745787, at *7–8 (S.D.N.Y. Aug. 19, 2015) (citation omitted) (concluding that plaintiff's claim for lost profits was not reasonably certain because plaintiff failed to provide any data behind its projections of profit despite plaintiff having "a successful and established product line"), *adopted*, No. 12-CV-5892 (VSB), 2015 WL 9478239 (S.D.N.Y. Dec. 29, 2015).

Thus, Plaintiff has failed to establish lost profits with reasonable certainty even if the Court assumes it was not a new business for the same reasons the Court articulated above. Plaintiff has not cited to any reliable evidence in support of its lost profits damages. Its experts' opinions are laden with assumptions, and Plaintiff has failed to connect any quantifiable data to its projections of lost profits, just like the plaintiff in *Louis Hornick & Co.*, rendering its lost profit damages claim not reasonably certain. As noted above, the principal support for Plaintiff's lost profits damages is projections, and Plaintiff itself recognizes the numerous factors that are beyond its control that could affect the accuracy of these projections, rendering the projections too speculative to support lost profit damages with reasonable certainty.

Plaintiff highlighted *Ashland Management* at oral argument; however, *Ashland Management* provides Plaintiff no refuge from the speculativeness of its lost profits claim. Indeed, *Ashland Management* illustrates exactly why Plaintiff cannot establish its lost profits claim with reasonable certainty. In *Ashland Management*, the court determined that the projection of future profits there was not only based on the "parties' carefully studied professional judgments" but also that the company had a "substantial presence" in the market for "several years" and the venture was part of a strategy that had a strong track record, among other things. 624 N.E.2d at 1012. Thus, the projections in *Ashland Management* were unlike the speculative nature of the projections in *Kenford Co.*, which were marred by "speculative assumptions and few known factors." *Id.* (citing *Kenford Co.*, 493 N.E.2d at 236). The court made clear that reasonable certainty requires that "damages

be capable of measurement based upon known reliable factors without undue speculation." *Id.* at 1010. At bottom, the key takeaway from *Ashland Management* is that a lost profits claim cannot be based on projections of profit that are built on assumptions and speculation. *See id.*

Accordingly, Plaintiff's claim for lost profits fails under *Ashland Management*. Plaintiff's projections of future profit include far too many speculative assumptions and few, if any, known factors to establish its claim with reasonable certainty. Plaintiff has not had a "substantial presence" in the Chinese SJ MOSFET market for years; rather, Plaintiff referred to itself as "a new entrant to the SJ MOSFET market." (Doc. 306 at 14); *see Ashland Mgmt.*, 624 N.E.2d at 1012. Nor are Plaintiff's projections based on the reliable track record that helped establish reasonable certainty in *Ashland Management*. As noted, Plaintiff has failed to show that its SJ MOSFET had a history of profit and Plaintiff recognized the numerous factors beyond its control that could affect its ability to make profit on its product. Thus, *Ashland Management* shows why Plaintiff's lost profit claim fails.

The newness of the business only affects the quantity and quality of the evidence Plaintiff must offer to establish its lost profits claim. Because Plaintiff has not cited sufficient reliable evidence on which to base its lost profits damages claim, its claim is not based on the reasonable certainty that New York law demands, and summary judgment will be granted in favor of Defendant on this claim. Given this conclusion, the Court need not determine whether these damages were foreseeable or within the contemplation of the parties when the Supply Agreement was formed.

### B.    Lost Business Value Damages Claim

Defendant argues that lost business value damages are unavailable because IceMOS was not destroyed, Plaintiff cannot prove lost valuation with reasonable certainty, and that lost business value damages were not within the contemplation of the parties or foreseeable from breach. (Doc. 229 at 18–20). Because the Court concludes that Plaintiff has failed to establish business value damages with reasonable certainty, it need not address whether

these damages were within the contemplation of the parties or whether these damages were foreseeable from breach.

"[T]he 'most accurate and immediate measure of damages'" of a new business can be its "market value . . . at the time of breach." *Washington v. Kellwood Co.*, 714 F. App'x 35, 41 (2d Cir. 2017) (ellipsis in original) (citation omitted). Fair market value is usually determined by calculating "capitalization of expected future profits." *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 566 F. Supp. 2d 305, 317 (S.D.N.Y. 2008); *see also Matter of Seagroatt Floral Co., Inc.*, 583 N.E.2d 287, 290 (N.Y. 1991). Calculating lost business value based on its market value at the time of breach is "inherently less speculative" than measuring damages through lost profits because it is "measured by proof of 'what a buyer is willing to pay for *the chance*' that the business will produce substantial income." *Washington*, 714 F. App'x at 41 (quoting *Schonfeld*, 218 F.3d at 177). However, a party must still show lost business value damages with reasonable certainty because lost business value damages are special damages. *Id.*; *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 129–30 (N.Y. 2008). To do so a party must typically offer a history of profit. *See 24/7 Records, Inc.*, 566 F. Supp. 2d at 316–17 (rejecting that past revenue was sufficient to establish lost business value damages with reasonable certainty given that business was unprofitable for a year-and-a-half); *S.A.B. Enters., Inc. v. Village of Athens*, 564 N.Y.S.2d 817, 822 (App. Div. 1991) (rejecting plaintiff's lost business value damages calculation because it was not based on proof of profit); *cf. In re Ford*, 312 N.Y.S.2d 966, 973 (App. Div. 1970) (noting, in litigation involving valuation of businesses that had been condemned by the government, that basing business valuation on "hypothetical future profits" is too speculative to establish lost business value).

///

///

///

///

///

It is undisputed that Plaintiff's lost business value damages expert, Greg Mischou ("Mischou"),[15] based his business valuation on revenue projections for 2017 and 2018 that he made in 2014. (Doc. 308 at 50–52). Mischou's expert report reads:

> In summary, in 2014, based on Comparable M&A Transactions analysis, I determined that a conservative financial valuation base for IceMOS in a M&A transaction would be 1.9 to 4.1 times revenue, resulting in a value range based on [Plaintiff]'s financial forecast of [redacted] for 2017 and extending this analysis to [Plaintiff's] 2018 projected revenues results in a transaction valuation range of [redacted] for 2018. Likewise, based on Comparable Public Company Valuation analysis, a conservative financial valuation base for IceMOS in a company sale would be [redacted] times revenue, resulting in a value range of [redacted] for 2017 and [redacted] for 2018.

(Doc. 296-4 at 16). Consequently, Plaintiff's lost business value damages claim is speculative because it is based on hypothetical future revenue without any proof of profit. As discussed *supra* Section III.b.1.A., it is undisputed that Plaintiff had no history of profit at the time of the alleged breach. (Doc. 308 at 33, 36). Plaintiff points to no other relevant evidence in support of its lost business value damages that overcomes this fact. Thus, because Plaintiff's lost business value claim is based only on projections and because Plaintiff has failed to establish a history of profit, Plaintiff has not established lost business value damages with reasonable certainty. Accordingly, the Court grants the motion for summary judgment as to Plaintiff's lost business value damages claim.[16]

---

[15] Although the Court grants Defendant's motion to exclude Mischou's expert testimony (Doc. 296) due to the Court's conclusion that lost business value damages are unavailable as discussed below, *infra* Section IV, the Court assumes, for purposes of analyzing whether lost business value damages are available, that Mischou's expert testimony is reliable.

[16] Given this conclusion, the Court will not address Defendant's claim that lost business value damages are only available under New York law where a business is destroyed. (Doc. 229 at 18–19). *But see Stanacard, LLC v. Rubard LLC*, No. 12 CIV. 5176 (CM), 2016 WL 6820741, at *4 (S.D.N.Y. Nov. 10, 2016) (indicating lost business value damages would be available where business was "almost completely destroyed"); Kenneth M. Kolaski & Mark Kuga, *Measuring Commercial Damages via Lost Profits or Loss of Business Value: Are these Measures Redundant or Distinguishable?*, 18 J.L. & Comm. 1, 5 n.8 (1998) (noting business value damages may be available where business was "permanently damaged").

## C.    Lost Development Support Damages Claim

Defendant asserts that Plaintiff's claim for lost development support damages are unavailable because: (1) Plaintiff has failed to show any damage, (2) lost development support damages were not foreseeable, and (3) Plaintiff has not offered proof that shows lost development support damages with reasonable certainty. (Doc. 229 at 20). Plaintiff responds that there is a genuine issue of material fact as to whether Defendant "was contractually obligated to provide developmental support for various generations of the SJ MOSFET." (Doc. 306 at 21). Plaintiff's claim for lost development support damages is grounded in a provision in the Supply Agreement that provides, "[Defendant] agrees to fully resource the development of all generations of Super Junction MOSFETs as indicated in Exhibit B2, through the duration of this A[greement]." (Doc. 59-1 at 6 (§ 4.2.1 of the Supply Agreement)).

If a contract's language is ambiguous, there is a material dispute of fact that the court cannot resolve on a motion for summary judgment. *Five Corners Car Wash, Inc.*, 20 N.Y.S.3d at 579. Whether a contract's language is ambiguous must be determined by the court. *See Amusement Bus. Underwriters, a Div. of Bingham & Bingham, Inc. v. Am. Int'l Grp., Inc.*, 489 N.E.2d 729, 732 (N.Y. 1985). A contract is ambiguous "when specific language is 'susceptible of two reasonable interpretations.'" *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014) (citation omitted).

Defendant asserts that the phrase "fully resource" merely refers to Defendant's obligations as a foundry, not that Defendant must pay for development support costs. (Doc. 327 at 18). Plaintiff responds that "fully resource" could include development support costs. (Doc. 306 at 19). Thus, Plaintiff claims there is a genuine issue of material fact that precludes summary judgment. (*Id.*). Plaintiff also contends that whether these development support costs are general or special damages is a question of fact that is not properly before the Court on a motion for summary judgment. (*Id.* at 19–20).

"Resource" means "[t]o provide or supply with resources." Resource, *Oxford English Dictionary* (3d ed. 2010). "Resources" are "[s]tocks or reserves of money,

- 29 -

materials, people, or some other asset, which can be drawn on when necessary." Resources, *Oxford English Dictionary*, *supra*. Given these definitions, Plaintiff's interpretation, based on the text of § 4.2.1 of the Supply Agreement, is not foreclosed as a matter of law because "to resource" includes providing monetary support when necessary. As such, there is a genuine issue of material fact because the term "fully resource" is ambiguous.

Additionally, just as Plaintiff suggests, this genuine issue of material fact precludes the Court from deciding whether Plaintiff's claimed development support damages are general or special. If Plaintiff's interpretation of the provision prevails, then it may be that lost development costs are the natural and probable consequence of breach of the Supply Agreement. *Yenrab, Inc.*, 892 N.Y.S.2d at 110. Defendant's criticism that Plaintiff has not offered sufficient evidentiary support for the specific amount of damages Plaintiff claims as its lost development support costs cannot be resolved on a motion for summary judgment. *See Anderson*, 477 U.S. at 248 (stating "[a]ny proof or evidentiary requirements imposed by the substantive law are not germane" to the materiality analysis).

In short, because there is a genuine issue of material fact as to what Defendant's obligations under the Supply Agreement were as to development support costs, the Court cannot grant summary judgment on Plaintiff's claim for these damages.

## 2. Fraud Claim

Defendant also moves for summary judgment on Plaintiff's fraud claim. (Doc. 229 at 22). Defendant argues that the fraud claim is barred by the economic loss doctrine because the subject matter of Plaintiff's fraud claim relates only to issues regarding the Supply Agreement. (*Id.*). Plaintiff responds that the economic loss doctrine does not apply here because it asserts the doctrine is generally inapplicable to fraud claims and because it claims its "damages directly relate to losses caused by fraudulent conduct that is unrelated to [Defendant]'s performance of the Supply Agreement." (Doc. 306 at 21–23).[17]

---

[17] Plaintiff's Response violated District of Arizona Local Rule of Civil Procedure 7.2(e)(1), which provides that a response may only be seventeen pages. Plaintiff's brief is eighteen pages. Although Defendant argues that the Court should strike the entirety of Plaintiff's argument on why the economic loss doctrine does not apply here, (Doc. 327 at 19–20), the Court has wide discretion on whether to sanction a party for violation of Local Rule 7.2(e). *See Christian v. Mattel, Inc.*, 286 F.3d 1118, 1129 (9th Cir. 2002). The Court finds no

As the Court previously noted, Arizona law applies to Plaintiff's fraud claim. (*See* Doc. 25 at 19–20). Under Arizona law, the economic loss doctrine precludes common law tort actions that seek "pecuniary damage[s] not arising from injury to the plaintiff's person or from physical harm to property." *Sullivan v. Pulte Home Corp.*, 306 P.3d 1, 3 ¶ 8 (Ariz. 2013) (alteration in original) (citation omitted). Thus, a contracting party is limited to contractual remedies for the recovery of purely economic loss that is not accompanied by physical injury to persons or other property. *Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 P.3d 664, 667 ¶ 12 (Ariz. 2010). "Economic loss" is "pecuniary or commercial damage, including any decreased value or repair costs for a product or property that is itself the subject of a contract between the plaintiff and defendant, and consequential damages such as lost profits." *Id.* ¶ 11.

The rationale behind the economic loss doctrine is that contract law better protects a party's expectations while tort law is designed to protect the safety of persons and property. *See Gilbert Unified Sch. Dist. No. 41 v. CrossPointe, LLC*, No. CV 11-00510-PHX-NVW, 2012 WL 1564660, at *4–5 (D. Ariz. May 2, 2012) (citing *Flagstaff Affordable Hous. Ltd. P'ship*, 223 P.3d at 667 ¶¶ 11–12). To determine whether the economic loss doctrine applies, the court must analyze "whether the facts preponderate in favor of the application of tort law or commercial law exclusively or a combination of the two." *Salt River Project Agric. Improvement & Power Dist. v. Westinghouse Elec. Corp.*, 694 P.2d 198, 210 (Ariz. 1984). When the allegations underlying a tort claim "are inseparable from the essence of the contractual agreement," the court should apply contract law rather than tort law because the facts preponderate in favor of applying contract law. *CIT Fin. LLC v. Treon, Aguirre, Newman & Norris PA*, No. CV-14-00800-PHX-JAT, 2016 WL 6610604, at *5 (D. Ariz. Nov. 9, 2016) (holding plaintiff's claim was barred by economic loss doctrine because the alleged misrepresentations at the foundation of the

---

sanction is warranted though the Court warns Plaintiff that future rule violations may result in sanctions. *See Kimoto v. McDonald's Corp.*, No. CV063032PSGFMOX, 2007 WL 9711198, at *2 n.1 (C.D. Cal. July 5, 2007).

plaintiff's tort claim were "inseparable from the essence of the contractual agreement"); *Gilbert Unified Sch. Dist. No. 41*, 2012 WL 1564660, at *4–6 (same).

Preliminarily, Plaintiff appears to contend that fraud claims are exempt from the economic loss doctrine. (*See* Doc. 306 at 21–22 ("[T]he ELR should not apply simply because, as a matter of necessity, damages incurred for fraud 'will relate to the subject of the parties' contract.'" (quoting *Jes Solar Co. v. Matinee Energy, Inc.*, No. CV 12-626 TUC DCB, 2015 WL 10943562, at *5 (D. Ariz. Nov. 2, 2015)))). But, the cases Plaintiff cites do not stand for the proposition that a fraud claim is never barred by the economic loss doctrine. For example, in *Jes Solar Co. v. Matinee Energy, Inc.*, the plaintiffs specifically alleged that the defendants there "never intended to perform on the contracts." 2015 WL 10943562, at *5. Therefore, the *Jes Solar Co.* court found that the facts there preponderated in favor of applying tort law because the plaintiffs would not have expected the defendants to have no intention of performing the contracts. *See id.* No such claim is presented here. Arizona law does not otherwise provide for a fraud exception to the economic loss doctrine. *See, e.g.*, *CIT Fin. LLC*, 2016 WL 6610604, at *5 (concluding fraud claim was barred by economic loss doctrine).

The economic loss doctrine bars Plaintiff's fraud claim here because the essence of Plaintiff's breach of contract claim and fraud claim are the same. In short, each of Plaintiff's allegations relating to Defendant's alleged fraudulent misrepresentations concern issues regarding Defendant's performance of various provisions of the Supply Agreement. (Doc. 59 at 35–38). As such, like *CIT Finance LLC*, Plaintiff's fraud claim is inseparable from its breach of contract claim, and thus, the facts preponderate in favor of applying contract law. Moreover, the policy considerations underlying the economic loss doctrine identified above also weigh in favor of applying the doctrine here. Both Plaintiff and Defendant are sophisticated parties that had equal bargaining power, and thus, each party could negotiate and bargain to order their contractual relationship and allocate the risks of breach according to their preferences. *See Gilbert Unified Sch. Dist. No. 41*, 2012 WL 1564660, at *4–5. As a result, there are contractual remedies available to Plaintiff

should Plaintiff show Defendant did not perform its end of the bargained-for Supply Agreement. The fact that Plaintiff seeks punitive damages does not affect this analysis. *See CIT Fin.*, 2016 WL 6610604, at \*5–6. Consequently, the facts here preponderate in favor of applying contract law; thus, Plaintiff's fraud claim is barred by the economic loss doctrine.

### 3.    Conclusion

Accordingly, the Court grants Defendant's Motion for Partial Summary Judgment (Doc. 229) as to Plaintiff's lost profits claim, lost business value claim, and its fraud claim (and thus its prayer for punitive damages as well (Doc. 59 at 38)). The Court denies the Motion as to Plaintiff's development support costs claim. The Court clarifies that this Order does not address any claim for general damages arising from Plaintiff's breach of contract claim.

## IV.    DEFENDANT'S DAUBERT MOTION TO EXCLUDE MISCHOU

As noted above, also pending before the Court is Defendant's Motion to Preclude Testimony of Plaintiff's Expert Greg Mischou (Doc. 296).

A party seeking to offer an expert opinion must show that the opinion satisfies the requirements set forth by Federal Rule of Evidence 702 ("Rule 702"). Rule 702 requires that the court "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). To be relevant, an expert's testimony must fit the case. *See id.* at 591.

Mischou's expert testimony regarding Plaintiff's lost business value damages is now irrelevant in light of the Court's decision that these damages are unavailable. *See supra* Section III.b.1.B. Plaintiff does not identify any other relevant issue Mischou's expert testimony will be offered for. (Doc. 324 at 18–20 (stating that Mischou was "retained merely" to opine on lost business value damages)). Nor is it apparent, based on Mischou's expert report, that his testimony could be offered for any other relevant issue. (*See* Doc. 296-4 at 4 (Mischou's report) (noting that Mischou was "asked to consider and provide [his] opinions regarding the potential value [Plaintiff] would have been able to obtain from

a merger and acquisition or company sale" absent alleged breaches of the Supply Agreement)). As such, Defendant's motion to exclude Mischou as an expert is granted because his expert testimony is irrelevant, and thus, not fit for this case.[18]

## V.    MOTIONS TO SEAL

Plaintiff and Defendant have filed various motions to seal in connection with the partial summary judgment motions (Docs. 153; 229) and Defendant's motion to exclude Mischou from offering expert testimony (Doc. 296). (*See* Docs. 194; 228; 304; 309; 321; 323; 345; 346). Because review of the unredacted materials was unnecessary to the Court's resolution of these motions, the requests to file unredacted versions of these materials into the record are denied as unnecessary. *See Maui Elec. Co. v. Chromalloy Gas Turbine, LLC*, No. CIV. 12-00486 SOM, 2015 WL 1442961, at *16–17 (D. Haw. Mar. 27, 2015). All documents filed lodged under seal will thus remain lodged under seal.

## VI.   CONCLUSION[19]

Based on the foregoing,

**IT IS ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. 153) is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** as to Defendant's breach of contract counterclaim for payment of Invoice No. MD140611OM150514. The Motion is **DENIED** as to Defendant's fraud counterclaim, the Defendant's Late Payment Counterclaim relating to the thirty-two other invoices (i.e., each invoice other than Invoice No. MD140611OM150514), and Defendant's No Payment Counterclaim.

---

[18] Although the Court had previously indicated that granting Defendant's Motion for Partial Summary Judgment on the issue of lost profits damages could be a ground to exclude the expert testimony of Bratic and Sasson, (Doc. 343 at 1 n.1), the parties' briefing on Defendant's motions to exclude Bratic and Sasson did not discuss the other issues that Bratic and Sasson have opined on. (*See* Doc. 293 (motion to exclude Bratic); Doc. 299 (motion to exclude Sasson)). Upon further review of Bratic's expert report (Doc. 293-1) and Sasson's expert report (Doc. 299-1), the Court finds that the expert testimony of Bratic and Sasson may be relevant despite the unavailability of lost profit damages. Accordingly, the Court will rule on Defendant's motions to exclude Bratic and Sasson in a separate order to follow.

[19] To be clear, any claim that is not subject to the parties' motions for partial summary judgment may proceed to trial.

**IT IS FURTHER ORDERED** that Defendant's Motion for Partial Summary Judgment (Doc. 229) is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** as to Plaintiff's lost profits claim, lost business value claim, and fraud claim. The Motion is **DENIED** as to Plaintiff's lost development support costs claim.

**IT IS FURTHER ORDERED** that Defendant's Motion to Preclude Testimony of Plaintiff's Business Valuation Expert Greg Mischou (Doc. 296) is **GRANTED** as his expert testimony is irrelevant.

**IT IS FURTHER ORDERED** that the following motions to seal (Docs. 194; 228; 304; 309; 321; 323; 345; 346) are **DENIED** for the reason indicated above. The Clerk of Court shall not unseal the related documents and shall instead leave Docs. 195; 230; 298; 305; 307; 310; 325; 329; 336 lodged under seal.

Dated this 13th day of November, 2019.

James A. Teilborg
Senior United States District Judge